UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO.  16-10343-ADB |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL L. BABICH, ET. Al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## UNITED STATES' CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS IN LIMINE 1-13

For the reasons stated below, the Court should deny the Defendants' Motions *in Limine* (Dkts. 572, 573, 574, 576, and 577).  The Defendants move *in limine* to preclude evidence relating to a variety of topics.  The Defendants' motions present a hodgepodge of incorrect statements of the law, incomplete (and inaccurate) depictions of the evidence, and mistaken assumptions as to the arguments and evidence that the government is likely to present at trial.  As set forth below, there is no basis to exclude any of the evidence challenged by the Defendants, and their motions should be denied in their entirety.

For instance, the Defendants claim that "[t]he government should not be allowed to present anything to the jury that does not go to Defendants' alleged intent and agreement to join the particular conspiracy charged in the [Second Superseding Indictment ("SSI")]."  (Def. MIL 1-6, Dkt. No. 572 at 2.)

But the Defendants ignore long established precedent regarding evidence admissible to prove participation in a conspiracy.  In particular, the Defendants seek to exclude the conduct of co-conspirators except to the extent that the Defendants "knew and intended" that conduct, implying that so-called "downstream events" do not constitute intended conduct.  (Def. MIL 1-6,

Dkt. No. 572 at 1.)  However, the law is clear that a member of a conspiracy is responsible for

the reasonably foreseeable acts of his co-conspirators and the consequences of those acts.  In

fact, the Modern Federal Jury Instructions state:

> A conspiracy is often referred to as a partnership in crime.  Thus, as in other types of
> partnerships, when people enter into a conspiracy to accomplish an unlawful end, each
> member becomes an agent for the other conspirators in carrying out the conspiracy.
> Accordingly, the reasonably foreseeable acts, declarations, statements, and omissions of
> *any* member of the conspiracy and in furtherance of the common purpose of the
> conspiracy are deemed, under the law, to be the acts of all of the members, and all of the
> members are responsible for such acts, declarations, statements, and omissions.

L. Sand, *et al*., *Modern Federal Jury Instructions - Criminal*, Instruction 9-9 (2007) (emphasis

added).  "[A] conspiracy is like a train. When a party knowingly steps aboard, he is part of the

crew, and assumes conspirator's responsibility for the existing freight—or conduct—regardless

of whether he is aware of just what it is composed."  *United States v. Baines*, 812 F.2d 41, 42

(1st Cir. 1987).  In the law of conspiracy, an act performed by one partner in furtherance of the

conspiracy "is attributable to all."  *Pinkerton v. United States*, 328 U.S. 640, 647 (1946).

Defendants also refuse to acknowledge that criminal conspiracies are secretive by nature

and usually proven through indirect evidence.  *United States v. Sasson*, 62 F.3d 874, 887–88 (7th

Cir. 1995) ("Because of the secretive character of conspiracies, direct evidence is elusive, and

hence the existence and the defendant's participation can usually be established only by

circumstantial evidence.").  In conspiracy cases, it is "imperative that [the court] not rend the

fabric of evidence and examine each shred in isolation."  *Id.* (internal citations omitted). The

agreement to join a conspiracy need not be express. A court may rely on evidence of a tacit

agreement that "may be inferred from the 'defendants' words and actions and the

interdependence of activities and persons involved.'" *United States v. Martin*, 228 F.3d 1, 11 (1st

Cir. 2000) (citations omitted).

The government also incorporates by reference the arguments made in its Motion *in Limine To Admit Evidence* filed under seal (Dkt. No. 587.) wherein the government explained that various bad acts are admissible because they: (a) are relevant evidence of the predicate offenses; (b) demonstrate the Defendants' knowledge and state of mind; (c) illustrate the relationship between co-conspirators; and (d) provide context to the conspiracy.

The government will address the Defendants' motions *seriatim*.

## 1.   DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE EVIDENCE OF PATIENT HARM

Defendants move to preclude evidence of "patient harm."  The level of care that patients received both before being prescribed Subsys and after being prescribed Subsys is relevant in three independent ways: to show (a) that the Defendants used bribes and kickbacks to cause practitioners to prescribe Subsys without regard to the medical condition affecting individual patients (SSI ¶ 30); (b) that the Defendants used bribes and kickbacks to deprive patients of the honest services of their practitioners (*id.*); and (c) the context of the conspiracy, including why the government was investigating Insys and these Defendants.[1]

### A.   Patient Testimony Provides Relevant Proof Of The RICO Conspiracy

There is significant relevant evidence that the government intends to elicit from patients who were using Subsys.  For example, patient testimony is relevant to the true medical condition of the patient if that condition was different from the condition that was represented to insurers in

---

[1] The government, however, does not intend to rely on the substance of any Adverse Event Records, which the defendants address at length in the Defendants' Motion *in Limine* No. 1. The government may elicit testimony about the existence of Adverse Event Records in general.  For example, it is anticipated that a witness or witnesses will testify that while working in the Insys Reimbursement Center, if they learned a patient was deceased, they were to complete such a record, and at times did so.  To avoid obtaining this knowledge, they were directed not to use Google to verify whether a patient was deceased prior to calling an insurance company or prescription payment manager.

furtherance of claims for reimbursement.  The interaction between the patient and the co-conspirator prescriber is relevant to the medical necessity for the use of Subsys.  The physical plant and operation of the co-conspirator prescriber's practice is relevant to the knowledge and intent of the co-conspirators regarding the quality of patient care, e.g., whether a prescriber was operating a "pill mill."[2]  The continued prescription of Subsys by co-conspirator prescribers to patients who became addicted or suffered other negative effects from the use of Subsys is similarly relevant to the intent of the members of the conspiracy.

A New Hampshire court recently admitted evidence of patient impact in the trial of a co-conspirator doctor who was one of the top Insys prescribers in the country.  *United States v. Clough*, No. 17-CR-37-01-JL (D.N.H. filed December 11, 2018).  In a prosecution for receiving kickbacks, the court ruled that "[e]vidence of addiction to Subsys or fentanyl among [the defendant's] patients" is "relevant to demonstrating whether [the defendant] in fact overprescribed Subsys and whether something other than medical need motivated his prescriptions of Subsys."  *United States v. Clough*, No. 17-CR-37-01-JL (D.N.H. filed December 11, 2018).[3]

Prescription of a highly addictive controlled substance to a known addict is also evidence of the prescriber's bad faith.  *See United States v. Sabean*, 885 F.3d 27, 47 (1st Cir. 2018).  As the First Circuit has stated, "it is difficult to find a relevant difference" between a medical professional who knowingly supplies an addict with narcotics and a drug dealer who does the same.  *United States v. Limberopoulos*, 26 F.3d 245, 250 (1st Cir. 1994).  The SSI charges the

---

[2] Insys employees ranging from sales representatives to Insys management frequented prescriber offices.

[3] Clough was convicted of all counts on December 18, 2018.

Defendants with orchestrating a scheme to identify and target unscrupulous doctors and bribe those doctors to prescribe Subsys regardless of medical necessity.  Evidence showing that patients were addicted to opioids is highly probative of the doctors' state of mind at the times when the doctors issued prescriptions, and hence such evidence bears directly on the government's theory of the case.

Furthermore, it was reasonably foreseeable to the members of the conspiracy that inducing medical practitioners to prescribe Subsys through bribery and, once prescribed, to increase dosages would impact the health of patients.  Since *Pinkerton v. United States*, it has been well settled that a co-conspirator is responsible for the reasonably foreseeable acts of other conspirators done in furtherance of the conspiracy. 328 U.S. 640, 647-48 (1946).  The linchpin is "reasonable foreseeability": a defendant is responsible for a co-conspirator's act despite lack of knowledge as long as the act was reasonably foreseeable.  *United States v. Bucci*, 525 F.3d 116, 132 (1st Cir.2008) (defendant liable for section 924(c) violation despite lack of knowledge that co-conspirator would use firearm because it was reasonably foreseeable).  Here, not only did the Defendants know about the risk of malfeasance by their targeted doctors, but several Defendants further knew that their bribed doctors were actually operating pill mills.  (*See* Ex. 1, 2012 Email Chain, including Babich, Burlakoff, and Lee, in which, a co-conspirator's practice is described as a "pill mill.").

Evidence of medical history of patients, and of their experiences, is also necessary to address the Defendants' assertions that Subsys is a wonder drug, that the Defendants were just marketing Subsys like any other product, that they merely endeavored to ensure that patients taking Subsys were receiving the proper doses of the drug, and that this prosecution is the result of political pressure to address the opioid crisis without any evidence of addiction.  (Hr'g Tr.,

Dkt. No. 403 at 24-26; *see also,* Ex. 2, Defendants' expert disclosure letter.)  The jurors are entitled to information that will allow them to evaluate the complete context of the case.   As such, the Government should be permitted to offer proof of the impact of Subsys prescriptions on the quality of life of patients.

Contrary to the Defendants' claim, evidence of addiction is not overly prejudicial.  The Defendants wrongly rely on *United States v. Mermelstein*, which does not evaluate prejudice under Rule 403.  (Defendants' Motion in Limine Nos. 1-6, Dkt. No. 572 at 4; *citing Mermelstein*, 487 F. Supp. 2d 242 (E.D.N.Y. 2007).)  Contrary to the Defendants' citation, the *Mermelstein* court considered whether the allegations of serious bodily injury were ***sufficiently pled*** to trigger the enhanced penalty under 18 U.S.C. § 1347.  *Mermelstein*, 487 F. Supp. at 248.  The court ultimately held that several of the injuries were time barred and others were pled with insufficient detail.  *Id.* at 259.  More persuasive is *United States v. McRae*, which states, "Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing." 593 F.2d 700, 707 (5th Cir. 1979); *See also, Wagenmann v. Adams*, 829 F.2d 196, 217 (1st Cir. 1979) ("A controlled environment for the reception of proof is essential, but an artificially sterile environment is neither necessary nor desirable.").

