# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES<br><br>v.<br><br>MICHAEL L. BABICH et al.,<br><br>Defendants. | Criminal No. 16-CR-10343-ADB<br><br>**REDACTED VERSION** |

## DEFENDANTS' MOTION AND MEMORANDUM OF LAW
## TO EXCLUDE PATIENT TESTIMONY

For months, the government disclaimed the need to introduce evidence of patient harm in this case. In the government's own words, "[t]he Indictment alleges a RICO conspiracy and, as such, *the government does not have to establish that the alleged scheme was successful or resulted in any actual harm to any victim*." Dkt. No. 512 at 11 (Government's Opposition to Defendants' Renewed Motion for a Bill of Particulars) (emphasis added). The government used these assertions to avoid providing Defendants with a bill of particulars, as well as various discovery.

Despite its prior representations to the Court—and despite a complete lack of evidence that Defendants, none of whom are healthcare practitioners, were involved in any healthcare practitioner's treatment decisions about any particular patient—the government has now decided that it will make this case about particular patients after all. Barely a month before trial, the government has indicated that it may call as many as 18 patients to testify at trial. Letter from Nat Yeager to Defense Counsel (Dec. 12, 2018) (Ex. 1).

The reasons for the government's last-minute change in course are obvious. First, out of the thousands of patients nationwide who were treated with Subsys during the alleged conspiracy period, it is easy enough to cherry pick some number who either experienced side effects from the drug or, in hindsight, wished their healthcare practitioner had prescribed something else. Second, because the government *has not obtained or produced* medical records for many of the 18 patients that it now wants to call at trial, Defendants will be substantially prejudiced in their ability to cross-examine them. Third, because testimony from these cherry-picked patients will undoubtedly stoke the jury's passions, it will increase the chances that the government could obtain convictions even it if fails to prove that Defendants intended and agreed to join the charged RICO conspiracy.

The government's last-minute change in course shows troubling signs of haste. The prosecutors in this case have not focused their five-year investigation on developing patient testimony. And what patient medical files are contained in the government's discovery came largely from other USAOs. Now the prosecutors in this case have scrambled to interview patients without obtaining each of their medical files, and apparently without reviewing the files obtained by the other USAOs. Indeed, where Defendants happen to have medical files related to some of the 18 patient witnesses, they can tell that the recent interview statements of several patients are contradicted by their own medical records. Simply put, the prosecutors in this case are not vetting the accuracy of the patients' testimony, so long as it is maximally inflammatory.

The question that the Second Superseding Indictment asks the jury to answer is whether Defendants *intended and agreed* that healthcare practitioners would prescribe Subsys to patients without a legitimate medical purpose. The proposed patient testimony sheds no light on that question. *See* Dkt. No. 572 at 2–7 (Defendants' Memorandum of Law in Support of Motion *in Limine* No. 1 to Exclude Evidence of Patient Harm). Instead, it will transform this case into a

series of mini-trials regarding the alleged co-conspirator practitioners' treatment of particular patients. This alone is a basis to exclude the proposed patient testimony under Rule 403. *See United States v. DeCologero*, 530 F.3d 36, 60 (1st Cir. 2008) (holding that a court may preclude evidence under Rule 403 if its admission would "distract from the main issues of the case" or cause a series of mini-trials within a trial). Nor does such testimony shed light on whether Defendants *intended and agreed* that practitioners would deceive patients. Rather, the patient testimony is full of improper hindsight assessments that are irrelevant, unduly prejudicial, and could well be the result of improper suggestion. *See* Dkt. No. 574 (Defendants' Memorandum of Law in Support of Motion *in Limine* No. 10 to Exclude Improper Opinions Regarding the Illegality of Witnesses' and Defendants' Conduct); Dkt. No. 577 (Defendants' Memorandum of Law in Support of Motion *in Limine* No. 13 to Exclude Evidence and Argument Regarding Any 'Fraud by Omission' Theory). And a number of the patients are being invited by the government to provide improper expert opinion.

When these issues are considered in their totality, it is clear that the government should not be permitted to call any of the 18 patients to testify.

## BACKGROUND

The government spent more than five years investigating this case. In that time, prosecutors and agents in Boston barely paid attention to patients as sources of evidence. Instead, until this past month, the patient materials provided in discovery in this case were largely from investigations by other USAOs of particular healthcare providers. *See, e.g.*, Letter from Nat Yeager to Defense Counsel at 2 (Feb. 16, 2018) (Ex. 6) (disclosing production of "[p]atient medical records from the Southern Districts of New York and Alabama").

