UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | )<br>)<br>) Crim. No. 16-10343-ADB |
| v. | )<br>) |
| MICHAEL L. BABICH, | )<br>) |
| Defendant. | )<br>) |

### PARTIES' AGREED STATEMENT OF FACTS

The parties have entered into an agreement dated January 9, 2019, a copy of which has been produced to the Court. In contemplation of a guilty plea by Defendant Michael L. Babich (Defendant) to the attached Information, the parties have agreed to the following statement of facts (Statement). This Statement is provided to the Court to assist the Court in its determination that there is an adequate factual basis to support the plea, and is not meant to provide a full rendition of all the facts and circumstances which may underlie the crimes alleged in the Information.[1]

The Parties agree that during the time period alleged in the Information, Insys Therapeutics' sole product was Subsys, a fentanyl spray approved by the FDA for use by cancer patients suffering from breakthrough pain. This was a very expensive drug and a very dangerous drug if abused.

---

[1] This agreed statement of facts does not prevent either party from supplementing this statement at Defendant Babich's plea colloquy or at any subsequent proceedings related to Defendant Babich's sentencing. Nor does this statement constitute a complete account of Defendant Babich's relevant conduct under the U.S. Sentencing Guidelines.

1

Insys did business in the District of Massachusetts. It employed sales representatives and a district manager, it solicited medical professionals to prescribe Subsys in Massachusetts, and it held events with prescribers in Massachusetts.

The defendant was employed by Insys from approximately 2007 through November 2015, and became the Chief Executive Officer in March 2011. In that capacity, in concert with, and at the direction of his superior John Kapoor, the Defendant conspired with others, including those named in the Second Superseding Indictment (SSI), to use the Insys Speaker Program (ISP) as a vehicle to bribe doctors and other clinicians to prescribe Subsys for their patients rather than a competitor drug. The evidence would show that some of these speakers received as much as $200,000 over the time period alleged in the Information. In order to increase profits, both personal and corporate, Defendant and his coconspirators agreed to engage in a marketing strategy that not only targeted medical professionals involved in pain management, but also induced the medical professionals identified in the SSI and other government disclosures to prescribe Subsys in return for the opportunity to participate in the ISP.

Although speakers programs were not illegal or improper in general, Defendant and his coconspirators used them at times as an illegal vehicle to bribe pain practitioners to prescribe Subsys rather than as a tool to educate medical professionals. Thus, the substance, if any, of many speaking events was secondary to the goal of paying the speaker and providing a free meal, and often, alcohol. These programs were often poorly attended and merely used as an excuse for the participant and his or her friends to have a free meal and drinks paid for by Insys. The Defendant conspired with John Kapoor, Alec Burlakoff, and Regional Sales Managers Joseph Rowan, Richard Simon, and Sunrise Lee to implement the aforementioned practices.

The scheme worked in the following fashion: medical professionals who prescribed Subsys were rewarded with speaking opportunities based upon the volume of prescriptions they wrote; thus, the volume of prescriptions written by the prescriber determined the remuneration paid to the prescriber. As evidence of the abuse of the ISP, Kapoor and Defendant, at Kapoor's direction, instructed Insys employees to track the volume of prescriptions written by participants in the ISP program. They rewarded prolific writers with more speaking opportunities – and more pay – and punished those who were not writing a sufficient volume by removing them from the ISP or withholding paid speaking engagements.

The U.S. mails were used in furtherance of this scheme by Insys, which paid the participants in the ISP by checks that were mailed, including those mailings described in the Information. Insurers and Pharmacy Benefit Managers (PBMs) also mailed checks to pharmacies to pay for Subsys prescriptions.

In order to gauge the effectiveness of their scheme, Kapoor, and other members of the conspiracy reviewed speakers' prescriptions on a regular basis. Participants in the ISP were also pressured to write prescriptions for ever increasing dosages of Subsys and were awarded with more speaking opportunities for doing so. The Insys commission protocol also rewarded the sales staff with greater commissions if medical professionals, including speakers, prescribed higher doses of Subsys.

In essence, Defendant and his coconspirators used the ISP to bribe medical professionals to prescribe Subsys to as many patients as possible. While participating in this scheme, Defendant and his coconspirators understood that medical professionals owed a duty to their patients to provide medically necessary care, and that the activities described in this Statement and Information increased the risk that such care would not be provided. As the conspiracy

progressed, Defendant and his coconspirators realized that there was an increased risk that their coconspirator medical practitioners would have their independent medical judgment compromised and write medically unnecessary Subsys prescriptions.

Defendant and his coconspirators used other methods to bribe and induce medical professionals to prescribe Subsys. One such method was to shift employees of a practitioner's office to the Insys payroll and to employ relatives and girlfriends of the medical professionals who were high volume writers. Another such method was that Defendant, Kapoor, and others, used a third party logistics shipping arrangement with a particular pharmacy in Alabama in order to give two prescribers added profits as a reward for prescribing Subsys instead of competitor drugs.

Although Defendant and his coconspirators were highly successful in increasing the prescriptions for Subsys as a result of the above scheme, they also faced resistance from certain insurers and PBMs that balked at providing reimbursements for Subsys. In order to obtain authorizations and subsequent payment for Subsys prescriptions, the conspirators created the Insys Reimbursement Center (IRC). Insys employees staffed the IRC. Thus, rather than employees of the practitioner communicating with providers, patient information was often sent to the IRC in Arizona where IRC employees provided false and misleading information to insurers to obtain Subsys authorizations. These false representations included the identity of the IRC employees who misrepresented themselves as employees of the practitioner as well as the medical history, and symptoms of the patients. But for the false representations, the insurance companies and PBMs would not have paid or authorized payment for Subsys prescriptions. As a result of this scheme, insurers and PBMs were defrauded by paying reimbursements for Subsys,

a more expensive drug than the generic alternative and some of its branded competitors, and paid when inappropriate.

Michael Gurry managed the IRC. Kapoor, with the participation and agreement of Defendant, directed that IRC employees, including Gurry and Elizabeth Gurreiri, provide false and misleading information to insurance companies and PBMs to obtain authorization and payments for Subsys.

As a result of the offenses described in this Statement and in the Information, Defendant personally obtained at least $3.5 million in proceeds.

Respectfully submitted,

Dated: January 9, 2019

ANDREW E. LELLING
United States Attorney

By: /s/ Fred M. Wyshak, Jr.
Fred M. Wyshak, Jr.
K. Nathaniel Yeager
David Lazarus
Assistant U.S. Attorneys

Michael L. Babich
Defendant

William Kettlewell, Esq.
Attorney for Defendant

Wick Sollers, Esq.
Attorney for Defendant

Mark Jensen, Esq.
Attorney for Defendant

5