UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIMINAL NO. 16-10343-ADB |
| ) | |
| v. ) | |
| ) | |
| MICHAEL L. BABICH, ET. Al. ) | |
| ) | |
| Defendants. ) | |
| ) | |

**SUPPLEMENTAL MEMORANDUAM IN OPPOSITION**
**TO DEFENDANTS' MOTION IN LIMINE No. 13.**

In their reply in support of their motion in limine (No. 13) to exclude evidence and argument regarding any "fraud by omission" theory, Defendants repeatedly assert that the Second Superseding Indictment (SSI) fails to identify the existence of any affirmative duty to disclose, and the government therefore should be prohibited from offering any evidence or argument that Defendants or any alleged co-conspirators committed fraud by failing to disclose to patients or insurance companies that doctors received payments from Insys in exchange for prescribing Subsys. In doing so, Defendants assert that the government, in its memorandum in opposition, attacks a "straw man" by repeatedly conflating "fraud by omission" and affirmative fraud. But it is the Defendants who have misunderstood the distinction between affirmative fraud and "half-truths", on the one hand, and "fraud by omission" on the other. In this case, as the government explained in its memorandum in opposition, the SSI alleges that the Defendants and/or any their co-conspirators committed fraud by failing to disclose to patients or insurance companies that doctors received payments from Insys in exchange for prescribing Subsys. Those actions, under settled precedent, constitute affirmative fraud or "half-truths"; the government is not proceeding under a theory of "fraud by omission."

**ARGUMENT**

A.   **Affirmative False Statements, "Half-Truths," and "Fraud by Omission."**

In *Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1st Cir. 1998), the First Circuit explained that "the *locus classicus* of fraud is a seller's affirmative false statement or a half-truth, *i.e.*, a statement that is literally true but is made misleading by a significant omission." *Id.* at 69 (citing *Emery v. American Ge. Fin., Inc.*, 71 F.3d 1343, 1348 (7th Cir. 1995) (Posner, C.J.)).  Outside of an affirmative false statement or a half-truth, the court further noted, the common law did not impose any broader, general duty to disclose, "but it is settled that the mail and wire fraud statutes go somewhat beyond the common law," inasmuch as the failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional, or contractual duty to disclose. *Id.* at 69-70.  The First Circuit also recognized that certain conduct alone, in context, can amount to a misrepresentation under federal law:

> No doubt a shadowy area exists in which conduct alone, in context, can amount to a misrepresentation.  Imagine the sale of a 240 DL where the salesman made no formal representations about the car, although knowing it to have a four-cylinder lawnmower engine in place of a car engine; or, consider a customer who explicitly told the salesman that she was buying the car because it had built-in child safety seats, when the salesman knew that the seats had been removed from that particular car.  If such deceptions were deliberate, we assume, at least arguendo, that the sales could be treated as artifices to defraud under the federal statutes.

*Id.* at 70.

Consistent with these principles, the First Circuit has explained that "[a] mail fraud conviction may be based on a defendant's 'deceptive conduct,' a category that certainly may include the dissemination of incomplete information, where the specific intent to defraud exists." *United States v. Rosen*, 130 F.3d 5, 10 (1st Cir. 1997).  This is true because, as other courts have explained, so-called "half-truths" are no less misleading, and no different under the law, than

affirmative misstatements. *See, e.g.*, *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) ("[F]raudulent representations, as the term is used in [section] 1341, may be effected by deceitful statements of halftruths . . . .") (quotation omitted); *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) ("[U]nder the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.") (quotation omitted); *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979) ("Deceitful statements of half-truths . . . [are] actual fraud under the statute.").

A good example of how these principles apply is *United States v. Carpenter*, 781 F.3d 599 (1st Cir. 2011). In that case, the defendant, in a nutshell, told clients he would hold their money in escrow accounts for which the client would pay a fixed fee and which would cautiously generate returns of either three or six percent. The defendant then, unbeknownst to his clients, invested the money in high-risk, high-return stock options, hoping to generate excess returns to keep for himself. *Id.* at 603. The defendant's option trading ultimately fared poorly, and he lost nine million dollars in client funds. *Id.*

As relevant here, after the defendant was convicted following a third trial, the defendant argued that there had been a constructive amendment because the government's theory at trial was misrepresentation by omission, while the indictment charged affirmative misrepresentations. In finding no merit to that argument, Judge O'Toole held that the government's evidence at trial and its arguments to the jury did not vary from or amend the indictment because the government's theory at trial was that the defendant's actions constituted either affirmative misrepresentations or "half-truths":

> The government's evidence at trial and its argument to the jury did not vary from the indictment. The government argued that the material provided by the defendant was either plainly false or were "half-truths" that made th[e] statements materially misleading. This theory was within the scope of the indictment.
>
> The "omissions" that the defendant complains of deal with the government's contention that the defendant failed to inform the exchangors that he was using their funds that were represented to be in "escrow" accounts to actively trade in options for his own profit. The affirmative representations that the funds were deposited in accounts maintained at Merrill Lynch and later Paine Webber were true as far as they went, but what they omitted made them misleading. Arguing that the defendant omitted material information necessary to make the affirmative statements not misleading did not transform the case from one of affirmative misrepresentations to a case of misrepresentations solely by reason of omission. There was no constructive amendment of the indictment

*United States v. Carpenter*, 2014 WL 691659, at *5 (D. Mass. Feb. 21, 2014).