### B.    Patient Medical History is Relevant to Proving Honest Services Fraud

Though not necessary, patient harm and the patient experience is probative of the Defendants' conspiracy to deprive patients of the honest services of their practitioners.  It is well-settled law that in proving a conspiracy, the government is not required "to establish that the intended victim was actually defrauded."  *United States v. Allard*, 926 F.2d 1237, 1242 (1st Cir.

1991).  *See United States v. Rosen*, 130 F.3d 5, 9 (1st Cir. 1997).  The Defendants, however,

assert that honest services mail fraud requires proof of actual harm:

> it takes more than a purported bribe to implicate honest services fraud. Where a doctor gives the patient the exact medication he or she needs, it can hardly be said that the doctor breached his fiduciary duty to prescribe medication for a legitimate medical purpose. *See United States v. Jain*, 93 F.3d 436, 441-442 (8th Cir. 1996)… (reversing an honest services fraud conviction because there was "no evidence that any patient suffered tangible harm" as a result of the kickback scheme).

Defendants Motion To Dismiss RICO Predicate Charges Of SSI, Dkt. No. 514, at 22.

The Defendants' reliance on *Jain* for the proposition that honest services fraud requires

proof of intended tangible harm is misplaced.  *United States v. Jain*, 93 F.3d 436 (8th Cir. 1996).

First, *Jain* was decided before the Supreme Court's decision in *Skilling v. United States*, 561

U.S. 358 (2010).  While Skilling did not explicitly overrule *Jain*, the *Skilling* Court eviscerated

the *Jain* Court's analysis.  See *United States v. Nayak*,  769 F.3d 978, 984-85(7th Cir. 2008)

(rejecting *Jain* for multiple reasons and holding that Skilling plainly holds that actual or intended

*tangible* harm to victims is *not* an element of the offense of honest-services mail fraud).

Nevertheless, because *Skilling* did not explicitly overrule *Jain*, and because the Eighth

and Seventh Circuits are split as to whether honest services fraud requires proof of tangible

harm, the government faces the prospect at trial, and potentially on appeal, that it must prove the

Defendants intended their fraud to cause tangible harm.  As quoted by the Defendants, the *Jain*

Court asked, when "the [patient] was not harmed because the breach did not affect the services

rendered, how has the [patient's] right to 'honest services' been violated?"  (Defendants Motion

To Dismiss RICO Predicate Charges Of SSI, Dkt. No. 514 at 22.)  The government merely seeks

to offer proof of the converse.  Specifically, the government is entitled to prove that patients

were harmed because the breach affected the services rendered.  *See, e.g. United States v.

Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) ("'[W]hen the "necessary result" of the ... scheme

is to injure others, fraudulent intent may be inferred from the scheme itself.' ") (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994).

C.     **Patient Harm Is Necessary to Provide Context for the Charged Conspiracy**

Given the addictive and dangerous nature of Subsys, the jury must be given the context of the conspiracy, including why the government was investigating Insys and these Defendants.  To rule otherwise would allow the jury to infer that the government is picking on these Defendants because they happen to sell an opioid in the middle of what has been publicly called an opioid crisis.  (*See* argument of attorney B. Wilkinson, Hr'g Tr., Dkt. No. 403 at 24-26.)

The First Circuit has long held that "[e]vidence that pertains 'to a chain of events forming the context…and set-up of the crime, helping it to complete the story of the crime on trial…[is admissible in appropriate cases]…where it possess[es] contextual significance.'"  *United States v. Sabetta,* 373 F.3d 75, 83 (1st Cir. 2004) (*quoting United States v. Ladd*, 885 F.2d 954, 959 (1st Cir. 1989)); *see also United States v. Charles*, 456 F.3d 249, 256 (1st Cir. 2006) (affirming admissibility of evidence explaining why officers approached the defendant).  The court has explained that "[e]vidence is not to be examined in isolation, but in its particular factual setting. Evidence of prior conduct is admissible 'to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.'" *United States v. D'Alora*, 585 F.2d 16, 20 (1st Cir. 1978) (*quoting* 2 Weinstein's Evidence § 404(09), at 404-57 (1975)).

In cases involving over-prescription of controlled substances, the effects of such substances on patients helps jurors understand the context of the case.  *United States v. Boros*, 668 F.3d 901 (7th Cir. 2012).   In *Boros*, the proprietor of an online pharmacy business was convicted of conspiracy to import controlled substances and conspiracy to possess controlled substances with the intent to distribute.   *Id*. at 903–05.  The court admitted a clinical

pharmacologist's expert testimony on the nature of anabolic steroids and their severe side effects. *Id*. at 905–06.  On appeal, the Seventh Circuit found that the pharmacologist's testimony qualified as relevant background evidence because "it aids the jury's understanding of the substances that [the defendant's company] was obtaining, importing, and selling."  *Id*. at 908. The drugs' side effects were also potentially relevant "for the purpose of providing a complete background picture to the jury."  *Id*.

## 2.   OPPOSITION TO MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE OR ARGUMENT REGARDING ANY PLEAS, CONVICTIONS, SETTLEMENTS, OR MEDICAL BOARD ACTIONS OF NON-TESTIFYING WITNESSES

The government does not intend to elicit evidence of pleas, convictions, settlements, or medical board actions of non-testifying witnesses except to the extent that members of the conspiracy were aware of the above events and continued to participate in the conspiracy with the disciplined members of the conspiracy.  Such continued conduct is relevant to the intent of the co-conspirators.

Five Health Care Providers ("HCPs") were indicted during the conspiracy period.  Two indictments were directly related to the prescription of Subsys.  Practitioner 3 was charged with health care fraud (18 U.S.C. § 1347) and distribution of controlled substances (21 U.S.C. § 841(a)(1)).  Practitioner 7 pled guilty to receiving kickbacks from Insys (42 U.S.C. § 1320a-7b(b)).  Despite these charges, the Defendants continued giving targeted HCPs speaker fees and other financial incentives—the same practices that ensnared Practitioners 3 and 7.  The Defendants, for example, had established a direct shipping relationship with Benzer, a pharmacy near Practitioner 3's practice, to keep up with demand generated by Practitioner 3and to avoid suspicious activity reports to the DEA.  A week after Practitioner 3 was indicted, Insys ended their direct shipping relationship with Benzer, calling Practitioner 3's indictment a "market

change condition."  (Ex. 3, Email dated May 9, 2014, Bates-labeled INS-BOS-00546753.)  The

Defendants nonetheless continued shipping directly to another pharmacy owned by co-

conspirator Practitioners 1 and 2.

The indictments of co-conspirators on other healthcare-related charges are relevant to the

Defendants' knowledge, the relationship between the co-conspirators, and the credibility of

witnesses.  *See United States v. Sanders, 95 F.3d 449, 454* (6th Cir. 1996) (co-conspirators'

guilty pleas are admissible so jury can assess credibility).  Practitioner 3 was indicted on

December 20, 2012 for submitting insurance claims for chiropractic procedures that were never

performed.  The Defendants nonetheless conspired with the indicted doctors, pressuring them to

write more prescriptions and increase the dosage amount.  At best, the Defendants' association

with prescribes such as Practitioner 3, demonstrates their blind ambition to increase sales.  At

worst, it shows the Defendants targeting doctors with a reputation for dishonest practices.

Unlike the cases cited by the Defendants, the government is not seeking to introduce the

co-conspirators' indictments as substantive evidence of the Defendants' guilt, nor are the

indictments offered for the truth of the allegations contained in the indictments.   Instead, this

evidence is offered to demonstrate Defendants' knowledge of the allegations and their effect (or

lack of effect) on the Defendants.  As such, this evidence is not hearsay.  Fed. R. Evid. 801.

Additionally, if the Defendants "open the door" by arguing that non-testifying HCPs

were engaged in legitimate practices and/or respected in the medical community, the government

should be allowed to present evidence about additional pleas, convictions, settlements, or

medical board actions.  *See United States v. Balthazard*, 360 F.3d 309, 317 (1st Cir. 2004) ("By

seeking to create an impression in the minds of jurors that Balthazard had had only limited prior

contacts with law enforcement, Balthazard's counsel opened the door to questioning about additional [police] reports[.]").

3.    **OPPOSITION TO MOTION IN LIMINE NO. 3 TO EXCLUDE ANY EVIDENCE OR ARGUMENT THAT ANY PRACTITIONER OTHER THAN THE THIRTEEN ALLEGED CO-CONSPIRATORS WAS BRIBED**

The Defendants move to preclude evidence of bribery of practitioners beyond the thirteen identified in the Indictment and other government filings.  Although the government has alleged that thirteen medical practitioners engaged in the RICO conspiracy with the Defendants, there will be evidence at trial that it was agreed that Insys sales representatives would, and did, attempt to induce other medical professionals to prescribe Subsys through the use of the Insys Speaker Program (ISP).  The behavior was so endemic that one sales representative asked Kapoor "how much speaker is being **thrown**" at doctors complained that other sales representatives were being given "UNCAPPED speaker money."  (Ex. No. 15, email form "Subsys Rep Sue" to J. Kapoor, Bates-labeled EFJ-000284712).  The fact that the Defendants and their Insys co-conspirators attempted to bribe other medical practitioners is certainly relevant to and part of the conspiracy alleged in the SSI.  It demonstrates that the nature and scope of the conspiracy included attempted bribery as well as actual bribery.