Concerned that the government might try to inject the prejudicial topic of patient harm into this case, Defendants have persistently sought information about the individual patients whose testimony the government might seek to introduce in this trial.  *See* Dkt. No. 294 (Letter Requesting Additional Discovery) (April 2, 2018); Dkt. No. 313 (Motion for an Order Requiring the Government to Produce Certain Patient Records) (May 21, 2018); Dkt. No. 315 at 2 (Motion for a Bill of Particulars) (May 21, 2018); Dkt. No. 500 at 2 (Renewed Motion for Bill of Particulars) (Oct. 23, 2018).  The government repeatedly refused Defendants' requests, claiming that it need not "establish that the alleged scheme was successful or resulted in any actual harm to any victim." Dkt. No. 512 at 11.  Then, on December 12, 2018—a month before trial—the government changed course and provided Defendants with a list of 18 patients it may call at trial. Ex. 1.[1]  This disclosure comes on the heels of a recent spate of interviews, reflecting that prosecutors and agents in Boston have been scrambling to assemble patient testimony for the case.

Beyond the names of the 18 patient witnesses, the government has produced only a patchwork of supporting discovery.  For half of the 18 individuals, Defendants have not received *any* medical records, or have received plainly incomplete medical records.[2]  For a few of the 18 individuals, Defendants have not even received interview memoranda.[3]  And the interview memoranda for the remainder illustrate a scattershot effort by the government to identify the

---

[1] The government has asserted to the Court that the list of patient witnesses provided in its December 12, 2018 letter is complete.  Dkt. No. 616 at 14 ("[O]n December 12, 2018, nearly four weeks before it was required to do so, the United States disclosed the names of the nineteen [sic] patients it may call at trial in this case."); *see also* Ex. 1 (listing 18 potential patient witnesses).

[2] Defendants have no medical records for disclosed patient witnesses DM, AH, TC, CA, FC, and PL.  Defendants have plainly incomplete medical records for SB (28 pages), WC (24 pages), and BC (17 pages).

[3] Defendants have not received FBI 302s or other documentation of a witness interview with AH, AF, and BE.

patients who have the worst things to say about their healthcare practitioners or about Subsys, and to present their testimony without any vetting or analysis.

It appears that only one of the 18 patients has anything to say about interacting with anyone at Insys. *See* SB Memorandum of Interview at 2 (Nov. 18, 2018) (Ex. 2) (discussing interactions with an unnamed Insys sales representative). And many of the patients have affirmatively told investigators they had no interactions with *anyone* at Insys. *See, e.g.*, DM Memorandum of Interview at 6 (Nov. 27, 2018) (Ex. 3); BC Memorandum of Interview at 1 (Nov. 26, 2018) (Ex. 4); JM Memorandum of Interview at 2 (Dec. 3, 2018) (Ex. 5). None of the patients indicate that they have interacted with any of the undersigned Defendants.

## **ARGUMENT**

Patient testimony should be excluded as untimely, irrelevant, and prejudicial, and because the government is asking patients to provide improper expert testimony.

## I.     **PATIENT TESTIMONY SHOULD BE EXCLUDED BECAUSE OF THE GOVERNMENT'S FAILURE TO TIMELY DISCLOSE THEIR RECORDS**

For months, Defendants have argued that they lack particulars necessary to prepare a defense to allegations that patients were prescribed Subsys when it was not medically necessary. *See, e.g.*, Hr'g Tr. 10:21–11:13 (July 17, 2018). Without any information from the government, Defendants have done their best to guess which of the hundreds of medical files in discovery— files largely obtained by other USAOs—might come into play in this case. But the recent patient interviews bear no apparent relationship to the evidence previously gathered by other USAOs. The incomplete information the government has provided thus far as to the 18 patient witnesses is insufficient to allow Defendants to prepare an adequate defense, and any supplementation at this point would come too late.

"Due process requires that defendants confronted by victim witnesses have an opportunity to inspect the medical records upon which the witnesses base their claims of injury." *United States v. W. R. Grace*, 401 F. Supp. 2d 1093, 1101 (D. Mont. 2005). Such records are quintessential *Giglio* material. *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."). There is, moreover, "no question that the medical records of testifying victim witnesses are discoverable and must be produced under Rule 16(a)(1)(E)." *W. R. Grace*, 401 F. Supp. 2d at 1101; *see also* Fed. R. Crim. P. 16(a)(1)(E) ("Upon a defendant's request, the government must permit the defendant to inspect . . . documents . . . if the item is within the government's possession, custody, or control and . . . the item is material to preparing the defense.").