The First Circuit affirmed and, in doing so, held that "the government did not prosecute a theory of fraud by omission: its theory was that the marketing materials and agreements contained affirmative misleading statements." 781 F.3d at 619-20. To the contrary, and after quoting from and agreeing with Judge O'Toole's analysis of the issue, the First Circuit concluded that "[u]nder the theory of affirmative misleading statements, there was no need to prove the elements of a pure failure-to-disclose case." *Id*. at 620.

These cases stand for the unremarkable proposition affirmative statements that omit material information are either affirmatively misleading or, at a minimum, "half-truths" because while the statements may have been literally true, they were made misleading by a significant omission. In this case, the SSI alleges that the Defendants and/or their co-conspirators affirmatively deceived patients and insurance companies in a number of ways, including through statements intended to lead them to believe that prescriptions were written based on medical

necessity in the usual course of practice (i.e., through the honest services of the prescriber), when in fact they were the result of bribes. As in *Carpenter*, those statements are properly viewed either as being plainly false or "half-truths" that were made materially misleading by a significant omission. This case, in other words, is not one based on simple nondisclosure, nor does the SSI allege a theory of "fraud by omission."

### B.    The SSI

The SSI alleges two schemes related to traditional money or property fraud: (1) that the Defendants used bribes and kickbacks to fraudulently cause insurers to pay for new prescriptions, as well as for increases in dosages and units of new and existing prescriptions (SSI at ¶30.a); and (2) that the Defendants directed employees to affirmatively mislead insurers when seeking prior authorization for payment (SSI at ¶¶ 63-71). In addition to traditional mail and wire fraud, the SSI also alleges that the Defendants used bribes and kickbacks to deprive patients of the honest services of their practitioners. (SSI at ¶ 30.b). None of those allegations are based on a theory of "fraud by omission."

#### 1.    Money or Property Fraud

Generally, the government proves the first element of a straight mail or wire fraud count with evidence that the defendant "was attempting to 'wrong [] one in his property rights by dishonest methods or schemes.'" *United States v. Pimental*, 380 F.3d 575, 585 (1st Cir. 2004) (quoting *McNally v. United States*, 483 U.S. 350, 358 (1987)). In establishing such proof, "[t]he essence of a scheme is a plan to deceive persons as to the substantial identity of the things they are to receive in exchange." *Harrison v. United States*, 200 F. 662 (6th Cir. 1912). *United States v. Brien*, 617 F.2d 299, 307 (1st Cir. 1980) (citations omitted).

### a. Fraudulently Causing Insurers To Pay for Prescriptions

The Controlled Substances Act (CSA), and its implementing regulations, define the closed system of distribution for schedule II drugs like Subsys. The implementing regulations to the CSA provide, as relevant here:

> (a) A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. 829) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.

21 C.F.R. § 1306.04(a). The CSA is relevant to this form of fraud for two reasons. First, the script must be issued for a legitimate medical purpose in the usual course of his professional practice. *Id.* Second, an order for medication that is not issued not in the usual course of professional treatment is not a valid prescription. *Id.*

The government anticipates that a pain management expert will testify at trial that in the course of treating patients for pain, physicians have a duty to (1) make a reasoned and informed diagnosis of the medical condition affecting each individual patient; and (2) formulate and implement an appropriate regimen of treatment for that individual based upon the diagnosis. If either of these two conditions are not met *prior* to the prescribing of controlled substances to a patient, the physician has violated the basic standard of care and is prescribing controlled substances outside the usual course of professional practice. Nevertheless, it is anticipated that at

least two practitioners will testify at trial that, because they were bribed, they prescribed Subsys outside the usual course of professional practice.

Further, it is anticipated that the jury will receive evidence that, in exchange for receiving bribes, the Defendants sought agreements with some doctors to write a specific number of new prescriptions per week, to increase dosages, and to increase the number of units of each dose.  One prescriber will testify that when she complained that she was unable to meet her agreement because she did not have any more cancer patients, she was told she should write off label.  Moreover, this testimony will be corroborated by other evidence of contemporaneous communications among the co-conspirators.  See, e.g. Ex.3: Email from Burlakoff to Babich, forwarding email from Simon, dated April 22, 2013 (" I WANT EXAMPLES  ON OUR NEXT CALL OF THE PLAN  YOU HAVE CREATED WITH YOUR TOP CUSTOMERS TO GET A SPECIFIC NUMBER OF SCRIPTS PER WEEK THAT IS MUTUALLY AGREED TO AND AN OUTLINE OF HOW YOU WILL HOLD YOURSELVES  AND YOUR CUSTOMERS  TO THIS  PLAN.") (emphasis in original).