Moreover, this evidence is necessary to prevent any insinuation by the Defendants that the conduct of the members of the conspiracy was limited to these thirteen individuals.

4.    **OPPOSITION TO MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE OF ANY CRIMES OTHER THAN RICO PREDICATE OFFENSES ALLEGED IN THE SSI**

The Defendants move to preclude evidence of crimes that are not the RICO predicates alleged in the SSI.  This argument is frivolous.  As the Defendants acknowledge in their filing, the RICO conspiracy alleged in the SSI by its very nature included numerous violations of the

Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) and the HIPPA statute (42 U.S.C. § 1320, *et seq.*)  Simply because these offenses are not chargeable as RICO predicates pursuant to 18 U.S.C. § 1961(1) does not preclude evidence of these crimes if they are relevant proof of the RICO conspiracy.  It is relevant evidence of the Defendants' knowledge and intent that their scheme would result in numerous violations of these criminal statutes.[4]

As detailed in the Government's *Motion in Limine to Admit Evidence*, the government is entitled to introduce evidence of other crimes and bad acts at trial.  (Dkt. No. 587.)   Those acts are proof of the RICO conspiracy and are thus intrinsic evidence not subject to Rule 404(b).

The Defendants argue that acts described in prior indictments but dropped from the SSI are inadmissible.  This claim is frivolous and conflates two very different concepts – notice of the charge provided by an indictment and evidence admissible to prove the charge.  The law is clear that an indictment need only give notice of the charges to the defendant; it does not limit the government to only presenting evidence described in the indictment.  *See United States v. Brown*, 295 F.3d 152, 154 (1st Cir.2002).  In *United States v. Weiner*, for example, the defendant argued that evidence about dismissed charges should have been excluded.  3 F.3d 17, 22 (1st Cir. 1993).  The court held that the evidence of the dismissed charges was admissible because they were relevant to the remaining RICO charges against Weiner.  *Id.*

> [T]he government must prove an enterprise and a pattern of racketeering activity as elements of a RICO violation. Proof of these elements may well entail evidence of numerous criminal acts by a variety of persons ... Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant ... because it tend[s] to prove the existence and nature of the RICO enterprise...."

---

[4] The government is cognizant of the difference between the right to introduce such evidence and the need to marshal the evidence efficiently.

*Id.* (quoting *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir.).  Here, too, the acts dropped from the language in the SSI prove the existence and nature of the RICO enterprise.

Additionally, bad acts by third parties are also relevant to the actions of the racketeering activity.  The government, for example, will present evidence that Insys' competitor, Galena, gave Practitioner 1 insider trading tips to encourage him to prescribe their fentanyl product, Abstral.  Such evidence provides context for the Defendants' racketeering acts, and is not unfairly prejudicial to the Defendants.

**5.      MOTION IN LIMINE NO. 5 TO EXCLUDE EVIDENCE OF CRIMINAL CONDUCT AND OTHER BAD ACTS ABSENT A PROFFER OF EVIDENCE THAT ANY DEFENDANT KNEW ABOUT THEM OR AGREED TO THEM**

The Defendants seek to preclude evidence of crimes or wrongdoing by other members of the conspiracy unless the Defendants knew about or agreed to them.  Neither knowledge nor agreement is required before admitting the acts of co-conspirators.  "The existence of a single conspiracy does not depend upon every participant having knowledge of every other participant, or of the details of the conspiracy."  *United States v. Mangual-Santiago*, 562 F.3d 411, 422 (1st Cir. 2009).  If a defendant knowingly joins a conspiracy and is aware of the "conspiracy's *features and general aims*," then "statements pertaining to the details of plans to further the conspiracy can be admitted against the [defendant] *even if [the defendant] does not have specific knowledge of the acts* spoken of."  *United States v. Angiulo*, 847 F.2d 956, 969 (1st Cir. 1988) (emphasis added).

The Defendants acknowledge that employees engaged in "unseemly" conduct with medical practitioners to induce them to prescribe Subsys.  This conduct was consistent with Insys' features and general aims because that was the corporate culture the Defendants promoted. (*See Government's Motion in Limine To Admit Evidence*, Dkt. No. 587.)  Not only did the

Defendants promote a reckless corporate culture, they miserably failed to promote corporate ethics and compliance.  The hiring of sales representatives who had no experience in the pharmaceutical industry and who were often hired for their appearance, regardless of their competence, was part of that culture.  To suggest that aberrant behavior under such circumstance was not reasonably foreseeable to the Defendants is the height of hypocrisy.  Furthermore, the evidence will demonstrate that the Insys sales force operated in a high pressure environment driven by an "anything goes" direction from managers.

The court in *Anguilo* rejected a claim similar to the Defendants' argument.  Two RICO defendants asserted that evidence of specific murders should not have been admitted against them absent evidence that they knew that the scope of that conspiracy included those murders. *Id.*  The court found that the evidence of murders was admissible because the defendants were generally aware that "the Patriarca Family engaged in violent crimes, even murders, to further its own interests." *Id.* at 969-70.  It follows that the Defendants need not know about every minute detail of the racketeering enterprise, as long as the Defendants were aware of the features and general aims of the conspiracy.

The Defendants mischaracterize *United States v. Josleyn* as finding that a third-party act was irrelevant "absent 'suggestion that either [defendant] knew of this alleged act.'"  (Def.'s MIL 1-6 at 15; Dkt. No. 572 (quoting *Josleyn*, 206 F.3d 144, 147 (1st Cir. 2000)).)  There, the evidence about a third-party act was exculpatory *Brady* material that the government withheld. *Id.* at 147.  The First Circuit was evaluating whether the newly-produced information required a new trial. *Id.*  It ultimately held that the third-party act did not "put the whole case in such a different light as to undermine confidence in the verdict."  *Id*. (citing *Kyles v. Whitley*, 514 U.S.

419, 435 (1995)).  The court made ***no*** finding about whether the evidence would have been admissible under Rule 401.

The Defendants also mischaracterize Judge Woodlock's treatment of evidence in *United States v. Reichel*, No. 15-CR-10324, Dkt. No. 201 at 27-39.  In a case charging conspiracy to violate the Anti-Kickback Statute, Judge Woodlock ruled that two doctors and a sales representative could testify even though these witnesses had no direct contact with the defendant or a co-conspirator.  *Id.* at 39.  The witnesses received instructions from district managers—who were not co-conspirators—and the district managers received instructions from the defendant. *Id.* at 35-36.  The court ruled that circumstantial evidence could form a "legible chain" from the witnesses to the defendant if the district managers did not testify at trial.  *Id.* at 39.  Nor did Judge Woodlock "require the government to proffer" information before a witness testified. (Defendants' Motion in Limine 1-6, Dkt. No. 572 at 16.)  Instead, he admonished the defendant, "It's not a new theory. …. We're talking about a theory that's pretty well understood and everybody knows where it's going."  *Id.* at 36.  That is exactly the case here.  Each bad act or criminal conduct related to the racketeering enterprise will be linked to a co-conspirator.  The government's theory is neither new nor novel, and the government should not be required to proffer information on a witness-by-witness basis.

Like *Reichel*, the other case the defendant cites, *United States v. St. Michael's Credit Union*, did not involve RICO charges.  In *St. Michael's Credit Union,* the defendant was convicted of violating the Currency Transactions Reporting Act.  880 F.2d 579, 581 (1st Cir. 1989).  The court ruled that evidence about the defendant's father's gambling operation was erroneously admitted because there was no evidence that the defendant knew about the gambling operation.  *Id.* at 600.  Unlike the case at bar, the defendant and her father were not part of a

single racketeering enterprise: the defendant was not part of her father's gambling operation and the defendant's father was not a co-conspirator in the credit union scheme. *Id.* at 601 (finding that familial relationship an "insufficient nexus to support the inference that [the defendant] must have known of the gambling operation"). In contrast, the Defendants and their co-conspirators are united under a single aim to increase profits by and through bribes, fraud, and illicit distribution of Subsys.

**6.     MOTION IN LIMINE NO. 6 TO EXCLUDE ANY EVIDENCE OR ARGUMENT OF CRIMINAL CONDUCT OR OTHER BAD ACTS THAT POST-DATE THE ALLEGED CONSPIRACY PERIOD**

The Defendants move to exclude evidence or argument about criminal conduct or bad acts that post-date the alleged conspiracy period. Post-conspiracy evidence, however, is probative of the existence of the conspiracy and consciousness of guilt.