Local Rule 116.2 requires production of materials, like patient records, that "cast doubt on the admissibility of evidence" "by any . . . date established by the court." That disclosure date has passed. *See* Dkt. No. 277 at 1 ("The Government shall by November 26, 2018 disclose to the Defendants . . . the exculpatory information identified in Local Rule 116.2 that has not been previously produced."). The government did not disclose either the list of potential patient witnesses by that date or their complete medical records. Given the volume of records Defendants would be required to review to prepare an adequate defense to the patient witness testimony, allowing such testimony would, at a minimum, detract from other necessary trial preparations, and it may well be impossible to complete by trial. Allowing the government to supplement the patient medical records at this point would therefore be "unreasonable." *W. R. Grace*, 401 F. Supp. 2d at 1100 n.3 (government proposal to provide Defendants with full information concerning medical records of testifying witnesses 30 days before trial was "unreasonable").

Moreover, based on the records that *have* been produced, Defendants can tell just how unreliable the patient witnesses identified by the government may be.  Defendants previously analyzed 1,040 pages of medical records for SD, a patient of ███████ whose records were obtained by the USAO that investigated ███████.  The work done by Defendants reveals substantial disparities between the medical records and statements SD recently made to investigators.  For example, SD told investigators that "████████████████████████ ███."  SD Memorandum of Interview at 2 (Nov. 23, 2018) (Ex. 7).  Her medical records, however, indicate that ███████ tried to *decrease* SD's prescription for Subsys.  Similarly, Defendants previously reviewed the voluminous medical file of DG, a patient of ███████ obtained by the USAO that investigated him.  DG recently told investigators that she ███████ ███████."  DG Memorandum of Interview at 1 (Oct. 23, 2018) (Ex. 8).  But DG's medical records indicate that ████████████████████████ with her and provided an educational brochure at the first visit where she was prescribed Subsys.  What's more, DG's records contain a TIRF REMS Patient-Prescriber Agreement Form signed by DG, explicitly acknowledging that ███████ provided and reviewed with her a copy of the Medication Guide for Subsys.

Defendants are only able to point this out because they happened to select the medical files of SD and DG (among others) for in depth analysis months *before* the recent interview memoranda were produced.  Yet even this small sample shows that the government is not concerned with vetting the information these patients are providing against their medical records.  That tells this Court all it needs to know about how the prosecutors intend to try this case.

Worse yet, the prosecutors in Boston are not limiting their patient interviews to patients whose files have been produced in discovery.  For example, the government asked DM, a patient

of , to review a letter of medical necessity and accompanying failed medications list that ███████ sent to United Pain Care on her behalf. Ex. 3 at 5–6; DM Exhibits (Nov. 27, 2018) (Ex. 9).  DM told the government ████████████████████████ ██████████████████████████████████████████ Ex. 3 at 6.  In the absence of DM's medical records, Defendants cannot evaluate the validity of her claims or properly prepare to cross-examine her at trial.

Likewise, TC, a patient of ███████████, told investigators:



TC Memorandum of Interview at 2–3 (Dec. 1, 2018) (Ex. 10).  The prejudicial implication of TC's assertion is that ███████ maintained her dose of Subsys only because he was being bribed, and reduced her dose only when he was forced to switch her to another medication.  Without TC's medical records, Defendants can only speculate whether her recounting of events is accurate, and cannot evaluate whether there was a legitimate medical reason for ███████ prescribing decisions.

Absent a complete production from the government, Defendants are unlikely to be able to obtain the medical records they require, and certainly are unable to do so in a timely manner.  *See United States v. Polan*, 970 F.2d 1280 (3d Cir. 1992) (noting a limited constitutional right of privacy in medical records sought by subpoena).  At any rate, Defendants cannot afford, at this late date, to devote significant resources to the in-depth review of medical records needed to prepare for the testimony of the disclosed patients without otherwise prejudicing their trial preparation.  Therefore, this Court should exclude the proposed patient testimony.

## II.     PATIENT TESTIMONY SHOULD BE EXCLUDED AS IRRELEVANT AND UNDULY PREJUDICIAL

To convict Defendants of RICO conspiracy based upon an agreement to violate the honest services fraud statute or the Controlled Substances Act, the government must prove that Defendants *intended and agreed* that healthcare providers would prescribe Subsys to patients who did not need it.  *See* Dkt. No. 319 at 21–31 (Mem. in Support of Mot. to Dismiss First Superseding Indictment); Dkt. No. 514 at 11–16 (Mem. in Support of Mot. to Dismiss Second Superseding Indictment).  In determining whether the government has proven beyond a reasonable doubt that Defendants did so, the jury will not be aided by the testimony of patients who never interacted with Defendants but are angry, in hindsight, at the medical treatment that they were provided by their healthcare practitioner.  To the contrary, the jury will be confused and inflamed, creating a heightened risk of conviction on the basis of guilt-by-association or other improper considerations, such as sympathy for the patients or general anger about opioid-related adverse events.