The allegation here is simple.  The Defendants bribed practitioners to write prescriptions outside the course of professional practice.  As such, they misled insurers by actively causing the submission of orders, purporting to be a prescription, issued not in the usual course of professional treatment.  The fake prescriptions generated by the bribes were used as instruments of fraud. Whether these prescriptions either were plainly false in context, or they contained "half-truths" in that they were made materially misleading by a significant omission, they are evidence of the fraudulent scheme, and the jury is entitled to consider them as such.

### b. Prior Authorization Fraud

The other form of traditional mail and wire fraud involves allegations related to the Insys Reimbursement Center (IRC). The SSI alleges that IRC employees were instructed to:

> mislead insurers by misrepresenting patient diagnoses, the type of pain being treated, and the patient's prior course of treatment with other medications. Insys Reimbursement Center employees also misled insurers by failing to disclose that they worked for Insys; instead, they posed as employees of the practitioner or stated they were calling from the practitioner's office…

(SSI at ¶ 67). Most of these allegations are plainly affirmative misrepresentations, e.g. a false diagnosis of dysphagia, a false statement that a patient had previously tried a particular drug, an posing as an employee of a particular practitioner. Only one of these allegations, "the spiel", involves the withholding of information,[1] but even with the spiel, the information withheld was always in response to a direct question from the insurer. Here, too, the statements made to the IRC were either plainly false or they contained "half-truths" in that they were made materially misleading by a significant omission.

### 2. Honest Services Fraud

For mail and wire fraud, Congress has defined the term "scheme or artifice to defraud" to include, "a scheme or artifice to deprive another of the intangible right of honest services." 18

---

[1] The government alleges that IRC employees were instructed that, if insurers asked if a patient was being treated for breakthrough *cancer* pain, they were supposed to answer using a written script, sometimes called "the spiel":

> 'The physician is aware that the medication is intended for the management of breakthrough pain in cancer patients. The physician is treating the patient for their breakthrough pain.'

The government intends to introduce testimony regarding the spiel, as well as a number of recordings during which the spiel was used.

U.S.C. § 1346. As described above, the SSI alleges that racketeering activity in this case included honest services fraud. While this is not the traditional form of mail or wire fraud, there is precedent that post-dates *Skilling v. United States*, 561 U.S. 358 (2010), that supports this theory of prosecution.

In *United States v. Nayak*, 769 F.3d 978 (7th Cir. 2014), the Seventh Circuit upheld an honest services mail fraud conviction where the owner of an out-patient surgery center paid bribes to physicians in exchange for patient referrals. In affirming the defendant's conviction, the Seventh Circuit reasoned that "[t]he intangible harm from a fraud can often be quite substantial, especially in the context of the doctor-patient relationship, where patients depend on their doctor—more or less completely—to provide them with honest medical services in their best interest." *Id*. 984.[2]

As a matter of law, honest services fraud does not require proof of an affirmative misrepresentation. *See Skilling*, 561 U.S. at 401 ("The actual deception that is practised [in honest services fraud] is in the continued representation … that he is honest and loyal ….") (quoting *United States v. Procter & Gamble Co.*, 47 F. Supp. 676, 678 (D. Mass. 1942)). Honest services fraud cases can, however, be based upon affirmative misrepresentations. *See United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (Sotomayor, J.).

In this case, the SSI alleges that practitioners "owed a fiduciary duty to their patients to prescribe medication in the usual course of professional practice for a legitimate medical purpose."

---

[2] The Seventh Circuit's rationale is consistent with the Model Penal Code (M.P.C.), which explicitly recognizes duties of fidelity to include those owed by a "lawyer, physician, accountant, appraiser, or other professional advisor or informant." M.P.C. §§ 224.8(1)(c). In fact, pursuant to M.P.C. §§ 224.8(3), a person is guilty of commercial bribery if s/he "confers, or offers or agrees to confer, and benefit the acceptance of which" is prohibited by M.P.C. § 224.8(1).

In addition to case law, as well as the testimony of the Government's expert regarding the standard of care for all physicians, this duty is explicitly referenced in the C.S.A.  21 C.F.R. § 1306.04(a). ("A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner….").

As described above, the allegations in this case are that the Defendants conspired to bribe practitioners to write scripts outside the usual course of professional practice.  In so doing, they sought to deprive patients of their right to honest medical services.  The fake prescriptions generated by the bribes were used as instruments of fraud.  Here, once again, these prescriptions were either plainly false or they contained "half-truths" in that they were made materially misleading by a significant omission.  *See Bonilla*, 150 F.3d at 69.

## CONCLUSION

WHEREFORE, the United States respectfully requests the Motion be denied.

ANDREW E. LELLING
United States Attorney

Dated: January 25, 2019    By:   /s/ *K. Nathaniel Yeager*
K. NATHANIEL YEAGER (BBO # 630992)
DAVID G. LAZARUS  (BBO #624907 )
FRED WYSHAK, JR. (BBO #535940)
Assistant U.S. Attorneys
One Courthouse Way, Ste. 9200
Boston, MA  02210
(617) 748-3100
david.lazarus2@usdoj.gov
nathaniel.yeager@usdoj.gov
fred.wyshak@usdoj.gov

**Certificate of Service**

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: January 25, 2019
                        /s/ *K. Nathaniel Yeager*
                        Assistant U.S. Attorney