Courts routinely admit testimony about attempts to destroy evidence or obstruct the investigation. *United States v. Santiago-Mendez*, 599 F. Supp. 2d 95, 113 (D.P.R. 2009) (Meeting to cover up evidence of crime was admissible because "[t]he ultimate effect was to continue the secrecy and the existence of the conspiracy.") In, *United States v. Gilbert*, for example, the First Circuit overturned the district court's exclusion of evidence that the defendant begged a witness to skip an appointment with investigators and tried to block the witness's car in his driveway. 229 F.3d 15, 26 (1st Cir. 2000). The court ruled that this evidence was "probative of a guilty conscience" and not so inflammatory as to require exclusion. *Id.*

Post-conspiracy statements, moreover, are admissible under Rule 801(d)(2)(E). Such statements are in furtherance of the conspiracy if they "can reasonably be interpreted" as "enhancing a co-conspirator or other person's usefulness to the conspiracy," keeping a co-conspirator "updated on the status of the business," motivating a co-conspirator's "continued

participation," or providing "background information on key conspiracy members." *United States v. Carson*, 455 F.3d 336, 366-67 (D.C. Cir. 2006); see also, *United States v. Tarantino*, 846 F.2d 1384, 1412-13 (D.C. Cir. 1988).

7.      **MOTION IN LIMINE NO. 7 TO EXCLUDE ANY COMPARISON OF SUBSYS TO HEROIN**

The Defendants move to preclude certain evidence that they characterize as "inflammatory and prejudicial."  To a large extent, this motion is redundant to other motions filed by the Defendants and ploughs the same ground.

First, the Defendants move to preclude "any comparison between Subsys and heroin or other street drugs, or between Defendants and street-level drug dealers."  The government agrees that it will not characterize the Defendants as street-level drug dealers.  However, to the extent that it is necessary to elicit the various strengths of Subsys in a fashion that the jury understands, the government seeks to have witnesses compare the strength and effect of Subsys to more common drugs that are more familiar to juries.

Second, the Defendants move to preclude "any evidence or argument involving characterizations of the supposed 'culture' at Insys or specific instances of 'bad' behavior among Insys employees."  There is no basis to exclude this evidence or argument, as further set forth in the *Government's Motion To Admit Evidence* submitted under seal (Dkt. No. 587) and the government's opposition to the Defendant's motion *in Limine* No. 5, above.

8.      **MOTION IN LIMINE NO. 8 TO EXCLUDE EVIDENCE OR ARGUMENTS CONCERNING "CORPORATE CULTURE" AT INSYS**

The Defendants move to preclude evidence of the "corporate culture" at Insys.  For the reasons set forth in the *Government's Motion To Admit Evidence* (Dkt. No. 587) and the

government's opposition to the Defendants' Motion *in Limine* No. 5, there is no basis to exclude

this evidence and the Defendants' motion should be denied.

### 9. MIL 9 TO EXCLUDE EVIDENCE OR ARGUMENTS CONCERNING CAFEPHARMA.COM POSTS

In their Motion *in Limine* No. 9, Defendants argue that <u>any</u> posts from message boards on

the cafepharma.com website should be excluded "because they contain inadmissible hearsay and

any conceivable probative value is substantially outweighed by the danger of unfair prejudice."

Dkt. 576 at 6 (hereinafter "MIL No. 9").  Defendants, however, miss the point: the government

will not offer relevant cafepharma.com posts—and related emails concerning those posts—for

the truth of the matters asserted in the posts.  Rather, if the government uses this evidence, it will

be for a non-hearsay purpose—namely, to establish that the Defendants had the requisite intent

and state of mind as they engaged in (and concealed) the conspiracy here.  Indeed, Defendants all

but concede that this would be an appropriate use of this evidence.  *See* MIL No. 9 at 7-8 ("The

only conceivable probative value offered by the posts and their contents goes to Defendants'

awareness of any issues discussed in them.").

Defendants nevertheless assert that "there is no evidence that any Defendant looked at the

[unspecified cafepharma.com] posts during the alleged conspiracy period."  MIL No. 9 at 8.

That is simply false.  Defendants did not just look at posts on cafepharma.com during the

conspiracy period; they actively tracked the website, directing subordinates to monitor posts

concerning Insys, and repeatedly demanded that cafepharma.com remove posts they did not

like—including posts that touched on the sort of criminal conduct charged here.  *See, e.g.* Ex. 4,

INS-BOS-08323020 (June 3, 2013 email chain including Burlakoff and Babich, where Insys

demanded the removal of a "post about being inspected by the IG"); Ex. 5, INS-BOS-8344569

(July 23, 2013 email from an Insys employee to Babich stating, "There has been some activity on

cafepharma about Alec's email about PIP's…"); Ex. 6, EJF-000341961-63 (December 21, 2015 email from Insys' general counsel demanding that cafepharma.com remove certain posts).

As early as 2012, the Defendants were working to plug leaks from Insys to cafepharma.com, attempting to stifle any potential disclosure of their wrongdoing. *See* Ex. 7, INS-BOS-08890215 (November 4, 2012 email to Babich, with the subject line "cafepharma," stating: "We made it on the most recent posts, they even incanted my name this time[.]  We could probably figure out who it is, based on what they said").

Defendants do acknowledge that Kapoor received email summaries of cafepharma.com posts in 2015.  MIL No. 9 at 6.  But the Defendants leave out the fact that Kapoor received emails forwarding relevant cafepharma.com posts much earlier than that.  *See* Ex. 8, EJF-000112961-63 (July 22, 2013 email chain including Kapoor).  In 2013, for example, Kapoor received a forwarded cafepharma.com post that stated, among other things: "INSYS is going to be in deep shit with both the FDA and DEA soon."  *Id.*  The cover email to Kapoor from Insys sales representative "Subsys Rep Sue" at "[redacted]@aol.com" added:

> Internet 'chatter' . . . pisses me off … but *I know why they are saying these things.*  If the good reps leave numbers will plummet.  This is what other people are saying – I only moan and groan to you.

*Id.* (emphasis added).

This evidence—the relevant posts and related emails—is admissible for the purpose of showing Defendants' awareness of the issues raised in these posts, and how they did (or did not) respond to those issues.  *See Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 368 (W.D.N.Y. 1999) (holding that anonymous customer complaints were admissible to show notice assuming proper foundation was established and issue was contested).

The Defendants now try to downplay the reliability and relevance of these posts, but their arguments fall flat given the importance that they themselves clearly placed on these posts during the conspiracy period.  Anonymous or otherwise, the Defendants cared enough about these posts to track them carefully, and to press to have them taken down in some instances.  This is relevant evidence of the Defendants' intent, and there is no basis to exclude it.  The jury will decide what weight, if any, to afford the evidence.  It is an issue of weight, not admissibility.

None of the cases cited by the Defendants requires a different result.  *See* MIL No. 9 at 6-7.  *Hiramanek v. Clark*, No. 5:13-CV-00228-RMW, 2016 WL 8729933 at *2 (N.D. Cal. July 8, 2016), and *Reynolds v. Family Dollar Servs., Inc.*, No. CIV.A. 09-56-DLB, 2011 WL 618966 at *4 (E.D. Ky. Feb. 10, 2011), merely stand for the uncontested proposition that anonymous, online hearsay is generally inadmissible for the truth of the matter asserted.  But the cafepharma.com posts here would only be used for a non-hearsay purpose.  And in *Russell v. Daiichi-Sankyo, Inc.*, No. CV 11-34-BLG-CSO, 2012 WL 1805038 at *8 (D. Mont. May 17, 2012), and *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-CV-01568-WJM-BNB, 2014 WL 1319361, at *5 (D. Colo. Apr. 2, 2014), those courts excluded certain online posts where no witness could lay a foundation or otherwise authenticate the posts.  But that is not an issue here, where there is evidence to establish that the Defendants saw the relevant posts.  *See supra* at 18-20.

Admissibility of cafepharma.com posts is not a novel concept; for example, at least one other court has recognized the relevance of anonymous posts on cafepharma.com to a party's state of mind.  *In re Schering-Plough Corp./Enhance Sec. Litig.*, No. CIV. A. 08-CV-397DMC, 2009 WL 1410961, at *1 (D.N.J. May 19, 2009).  In *In re Schering-Plough Corp./Enhance Sec. Litig.*, the defendants argued that a securities complaint's references to "anonymous postings on

20

the CafePharma Web site" should be stricken from the record as "impertinent and scandalous." *Id.*  The court disagreed, holding that the postings "are relevant to the ultimate issue of scienter in that they purport to show the timing within which Defendants became aware of the [relevant] study's results."  *Id.*

Here, there is no reason to exclude all evidence of cafepharma.com posts wholesale.  The Government will limit its use of such evidence, as described above, and the Court can manage any issues concerning specific evidence as they arise.  For all of these reasons, Defendants' MIL No. 9 should be denied.

## 10.   OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 10

At trial, the government intends to elicit testimony from various co-conspirators that they knew the Insys Therapeutics speaker program, and their involvement in it, was wrong and illegal. Defendants have moved to exclude this testimony as irrelevant, prejudicial, and inadmissible lay opinion.  The Court should deny their motion.

The disputed testimony directly addresses the elements of the RICO conspiracy charge. The government must establish that the defendants knowingly joined a conspiracy to participate in the affairs of an enterprise through a pattern of racketeering activity.  The co-conspirators will testify that they believed their conduct—participating in Insys' speaker program to pay money to doctors in order to influence their Subsys prescription habits—was wrong or illegal.  That testimony constitutes direct evidence showing the existence of the criminal agreement charged in this indictment and, thus, satisfies the relevancy standard in Fed. R. Evid. 401.  *Cf. United States v. Maxwell*, 643 F.3d 1096, 1101 (8th Cir. 2011) ("[E]vidence 'tending to make the existence' of a conspiracy 'more probable' was relevant in that it helped to establish an element of the charged offense.") (alteration omitted)).