The government's desire to turn this case into a trial-by-proxy of the co-conspirator practitioners' conduct is made plain by the patients' interview memoranda.  For example, several of the 18 patients recount their observations concerning the offices and clientele of alleged co-conspirator practitioners.  *E.g.*, DM Memorandum of Interview at 1 (Nov. 25, 2018) (Ex. 11) .  Others blame Subsys for a variety of negative developments in their life, even where those developments occurred long after they stopped taking the medication.  *See e.g.*, TW Memorandum of Interview at 3 (Dec. 4, 2018) (Ex. 12) ).

Even if true, patients' testimony about unwanted side effects they experienced from Subsys—side effects that are conspicuously warned of in Subsys's FDA label, as well as the TIRF

REMS paperwork that every Subsys patient was required by law to read—or about how, with the benefit of hindsight, they believe that their physician should have treated their pain is irrelevant to whether Defendants knowingly and intentionally joined the charged RICO conspiracy. *See* Fed. R. Evid. 401.[4]  And even if it were relevant in some tangential way, the potential for significant and unfair prejudice to Defendants substantially outweighs any conceivable probative value. *See* Fed. R. Evid. 403.  Indeed, much of the information obtained by government investigators seems calculated to "invite[] the jury to render a verdict on an improper emotional basis." *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000).  For that reason, similar patient testimony has been excluded in other cases. *See United States v. Robinson*, 258 F. Supp. 3d 87, 90 (D.D.C. 2017) (excluding patient testimony to the effect that physician-defendant was "operating a 'pill mill'").

Such information is especially prejudicial where, as here, none of the practitioners who prescribed Subsys to these patients are on trial.  At a minimum, the proposed patient testimony is likely to confuse the jury and lead to collateral mini-trials as to the treatment of particular patients by particular practitioners. *See DeCologero*, 530 F.3d at 60 (holding that evidence may be excluded under Rule 403 on this ground).  Moreover, the proposed patient testimony would confuse the jury into deciding Defendants' guilt or innocence based upon whether the government has proven that patients were harmed by Subsys prescriptions that were written by alleged co-

---

[4] The government's apparent belief that medically unnecessary prescriptions are a reasonably foreseeable result of a kickback scheme is beside the point.  This is not a civil case to be decided upon questions of proximate causation.  Nor is it a substantive criminal case in which the jury is asked to decide whether Defendants are liable for particular Controlled Substances Act violations by practitioners based upon a *Pinkerton* theory.  The government cannot shed its burden of proving substantive violations by only charging Defendants with conspiracy, then turn around and seek to prove the conspiracy by introducing evidence of bad conduct by the prescribers and arguing that it was foreseeable.

conspirator practitioners whom Insys had paid to be speakers.  Especially given the current public environment with respect to the topic of opioid treatment, no amount of cautionary instructions could ameliorate this risk.  The Court should therefore exclude any patient testimony about purported harm caused by their practitioners.  *See* Dkt. No. 572 at 2–7.

In addition, to convict Defendants based upon the honest services predicate, the government must prove that Defendants agreed that physicians should deceive their patients.  *See* Dkt. No. 577.  Yet none of the interview memoranda documents any statement from a patient witness alleging a misleading statement from the practitioner who prescribed them Subsys.  In lieu of such evidence, the interview memoranda illustrate that the government will seek to illicit irrelevant and prejudicial assertions by patients that they " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ KS Memorandum of Interview at 1 (Oct. 23, 2018) (Ex. 13); *see also* Ex. 8 at 1 (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).  This testimony is irrelevant and impermissible in a case where the government has failed to articulate a proper basis for fraud by omission.  *See* Dkt. No. 577 (Defendants' Memorandum of Law in Support of Motion *in Limine* No. 13 to Exclude Evidence and Argument Regarding Any 'Fraud by Omission' Theory).

Finally, the patients in question are being asked to evaluate their own medical care through hindsight colored by what they " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."  *See* MK Memorandum of Interview at 2 (Nov. 23, 2018) (Ex. 14); *see also id.* (" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  This kind of hindsight testimony should be excluded as irrelevant and prejudicial. *See* Dkt. No. 574 (Defendants' Memorandum of Law in Support of Motion *in Limine* No. 10 to Exclude Improper Opinions Regarding the Illegality of Witnesses' and Defendants' Conduct).