The testimony also does not trigger the constraints of Fed. R. Evid. 701 because it does not constitute opinion testimony.   Rather, the government will elicit testimony about the witnesses' state of mind at the time they participated in the conspiracy—*i.e.*, that the particular witness acted with knowledge of the conspiracy's illegal purpose.   Courts have long held that a witness's testimony about the contents of his or her mind at an earlier point in time is not "opinion testimony" of the kind addressed by Rule 701, even if expressed as a statement of opinion or belief.   *See United States v. Morton*, 391 F.3d 274, 277 (D.C. Cir. 2004) ("A witness's testimony about his own state of mind is not opinion testimony."); *United States v. Giovannetti*, 919 F.2d 1223, 1226 (7th Cir. 1990) ("What [the witness] called his 'opinion' was actually a report of the contents of his mind ... The admission of such testimony is not problematic."); *see also United States v. Phillips*, 356 F.2d 297, 308 (9th Cir. Cir. 1965) ("The state of a victim's mind at a previous point in time is not the expression of an opinion ... This is nonetheless true where the state of mind necessarily evinces an opinion formulated by that person at that previous point in time.").

Because the disputed testimony directly addresses an element of the charged conspiracy and does not trench on Fed. R. Evid. 701, Defendants' theories of exclusion lack merit.   Their motion should be denied.

Defendants offer three responses, none of which is persuasive.   They first contend (Mot. 2) that "a witness's hindsight opinions regarding the illegality of the witness's own actions (or the Defendants' actions for that matter) is irrelevant and substantially more unfairly prejudicial than probative."   But the objected-to testimony does not implicate "hindsight" impressions; the witnesses instead acknowledge that they *contemporaneously* understood the wrongfulness or illegality of their conduct during the conspiracy.  *See, e.g.*, █████████████████

███████████████████████████████████████████████



The government intends to elicit similar contemporaneous-focused testimony at trial.

Defendants next argue (Mot. 3) that "a witness's opinions (whether in hindsight or not) regarding the illegality of *Defendants'* actions . . . are inadmissible and inappropriate lay opinions under Federal Rule of Evidence 701." That contention is misplaced; the government has not sought (and will not seek) trial commentary from the co-conspirators regarding the illegality of the defendants' conduct. As discussed above, however, the government may elicit state-of-mind testimony from the co-conspirators—namely, that they participated in the Insys speaker program despite their knowledge and concern that the program was wrong or illegal. That testimony will assuredly implicate the conduct of the Defendants, all of whom held management positions at Insys and administered the speaker program. But so long as the testimony addresses only the co-conspirator's state of mind at the time he or she participated in the program, it does not trigger Rule 701 because the witness "[i]s not being asked to draw an inference for the jury's benefit—to formulate an opinion in litigation—but rather to explain the basis on which he [or she] had drawn an inference in the past." *Giovannetti*, 919 F.2d at 1226.

Defendants lastly assert (Mot. 3) that the co-conspirators will provide "hindsight testimony . . . intended to fill gaps in the government's case." In particular, they accuse (*id*. at 2) one co-conspirator of having "evolutions in . . . thinking . . . following meetings with the government."

The government disputes this allegation; the fact that a witness provided a more detailed statement in a subsequent interview reflects the realities of the investigatory process. As the government uncovers more evidence about the criminal enterprise, it poses more probing questions to cooperators about their knowledge of and involvement in it. In any event, the government's trial proof will appropriately focus on the co-conspirators' knowledge and state of mind at the time they participated in the Insys speaker program. If the defendants believe that knowledge has "evolved" during the course of the government's investigation, they will have their full complement of tools to impeach that testimony on cross-examination. *See United States v. Neal*, 36 F.3d 1190, 1206 n.20 (1st Cir. 1994) ("[Defendant's] argument that [the witness's] knowledge was not formed on the basis of information that she possessed on the date of the robbery . . . goes to the weight rather than the admissibility of the testimony.") (internal quotation marks and citation omitted).

## 11. MOTION IN LIMINE NO. 11 TO EXCLUDE EVIDENCE OF SO-CALLED "PERMISSIBLE PRACTICES"

With their Motion *in Limine* No. 11, the Defendants seek absolution for certain conduct that the Defendants characterize as "permissible medical and marketing practices[.]" Dkt. 576 at 2 (hereinafter "MIL No. 11"). With no legal support whatsoever, the Defendants seek to exclude "any argument or insinuation at trial" that evidence relating to the following practices are evidence of criminal conduct: (i) the Defendants' targeting high prescribers of TIRFs; (ii) the Defendants' promoting off-label prescribing of Subsys; (iii) the Defendants' advocating higher dosing through "titration"; and (iv) the Defendants' assisting patients with prior authorization from insurance companies. MIL No. 11 at 6.

There is no dispute that these practices are, generally speaking, permissible. But that is not what this case is about. This case is instead about a criminal agreement. This case is about how Defendants agreed and sought to abuse and exploit these practices (and others) to corrupt

and coopt the medical judgment of doctors, defraud insurance companies, and otherwise further their illegal scheme.  After all, that is how fraud typically works: the schemers take some generally innocent practice and repurpose it to deceive and take advantage of their victims. Here, the Government should be permitted to offer evidence of these practices to show how Defendants' scheme, resulting from their criminal agreement, worked, and to prove Defendants' awareness of their wrongful conduct.

To the extent that the Defendants disagree with any "characterization" of this evidence, the Defendants are free to make their points through cross examination and argument of their own.  But it is for the jury to ultimately decide the facts, including whether the Defendants agreed to employ these medical and marketing practices in furtherance of an illegal scheme.  *See, e.g.*, *United States v. Valdivieso Rodriguez*, 532 F. Supp. 2d 316, 322 (D.P.R. 2007) (recognizing that "whether a physician's conduct exceeds the bounds of professional medical practice . . . is one for determination by a jury") (*citing United States v. Moore*, 423, U.S. 122, 142 (1975)); *see also United States v. Sabean*, 885 F.3d 27, 44–45 (1st Cir. 2018) ("[A]cts or omissions may still be relevant to the jury's decisional calculus even if, on their own, they cannot dictate a finding of guilt").[5]

---

[5] For these reasons, the Government also objects to the Defendants proposed jury instructions on these topics, and in particular, the Defendants' Proposed Preliminary Instruction No. 7 ("OFF-LABEL USE OF PRESCRIPTION DRUGS") and the Defendants' Proposed Preliminary Instruction No. 10 ("DIRECT SHIPPING").  These proposed instructions would have the Court adopt Defendants' mistaken description of the law and characterization of the evidence.  These proposed instructions would be misleading and prejudicial, improperly suggesting to the jury that it cannot consider evidence of these practices as part of the Defendants' illegal scheme.

**A. Defendants Conspired To Target The Marketing Of Fentanyl Spray On Pill Mills And The Most Aggressive TIRF Prescribers.**

There is no dispute that Insys was legally permitted to market the Subsys to prescribers of TIRF medications.  MIL 11 at 2-3.  The issue instead is how the Defendants targeted their marketing efforts on the most prolific writers of prescriptions for TIRFs as part of the conspiracy.  By targeting these particular types of prescribers for bribes, the Defendants agreed to corrupt and coopt the medical judgment of these doctors and furthered their illegal scheme. This evidence will help to establish the Defendants' intent in conspiring to target their bribes on these types of prescribers, including prescribers that the Defendants knew to be running "pill mills" and knew to be under federal indictment for health care fraud and other crimes.

Defendants argue that "[d]octors . . . had good reason to switch patients from other TIRFs to Subsys—and Defendants had good reason to market Subsys as a superior alternative to other TIRFs."  MIL No. 11 at 3.  Defendants are free to make that point through cross-examination and argument to the jury.  But they cannot keep this evidence out altogether.

**B. Defendants Conspired To Bribe Doctors To Write Illegitimate Off Label Prescriptions.**

There is no dispute that a doctor may, in the proper exercise of his or her medical judgment, prescribe a medication for an off-label use.  Defendants nevertheless accuse the Government of "casting aspersions on off-label prescribing—in particular, doctors' prescribing of Subsys to non-cancer patients."  MIL No. 11 at 3 (citing First Superseding Indictment ("FSI") ¶ 79).  But the Defendants miss the point.  The issue is not that doctors were prescribing Subsys off-label; rather it is that the Defendants illegally conspired <u>to bribe doctors</u> to cause them to agree to prescribe Subsys off-label.  Evidence of prescriptions for off-label use by doctors who

received bribes is evidence of the conspiracy; there is no reason to arbitrarily exclude this

evidence, nor any reason to hamstring the government's ability to explain how the Defendants

used off-label prescriptions to further their scheme.

Indeed, off-label promotion was central to the conspiracy.  The Defendants cite

Paragraph 79 of the First Superseding Indictment, which they characterize as "quoting text

message concerning the efficacy of Subsys for all breakthrough pain[.]"  MIL No. 11 at 3.  In

fact, the text message shows how bribing doctors to agree to prescribe off-label was crucial to

the scheme: Defendant Simon wrote to a sale representative that he needed "confirmation from

YOU that you had a conversation with … [the practitioner] where he will not ONLY promote for

cancer patients."  FSI ¶ 79.  Simon continued:

> If he does this he will single handedly take down the whole company. He MUST
> creatively share how docs write this product everywhere. Please get back to me
> ASAP with confirmation that he will share with our other speakers how effective
> ... [Subsys] will be to treat ALL BTP [Breakthrough Pain].