### III.   "EXPERT" PATIENT TESTIMONY SHOULD BE EXCLUDED

The government did not disclose any retained experts to testify about the 18 patients at issue.  Instead, the government seems to be attempting to admit expert testimony under the guise of patient testimony.  This runs afoul of Federal Rule of Evidence 701, which prohibits lay opinion testimony that is "based on scientific, technical, or other specialized knowledge."

The government says that it intends to have the patients "testify regarding the details of their health before, during, and after taking Subsys."  Dkt. No. 616 at 14.  But a cursory review of the memoranda from the government's interviews with patients reveals opinions that could only be introduced—if at all—though a qualified expert witness.  For example, DM told investigators that she was "█████████████        when she was prescribed Subsys—a determination that only a qualified health practitioner can make.   Ex. 3 at 4.  Such testimony falls outside the bounds of permissible lay opinion testimony.  *See* Fed. R. Evid. 701.  To take another example, MK, a patient of ██████████, opined to investigators that she "███████████████████████████ ██████████████████████."  Ex. 14 at 2.  Such information does not satisfy the "indicia of the absence of a legitimate medical purpose" that courts have asserted a lay person could recognize.  *United States v. Binder*, 26 F. Supp. 3d 656, 662, 665 (E.D. Mich. 2014) (granting motion for acquittal on Controlled Substances Act charge).  Rather, as noted above, MK bases her conclusion on what she  █████████████████████████."  Ex. 14 at 2.

That the government is asking patients to evaluate their own medical care in light of alleged bribes confirms what the Defendants have been telling this Court all along—the government impermissibly equates Anti-Kickback Statute violations with lack of medical necessity.  Surely, it is improper for the government to bridge this gap by inviting lay witnesses to comment on medical necessity, in hindsight, after exposing them to the allegation that their practitioners were bribed.

## **CONCLUSION**

For the foregoing reasons, the Defendants respectfully request that the Court bar the government from putting on the patient testimony it has disclosed on the eve of trial.

Dated: December 26, 2018

Respectfully submitted,

/s/ Steven A. Tyrrell
Steven A. Tyrrell (admitted *pro hac vice*)
steven.tyrrell@weil.com
Patrick J. O'Toole, Jr. (BBO# 559267)
patrick.otoole@weil.com
Weil, Gotshal & Manges LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 682-7213

*Attorneys for Richard Simon*

/s/ Michael Kendall
Michael Kendall (BBO# 544866)
michael.kendall@whitecase.com
Alexandra Gliga (BBO# 694959)
alexandra.gliga@whitecase.com
White & Case LLP
75 State Street
Boston, MA 02109
Telephone: (617) 939-9310

*Attorneys for Joseph Rowan*

/s/ Tracer A. Miner
Tracy A. Miner (BBO# 547137)
tminer@demeollp.com
Megan Siddall (BBO# 568979)
msiddall@demeollp.com
Demeo LLP
200 State Street
Boston, MA 02109
Telephone: (617) 263-2600

*Attorneys for Michael Gurry*

/s/ Beth A. Wilkinson
Beth A. Wilkinson (*admitted pro hac vice*)
bwilkinson@wilkinsonwalsh.com
Alexandra M. Walsh (*admitted pro hac vice*)
awalsh@wilkinsonwalsh.com
Kosta S. Stojilkovic (admitted *pro hac vice*)
kstojilkovic@wilkinsonwalsh.com
Wilkinson Walsh + Eskovitz LLP
2001 M Street NW
Washington, D.C. 20036
Telephone: (202) 847-4000

Brien T. O'Connor (BBO# 546767)
brien.o'connor@ropesgray.com
Aaron M. Katz (BBO# 662457)
aaron.katz@ropesgray.com
Ropes & Gray LLP
Prudential Tower 800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000

*Attorneys for Dr. John Kapoor*

/s/ Peter C. Horstmann
Peter C. Horstmann (BBO# 556377)
pete@horstmannlaw.com
Law Offices of Peter Charles Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
Telephone: (617) 723-1980

*Attorney for Sunrise Lee*

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(2), I hereby certify that counsel for Dr. Kapoor have in good faith conferred with counsel for the government to resolve or narrow the issues presented by this motion, and that the disputed issues remain unresolved..

/s/ Beth A. Wilkinson

Beth A. Wilkinson
Counsel for Dr. John Kapoor

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document will be served on all counsel of record through the ECF system.

/s/ Beth A. Wilkinson

Beth A. Wilkinson (admitted *pro hac vice*)
Counsel for Dr. John Kapoor