*Id.*

> Similarly, at a national sales meeting, in 2014, Burlakoff told Insys' sales force:

> [t]hese [doctors] will tell you all the time, well, I've only got like eight patients
> with cancer.  Or, I only have, like, twelve patients that are on a rapid-onset
> opioids [sic].  Doc, I'm not talking about any of those patients.  I don't want any
> of those patients.  That's, that's small potatoes.  That's nothing.  That's not what
> I'm here doing.

FSI ¶ 80.

This evidence goes to the state of mind of the Defendants, and their intent to conspire to

have doctors agree to write prescriptions where there was no medical necessity, outside the usual

course of medical practice.

Such evidence is also key to another aspect of the conspiracy: the fraud on insurance

companies to ensure that they would pay for prescriptions for Subsys.  Defendants knew that

insurance companies generally would not pay for off-label prescriptions of Subsys.  The overwhelming majority of prescriptions, however, were for off-label use, unrelated to cancer. The Defendants' solution?  Systematically deceive the insurance companies about whether prescriptions were off-label.  For example, the Defendants set up the Insys Reimbursement Center ("IRC"), taking on responsibility for directly communicating with the insurers on behalf of doctors.  The Defendants then coached representatives to mislead insurers about patients' diagnoses, deceiving insurers into believing that prescriptions were for breakthrough cancer treatment when they were in fact not.  Evidence of this deception is highly relevant to the conspiracy, and there is no basis to exclude it from trial.

### C.  Defendants Conspired To Bribe Doctors To Prescribe High Doses Of Subsys.

There is no dispute that a doctor may, in the legitimate exercise of his or her medical judgment, determine an appropriate dose of Subsys to prescribe for a patient.  *See* MIL No. 11 at 4-5.  Again, that is not the issue here.  Titration itself, when medically advised, is proper.  The issue instead is how the Defendants conspired to corrupt doctors' judgment and to promote *unnecessarily* high doses of Subsys through the systematic payment of bribes.  There is no reason to arbitrarily exclude or limit the evidence showing this aspect of the Defendants' illegal scheme.  The jury should be permitted to decide what weight, if any, this evidence is worth.

This evidence includes a video prepared for Insys' 2015 National Sales Meeting that encouraged sales reps to push practitioners to prescribe higher doses of Subsys.  FSI ¶ 91.  In the video, prominent sales reps rapped and sang about titration, dancing with a life size 1600 mcg bottle of Subsys (the largest dosage available in the United States).  The sales reps repeated the refrain, "I love titration, and that's not a problem!"  Burlakoff was inside the giant Subsys bottle,

and the video concluded with him removing his costume and shouting: "Woo!  I love titration, ya that's not a problem!"  *Id.; see also* screenshot of video, Ex. 16.

This evidence shows how Defendants conspired to push for higher doses regardless of medical need.  For example, in July 2012, Babich emailed the Insys sales force to promise a cash prize for the top five sales representatives with the highest number of units written for 600 mcg or higher (with an additional cash prize for the overall winner).  FSI ¶ 84.  Evidence that the company incentivized high dosage prescriptions, regardless of medical necessity, is evidence of the criminal agreement alleged here.  Incentivizing a sales force to push higher dosages of Subsys cannot possibly account for the medical decision making of the prescriber.  In any event, this should be left for the jury to consider.  The Defendants are free to argue to the jury that the evidence does not demonstrate what the government argues it does; rather, they are free to argue that elevating dosages is consistent with the package insert and other information.  However, it should be entirely for the jury to decide the import of this conduct.

As further evidence of the criminal conspiracy, the executives, including the Defendants, put seemingly constant pressure on the sales force to push higher dosages.  For example, on September 13, 2012, Burlakoff emailed all sales reps in the southeast sales district (copying Kapoor, Babich, and others), writing: "Effective immediately, I need a reply … each and every single time you receive a message … indicating that you had a prescription written for less than 400 mcg. … 100mcg or 200mcg of ... Subsys does NOT work. We would be better off having the doctor write a prescription for one of our competitors rather than write for 100mcg or 200mcg of ... Subsys.  At least then -we would theoretically still have a chance of proving our drug to be efficacious if and when we sell the doctor on 'effective dosing' … ."  FSI ¶ 85.

Burlakoff added: "**Anyone who ignores these instructions is subject to immediate negative consequences… .**" *Id.* (emphasis added).

One week after that email, Burlakoff sent another email to the entire Insys sales force, copying Babich and others, and blind copying Kapoor. FSI ¶ 87. Burlakoff reminded the sales reps that they would receive an email from the Insys corporate office "each and every time a prescriber in [their] territory writes for a Subsys prescription at 100 mcg or 200 mcg …." *Id.* Burlakoff wrote (in part):

> Each new . . . Subsys patient should be started at 100 mcg, per the package insert.
>
> To be clear, the last thing we want you to think is that we are harassing you for generating sales. What we are attempting to do is; help you to maintain these newly generated … Subsys patients by rapidly informing you of the fact that they wrote for a dose and number of units that is simply **NOT** effective. We are 100 percent sure that those patients whom are prescribed 60 units of 100mcg, do not end up filling a prescription for … Subsys the following month. This is information that we feel obligated to share with you, as there is no good at all that comes out of withholding the very data that will determine your quarterly bonus payouts. … The goal is to generate … Subsys patients whom believe in the safety and efficacy behind this product, hence these patients will continuously refill their months prescriptions indefinitely. This of course equates to residual income for you! …"

*Id.*[6]

The Defendants tied bonuses for sales representatives to the promotion of higher doses of Subsys, with higher doses tied to higher payouts. *See* FSI ¶¶ 88-89. Kapoor, Babich, and Burlakoff even doubled the percentage used to calculate bonuses for sales of prescriptions for Subsys of 600 mcg or higher. *Id.* And higher doses meant significantly larger reimbursements

---

[6] Citing the label for Subsys, the Defendants note that only 4% of patients who participated in the double-blind period of the clinical trials found 100 mcg of Subsys to be a "successful dose[.]" MIL No. 11 at 4. But that is a red-herring: those trials involved only cancer patients, and as such provide no basis for ever-increasing doses for the non-cancer patients who were the vast majority of patients prescribed Subsys by corrupted doctors.

from insurance companies, making this another important aspect of Defendants' agreement to defraud the insurers.

This and similar evidence offered at trial will show that higher doses of Subsys were the result of the conspiracy, and not, as Defendants claim, "individual dosing decisions that took into account patients' medication history."  MIL No. 11 at 5.  This is, at the very least, a question of fact for the jury.  There is no basis to exclude this evidence.

### D.  Defendants Conspired To Use The Insys Reimbursement Center To Defraud Insurers.

There is no dispute that "pharmaceutical companies may properly assist patients seeking to obtain coverage for their treatments from insurance companies."  MIL No. 11 at 5.  But that is not what happened here.  The Defendants used the IRC to carry out their conspiracy, by systematically deceiving insurance companies into paying for prescriptions for Subsys based upon material misrepresentations and material omissions, designed to trick them into authorizing payment.  Once again, the issue is not that the Defendants **had** a patient reimbursement program, but rather **how** the Defendants agreed to use the patient reimbursement program to further their illegal scheme.

Prior to the creation of the IRC, Insys had relied on a third-party company, Apricot, to assist patients with reimbursement for Subsys.  But the pull through rate for claims handled through Apricot was only 20 – 30%, and Defendant Kapoor was not satisfied.  Defendant Kapoor wanted a 100% approval rate.  The Defendants agreed to bring reimbursement assistance in-house, and thus the IRC was born.  The IRC allowed Defendants to further their conspiracy and conceal that Subsys had been prescribed for non-cancer pain and outside the usual course of medical practice, which caused the insurance authorization rate to skyrocket.  The agreement to

bribe prescribers was one part of the plan, the agreement to deceive insurance companies – so Insys would get paid – was a second aspect of the agreement.

This was all by design.  The Defendants conspired to create a pay structure for IRC employees that rewarded prior authorization approvals with substantial financial bonuses based upon their success in obtaining prior authorizations.  FSI ¶ 100.  Every week, Gurry, together with another co-conspirator, set a weekly minimum threshold, called a "gate," for the entire IRC. An IRC employee, no matter how productive, could not qualify for a bi-weekly bonus until the entire IRC reached each week's threshold number of approvals.  Id.

In or about January 2013, Kapoor, Babich, and Gurry learned that insurers were often unwilling to engage representatives of a pharmaceutical company in the prior authorization process.  Babich and Gurry responded by seeking to conceal the identity of IRC employees communicating directly with insurers, deliberately shielding the existence of the unit from insurers.  Id. ¶ 104.  IRC employees were instructed to mislead agents of insurers to believe that the IRC employees were calling from the office of the practitioner, as if they were employees of the practitioner.  Id. ¶ 105.

Moreover, Kapoor, Babich, and Gurry knew that insurers were less likely to authorize payment for a drug that had been prescribed for a use that was off-label, e.g., for other than breakthrough cancer pain.  Id. ¶ 107.  Gurry, and others, instructed IRC employees, when asked by an insurer if a patient was being treated for breakthrough cancer pain, to answer using a written script referred to as "the spiel:" "Yes.  The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients.  The physician is treating the patient for their pain (or breakthrough pain, whichever is applicable)."  Id. ¶ 109.  This was part of a pattern of lies by IRC employees, which were known and approved at the highest levels

of the Company.  This included lies about patient diagnoses—including false diagnoses or misrepresentations about cancer—lies about tried and failed medications by patients, and lies about patients being diagnosed with difficulty swallowing.  *Id.* ¶ 101.  This is all evidence of how Defendants carried out the conspiracy, and it is plainly admissible.

For all of these reasons, the Defendants' motion *in limine* No. 11 should be denied.

## 12.  MOTION IN LIMINE NO. 12 TO EXCLUDE EVIDENCE AND ARGUMENT CONCERNING DIRECT SHIPPING

In their Motion *in Limine* No. 12, the Defendants argue that the Government has "mischaracterized" the "permissible practice" of "direct shipping," and—with no legal support— seek to exclude any evidence or argument that the Defendants attempted to use direct shipping to evade DEA regulations.  Dkt. 576 at 7-12 (hereinafter, "MIL No. 12").  The Defendants argue that direct shipping agreements are "not prohibited," but that again misses the point; nobody is arguing otherwise.

The issue here is how the Defendants agreed to use direct shipping to evade the caps placed on shipments of Schedule II drugs (such as Subsys) to wholesalers, in an effort to conceal their bribery scheme from the DEA and to reward high prescribers for their prescribing practices. This is relevant evidence of the means and manner of the conspiracy and the Defendants' intent, and Defendants identify no undue prejudice or other basis that might justify its exclusion.  For these reasons, the Defendants' motion *in limine* No. 12 should be denied.

Due to caps on shipments of Schedule II drugs, wholesalers would not ship enough medication to pill mills to keep up with the prescriptions being written.  Faced with this problem, the Defendants came up with what they believed to be a solution: direct shipping to pill mill pharmacies that were connected to doctors they had agreed to bribe to write prescriptions of Subsys.

For example, in an email dated October 3, 2012, Simon wrote to Babich and others about Practitioner 8, who they had agreed to bribe, and who had received bribes, and was one of the largest prescribers of Subsys.  *See* Ex. 9, INS1988515.  Simon wrote that Prescriber 8's "challenge is getting Subsys to his pharmacy as McKesson and Cardinal won't ship to his pharmacy as he writes so many schedule 2's. … From the physicians standpoint it would be ideal to supply direct."  *Id.* (identifying as a solution: "Ship Subsys direct to his pharmacy (most preferred option)").  Two days after this email, on October 5, 2012, an Insys sales rep took Practitioner 8 to dinner and came away with a "guarantee from [Practitioner 8] to have 'more scripts than we can handle' once the pharmacy issue is resolved and [he] begins to speak."  Ex. 10, [10/7/12 C. Hanoch email].

The pattern repeated with other pill mills, including "C&R" in Mobile, Alabama, which was co-owned by Practitioner 1, whom the Defendants had also agreed to bribe.  In an email dated January 3, 2014, Insys' Director of Trade wrote to Kapoor: "had conversation with [Practitioner 1's] pharmacist regarding direct sales and he was very excited about the concept.  I plan to meet with them at C&R in the next couple of weeks[.]"  Ex. 11, [1/3/14 email, no bates].  In an email dated January 18, 2014, an Insys executive reported that "C&R is hitting supply chain CII caps on subsys and is forced to use alternatives…Don't know, but going direct may address[.]"  Ex. 12, [1/18/14 email, no bates].  On January 29, 2014, the Director of Trade wrote again that C&R "want[ed] to order direct to address limits on CIIs in place by urrent wholesaler ABC.  ***Goal is to ensure uninterrupted delivery to patients of [Practitioner 1].***"  Ex. 13, [1/29/14 email, no bates] (emphasis added).

In February 2014, with knowledge that Practitioner 1 was (a) writing prescriptions for a competitors product, and (b) already receiving the internal maximum speaker program fees

(bribes), Kapoor and Babich traveled to Mobile, Alabama, to meet with Practitioner 1 and his partner and take them out to dinner.  During the dinner, the group began talking about the difficulty that C&R faced in acquiring enough supply of Subsys to fill prescriptions.  Babich proposed that this problem might be solved if Insys set up a "direct account" for C&R.  The group also discussed the financial benefits of such an arrangement for C&R, including that Insys could increase its kickbacks to C&R by paying it the 7% normally paid to the wholesaler.  FSI ¶¶ 135-36.  In this manner, direct shipping served a dual purpose: the Defendants used it to evade the caps on Schedule II drugs, and also to increase the bribes paid to owners of pill mills.

From February 2014 until May 2015, the Defendants directly shipped Subsys to C&R, while paying C&R approximately 7% of its monthly gross purchases of Subsys.[7]

The Defendants devote several pages to arguing that Insys was not registered with the DEA as a manufacturer or distributor of Subsys, and thus "never had any obligation to monitor or report suspicious Subsys orders."  MIL No. 12 at 9-12.  So what?  This is just another red-herring: the Government does not argue that Insys took on its third-party logistics ("3PL") company's reporting obligations, or that Insys failed to meet a reporting obligation imposed under the relevant DEA regulations.  That is entirely separate from the question that the jury will have to consider: whether Defendants agreed to use direct shipping to conceal and further their illegal scheme.  The Government should be permitted to present evidence and argument showing that Defendants did.

---

[7] The Defendants ultimately came to learn that direct shipping was not the solution they had anticipated and agreed to use in furtherance of the conspiracy.  *See* Ex. 14, [3/24/14 email to Kapoor, Babich et al., no bates] (reporting that "that we have not solved the issue of 'shipment turnoff' related to suspicious order monitoring by simply moving Benzer and C&R from our wholesaler group and redirecting them instead to direct shipments from ICS (our packaging/inventory/distribution entity)…").  Nevertheless, this evidence shows the Defendants' agreed-upon efforts to conceal the conspiracy and is therefore at least relevant to their intent.

The Defendants seek to exclude an email (and "anything like it") dated December 19, 2013 from the Director of Trade to Babich.  MIL No. 12 at 11.  The Defendants claim that the "email is based on the [Director of Trade's] mistaken understanding of the legal obligations under applicable DEA regulations."  *Id.*  That is no basis for excluding this evidence; the Defendants turned to the Director of Trade on these issues, and his email and understanding is relevant evidence of the state of mind and intent of the Defendants.  Moreover, the Defendants leave out important details, including that the Director of Trade wrote that the email was based on a conversation "with the industry 'expert' [CF], who heads up Purdue supply chain risk management for the oxy product."  INS-BOS-04264345 (Exhibit 11 to MIL No. 12).  Defendants also leave out the part where the Director of Trade wrote:

> Currently the DEA expects/requires that in the event a downstream customer (retail) sourcing our product from multiple Wholesalers we should 'alert' the DEA. (I do)

> Wholesalers are viewing the entire class and gating accordingly.  ***By going direct we potentially disrupt the true view of usage.***

*Id.* (emphasis added).  For the Defendants, however, that was the point of their agreement: go "direct" to conceal the true view of their shipments to corrupt doctors and their pill mills.

For all of these reasons, the Defendants' motion *in limine* No. 12 should be denied.

## 13.    MOTION IN LIMINE NO. 13 TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING ANY "FRAUD BY OMISSION" THEORY

In their Motion *in Limine* No. 13 ("MIL No. 13"), the Defendants argue that they had no "duty to disclose" the illegal bribes at the heart of their scheme.  Dkt. 577.  The Defendants thus seek to exclude any "evidence or argument that doctors committed fraud by failing to disclose to patients that they had received money in exchange for prescribing medication" as well as any

"evidence or argument that any alleged co-conspirators committed fraud by failing to affirmatively disclose these payments to insurance companies." MIL No. 13 at 2. Defendants are mistaken, and their motion should be denied for at least three reasons.

First, the premise of the Defendants' motion—that this is a "fraud by omission" case—is flawed. The Defendants are not charged with merely failing to report information pursuant to a statutory or regulatory duty. Rather, the Defendants are charged with conspiring to carry out a vast bribery scheme, with the Defendants and their co-conspirators agreeing to deceive insurance companies, regulators, and patients to carry out (and conceal) the scheme. In other words, the crime alleged is an agreement to commit affirmative fraud, not fraud by omission.

On this point, the Court's ruling in *In re Lupon Mkt'g & Sales Practices Litig.*, 295 F. Supp. 2d 148, 167-68 (D. Mass. 2003), is instructive. There, as here, the defendants claimed that they had no duty to disclose their fraudulent scheme. 295 F. Supp. 2d at 167. The Court rejected that argument, holding that:

> [T]his is not a case of nondisclosure. Defendants did not stand mute. As alleged in the Amended Complaint, defendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud. Whether one views the defendants' actions as involving the dissemination of information that was wholly false, or false because of an incomplete depiction of the truth, they are actionable under the mail and *168 wire fraud statutes.

*Id.* at 167–68; *see also United States v. Barker Steel Co.*, 985 F.2d 1123, 1130 (1st Cir. 1993) (distinguishing affirmative acts of fraud from fraud committed by failing to report under a statutory duty to do so).

Here, the Defendants conspired to bribe doctors, affirmatively agreeing to corrupt and coopt the medical judgment of these practitioners so that they would write unnecessary prescriptions for Subsys. The Defendants knew that insurers would only pay for medically necessary prescriptions of Subsys, and would refuse to pay if they knew about the bribery

scheme.  Defendants thus conspired to conceal all of this from the insurers.  But the Defendants

and their co-conspirators did not simply "stand mute."  For example, the Defendants conspired to

use the Insys Reimbursement Center to mislead and lie to insurance company agents; coaching

IRC employees to tell insurers – or trick them into believing – that patients had been diagnosed

with cancer when they had not, and that they—the IRC employees—were employees of doctors'

offices when they were not.  These lies and misrepresentations were designed to trick the

insurance companies and pharmacy benefit managers into believing that their internal policies

would authorize payment for Subsys, when, had they known the true and complete facts, they

would not have authorized such payments.  The Defendants and their co-conspirators agreed to

engage in a scheme to defraud with the requisite intent; that is all that is necessary here.

Second, the Defendants mischaracterize the duty of disclosure.  As an initial matter, the

First Circuit has acknowledged that "conduct alone, in context, can amount to a

misrepresentation[,]" and that *deliberate* nondisclosures can thus "be treated as artifices to

defraud under the federal statutes"—even in the absence of a duty to disclose.  *Bonilla v. Volvo

Car Corp.*, 150 F.3d 62, 70 (1st Cir. 1998).  Evidence of such conduct exists here, as the

Defendants conspired to bribe practitioners to write unnecessary prescriptions for Subsys, and

then deliberately concealed the scheme – and the true material facts – from insurers to ensure

payment for the prescriptions.  That should be the end of the discussion.

In any event, the Defendants concede that a duty of disclosure is triggered by misleading

statements and the telling of "half-truths."  MIL No. 13 at 4, citing Bonilla, 150 F.3d at 69-70.

The First Circuit "has said that 'the *locus classicus* of fraud is a seller's affirmative false

statement or a half truth, i.e., a statement that is literally true but is made misleading by a

significant omission.'"  *In re Neurontin Mktg. & Sales Practices Litig.*, 677 F. Supp. 2d 479, 492

(D. Mass. 2010), *rev'd in part on other grounds*, 712 F.3d 51 (1st Cir. 2013) (*quoting Bonilla*, 150 F.3d at 69).  In *In re Neurontin*, for instance, the plaintiff presented evidence that the defendant pharmaceutical companies "communicated half-truths that are actionable under the RICO statute . . . includ[ing] instances of Defendants suppressing negative information while submitting for publication in monographs positive information about off-label indications" and providing information concerning the "recommended maximum dose" without indicating that "clinical evidence did not support increased efficacy at that dose."  677 F. Supp. 2d at 492.

Here, the Defendants claim that "[t]he government does not allege that any of the conspirators told half-truths; the allegation is that the payments were never mentioned at all." MIL No. 13 at 1-2.  That is not supported by any fair reading of the SSI, which alleges numerous acts by Defendants and their co-conspirators to conceal the bribery scheme.  *See*, *e.g.*, SSI ¶¶ 63-70 (describing false and misleading representations and omissions to insurers to secure payment for Subsys prescriptions); *Id.* ¶¶ 71-73 (describing conduct to prevent detection of the scheme). The bribery scheme caused prescribers to write Subsys prescriptions based not on medical judgment alone, but on an agreement to write prescriptions in exchange for bribes.  To obtain payment for these prescriptions, the conspirators agreed to use the IRC to take steps to deceive insurers into authorizing payment.  The Defendants argue that they did not use half-truths or lies, but that is for the jury to decide based on all of the evidence of the Defendants' agreement including their interactions with insurers, practitioners, and patients.

To be clear, speaker programs writ large are not on trial here.  The relevant evidence here is the manner in which the Defendants in this case, and this case alone, agreed to use speaker program payments to prescribers as bribes in exchange for prescriptions.  The Defendants argue that there is no "duty requiring doctors to tell patients that they have been paid to prescribe a

medication," nor any "duty requiring pharmaceutical companies to disclose this kind of arrangement to insurance companies[.]"  MIL No. 13 at 4.  Unsurprisingly, the Defendants fail to cite any authority in support of this claim that pharmaceutical companies and corrupt doctors can conceal their bribery schemes with impunity.

In fact, doctors have a fiduciary duty to be candid with their patients and tell them the truth—and that duty is breached when a doctor conceals that his or her judgment has been corrupted by bribes.  *See Harrison v. United States*, 284 F.3d 293, 298-99 (1st Cir. 2002) (observing that Massachusetts requires a physician to "disclose 'information he should reasonably recognize is material to the [patient's] decision'" in the context of informed consent) (quoting *Harnish v. Children's Hosp. Med. Center*, 439 N.E.2d 240, 243 (Mass. 1982)); *Bourassa v. LaFortune*, 711 F. Supp. 43, 47 (D. Mass. 1989) ("The relationship between a physician and his patient is one of trust and confidence."); *Canterbury v. Spence*, 464 F.2d 772, 786-87 (D.C. Cir. 1972) ("[T]he test for determining whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the decision must be unmasked.").  Likewise, pharmaceutical companies have a duty to not be deceptive—and that duty is breached when they mislead insurance companies and conceal that prescriptions are the result of bribery.

Indeed, it is not even clear what evidence of "fraud by omission" would actually be excluded under Defendants' proposed approach.  Defendants state that they do not seek to exclude "the substance of the IRC calls regarding particular patients and prescriptions[.]"  MIL No. 13 at n.2.  But that concession causes Defendants' argument to collapse: those communications from the IRC to insurers are among the "half-truths" that triggered Defendants' duty to be complete and truthful in their communications with insurers.  If, as Defendants admit,

some of those communications with insurers are relevant, then there is no basis to exclude the others.  The jury is entitled to a complete picture of how Defendants conspired to deceive and mislead the insurers here.

Third, there is no support for the Defendants' demand that the Government be forced to parse out its proof of the elements of fraud at trial.  MIL No. 13 at 5-7.  The Defendants argue that the Government must prove that an omission was materially misleading before the jury can even hear about that omission.  But the Defendants cite no authority supporting that approach—an approach that would bifurcate the government's proof of individual elements of fraud and confuse the jury.  There is no requirement that the government prove the intent to defraud before it is permitted to introduce into evidence a false statement or half-truth.  Indeed, the evidence of the false statement or half-truth can itself be evidence of intent.

Defendants point to this Court's approach in *United States v. Facteau*, No. 1:15-CR-10076-ADB (D. Mass.), but that case does not support the sweeping relief they seek here.  In *Facteau*, the defendants were charged with defrauding doctors and others by failing to disclose certain negative facts about a medical device that defendants had promoted for an off-label purpose.  The specific issue there was Court's concern about unmoored questions to doctors such as, "Would you have wanted to know about it?"  *Facteau*, 5/13/2016 Hr'g Tr. (ECF No. 351) ("*Facteau* Tr.") at 48.  But the Court nevertheless made clear that "if they're providing misleading information, affirmatively providing misleading information, then they're allowed to go after that."  *Id.* at 59.  The Court added: "They can't suggest a duty to disclose; but if there are things that are said to doctors that aren't true, they are allowed to establish whether the truthful information on that would have been material to them I think."  *Id.* at 60.

To prove the criminal agreement here, the government intends to follow that same approach.  The government will not ask witnesses "would you have wanted to know" without a proper foundation, and will focus its questioning on establishing the false and misleading information that was communicated by the Defendants and their co-conspirators, and agreed to be communicated.  The government will ask questions, where appropriate, to establish that information was not disclosed by co-conspirators to insurers and patients, when other information was disclosed.  Where the testimony establishes that information was not disclosed, the government will then follow up with questions to establish whether that information was material (or important) and if so, why.  The Defendants will then have an opportunity to test and challenge this evidence through cross examination and witnesses of their own.  In contrast to the blunt remedy proposed by the Defendants, this approach will allow the Court to address any genuine issues as they arise, in the context of actual testimony from specific witnesses.[8]

Ultimately, there is no basis to keep this relevant evidence from the jury.  Fed. R. Evid. 401.  The jury will have to consider whether the Defendants and their co-conspirators agreed to make statements that were deceptive and misleading—and if so, whether any facts omitted by Defendants and their co-conspirators were material.  The jury is entitled to consider all of the evidence and argument bearing on these questions.  *See United States v. Blastos*, 258 F.3d 25, 28-29 (1st Cir. 2001) (affirming wire fraud conviction and acknowledging that a "'material' fact or matter is one that has a natural tendency to influence or be capable of influencing the decision

---

[8] The Defendants note that the Court ordered the government in *Facteau* to provide a "mini Bill of Particulars," but that was simply a list of the things that the government believed needed to be said to make a particular statement true and not misleading.  *Facteau* Tr. at 73. That does not apply here, however, as the SSI adequately sets forth which statements were false and misleading and why.  There is no basis for any further bill of particular here.

of the decision maker to whom it was addressed").  For all of these reasons, Motion *in Limine*

No. 13 should be denied.

## CONCLUSION

WHEREFORE, the government respectfully requests the Court deny the Defendants'

motions, Dkts. 572, 573, 574, 576, and 577.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Dated: December 19, 2018         By:     /s/ *David G. Lazarus*
K. NATHANIEL YEAGER (BBO # 630992)
DAVID G. LAZARUS  (BBO #624907 )
FRED WYSHAK, JR. (BBO #535940)
Assistant U.S. Attorneys
One Courthouse Way, Ste. 9200
Boston, MA  02210
(617) 748-3100
david.lazarus2@usdoj.gov
nathaniel.yeager@usdoj.gov
fred.wyshak@usdoj.gov

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ *David G. Lazarus*
Assistant U.S. Attorney

Dated: December 19, 2018