UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 16-cr-10343-ADB |
| MICHAEL BABICH | |
| Defendant | |

## SENTENCING MEMORANDUM ON BEHALF OF MICHAEL BABICH

### LEAVE TO FILE GRANTED ON 12/18/19

KING & SPALDING LLP
Joseph Sedwick Sollers III
Mark A. Jensen
Daniel C. Sale
1700 Pennsylvania Ave., NW
Washington, D.C. 20006
+1 202 737 0500

HOGAN LOVELLS
William H. Kettlewell
125 High Street
Suite 2010
Boston, MA 02110
+1 617 371 1005

*Attorneys for Defendant Michael Babich*

December 18, 2019

## PRELIMINARY STATEMENT

Mike Babich is a good person, defined as much by his devotion to his two small children and family as he is by the mistakes he made in this case as a young, first-time pharmaceutical executive. The truth of this matter is that Mike Babich was out of his depth at Insys Therapeutics, positioned as a CEO in name only at one of Dr. John Kapoor's businesses because he was inexperienced and would follow his directives. And follow he did, and he makes no excuses for his lapse in judgment in doing so. Mike Babich is contrite, he has accepted responsibility for his actions, confronted his mistakes directly through his significant cooperation with the government and his lengthy trial testimony, and is suffering the consequences every day with a ruined reputation and knowing he let down too many.

But the conduct at issue in this case represents an aberration in the life of a person whose "personal history and characteristics" emphasize the type of individualized assessment required under the Supreme Court's sentencing jurisprudence; and these unique characteristics cannot be reduced to rote mathematical computations under the Sentencing Guidelines. Mike Babich's life otherwise has been defined by good behavior, compassion, and dedication to helping others.

We have reviewed the Initial Presentence Report and provided comments to the Probation Department. We have not yet reviewed the Final PSR but understand from the Probation Office that it should be available approximately one week prior to Mike's sentencing on January 9, 2020. The Probation Office has also advised that many of the issues raised in our comments will be deferred to the Court. Accordingly, our comments and objections to the Initial PSR are likely to remain at issue and are repeated, in part, and preserved below in this submission.

The Initial PSR contains a presumptive Guidelines range of 97–121 months. The government's objections to the Initial PSR contain a presumptive Guidelines range of 121–151 months. We anticipate that the government will submit a motion outlining Mike's substantial assistance and cooperation in this, and other cases, under Section 5K1.1 of the Guidelines, and

recommending a sentence significantly below the presumptive range. Mike's cooperation was extensive and crucial to the government's case, but we respectfully submit that the Court should consider much more than the government's motion in sentencing Mike to a below-Guidelines sentence. For the reasons discussed below, a just sentence in this case is home confinement coupled with a term of probation and extensive community service. Such a sentence is supported by the facts of this case, the law, and the factors enumerated in 18 U.S.C. § 3553(a).

From *Booker* through *Gall* and its progeny, the Supreme Court has made clear that sentencing courts must make an "individualized assessment" based on all the Section 3553(a) factors. *Gall v. United States*, 522 U.S. 38, 50 (2007). As § 3553(a) states, the sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing described in § 3553(a). 18 U.S.C. § 3553(a); *Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011). That calibrated approach means the *least* restrictive sentence here.

In this case, we respectfully submit that a variance from the sentence suggested by the Guidelines is warranted for Mike for four main reasons.

1.     Mike accepted responsibility for his actions and provided extraordinary cooperation in this prosecution in a way that mattered. As the Court is aware, this case would have been very different had Mike not testified over six days. Both sides at trial referred to Mike's testimony as critical. Both sides cited his testimony favorably and unfavorably when it advanced their arguments, a clear indication that he testified to the best of his abilities regardless of the personal consequences for himself. The Court itself cited Mike's testimony at least 35 separate times in its opinion upholding the convictions of the Trial Defendants, including to connect certain defendants to key aspects of the offense and to describe details of events that only Mike's unique testimony provided given the Trial Defendants' decisions not to testify. Put simply, without Mike's testimony in this case, it is not at all clear that the government would have been able to prevail at all or to the extent it did in this

prosecution.  Furthermore, Mike has cooperated with government prosecutors in other districts to assist in other related prosecutions.  His cooperation continues to this day.

2.    Mike is a devoted and present father and husband, and a lengthy prison term would have devastating and irreversible effects on his family.  Since 2015, when he was terminated from Insys, Mike has been a stay-at-home-dad, caring for his wife and young boys, and they rely on him extensively.  Mike's wife, Natalie, ███████████████████████████████

████████████████████████████████████████████████████████████

██████████████████   At times, she is unable to pick up either of their two boys.  As a result, Mike is integral to their day-to-day care.  ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████   Although Mike's family situation does not decrease his culpability, it is relevant to his sentence under § 3553(a).  We respectfully submit that a lengthy term of confinement would wreak havoc on his young family, and they, he, and the public would be better served with a sentence of home confinement, probation, and community service.

3.    Mike was an inexperienced pharmaceutical executive at 35 years old, and while bright, he was out of his depth at that age when Dr. Kapoor named him the Insys Chief Executive Officer with no advance warning in 2011.  Mike had never received any scientific, medical, regulatory, promotional, marketing or other standard training that is commonplace in the pharmaceutical industry.  Before his appointment, his only pharmaceutical background was indirect and modest, self-learned only as a finance manager for Dr. Kapoor's home office holdings for almost a decade directly out of college.  His inexperience in business, particularly pronounced in the highly regulated pharmaceutical industry, would prove catastrophic.  Despite this lack of experience, he was thrust into the role of the public "face" of the Company and necessarily relied on those around him—who had significantly more expertise in the pharmaceutical sector—to manage a public company selling a tightly

controlled substance.[1]  Again, we do not intend to diminish Mike's culpability—he made significant and regrettable mistakes—but hope to explain Mike's mental state, the pressures he was under at the time, and his relative naïveté.  Almost overnight Mike found himself an executive in a publicly traded company.  He wanted to make his family proud and did not want to let down the people who relied on him.  He was in his mid-thirties and had the weight of an overbearing, verbally hostile, micro-managing executive chairman, along with the demands of trying to learn and run a public company, all on his shoulders.  Due in part to these pressures, he did not make the responsible decision to stop inappropriate conduct when he should have.

4.       The driving factor behind the Guidelines-recommended sentencing range in this case is a deeply flawed calculation of the purported monetary loss involved, resulting in the PSR-calculated 20-level increase in the Base Offense Level under Section 2B1.1(b)(1)(I) (the "Fraud Guideline").  As described below, the Probation Office's calculations are legally and factually deficient, and significantly overstate the amount of loss involved.  While correctly recognizing that the loss amount should be based on the number of medically unnecessary prescriptions written, the loss methodology used in the PSR and by the government does not result in a sound and supportable actual-loss amount.

Focusing myopically on the Guidelines loss table distracts from the imperative of imposing a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing

---

[1]  We also observe that following Insys's receipt of the December 2013 subpoena in this action, Insys hired one of the most sophisticated and experienced outside law firms in the world, Skadden Arps, to help evaluate relevant issues and counsel the company on its compliance program.  Mike had no role in deciding whether Insys, the Department of Justice, or the Trial Defendants would seek to waive the attorney-client privilege and reveal the nature and extent of Skadden's multi-year engagement during the very period of the charged conspiracy, which endured for at least two years during Skadden's retention through the end of 2015 when Dr. Kapoor fired Mike.  Suffice it to say, however, that Dr. Kapoor, legal counselors, medical and regulatory experts, Board of Directors members and others at Insys in 2014-15 were substantially involved in deciding the affairs of the Company.

as set forth in Section 3553(a)(2).   As Judge Rakoff of the Southern District of New York has explained:

> [T]he Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment:   the amount of monetary loss or gain occasioned by the offense.  By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, *effectively guaranteed that many such sentences would be irrational on their face.*

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (emphasis added).  We respectfully submit that the presumptive Guidelines range relies on a flawed methodology, and in any event, relies far too heavily on a single sentencing factor that would result in a sentence for Mike greater than necessary to achieve the purposes of sentencing in § 3553(a).

## I.   FACTUAL BACKGROUND

After a ten-week trial, including six days of testimony from Mike, this Court has seen and heard about the work pressures at Insys, but there was little information about Mike's personal history or modest background.  He comes from a simple upbringing in the Midwest, his father an electrician and mother a receptionist.  Mike's family is close-knit, and he learned the value of hard work while trying to build a career.  He is exceedingly humble and never benefitted from privilege or connections.

This investigation and prosecution, now entering its seventh year, has hovered over Mike and his family on a daily basis, exacting an irreparable toll that this Court may deem relevant in fashioning the duration of his sentence.  In December 2016, Mike was arrested from his suburban home in Arizona at 6:30 am by more than twenty armed agents.  He was neither a safety nor flight risk.  He had just gone to bed after staying up all night with his youngest son, born nine days earlier and only two days after having been released from the neonatal intensive care unit.

Since then, Mike has been unemployed (and unemployable), ostracized, dejected, and above all else, ashamed.  His wife suffers from serious health issues, as do his parents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—and he worries that "bothering" people with requests to write

letters on his behalf for this sentencing will only put a further strain on his relationships. He does not want to burden his family, friends, or even the Court, with pleas for leniency. The letters that have been submitted with this Memorandum uniformly describe Mike—despite his mistakes—as consistently seeking to better the lives of those around him, as uplifting and motivating numerous family and friends, and as a devoted husband and father. Mike puts his family above all else and acts as the glue that holds his family together.

### a. Mike Babich's Early Life

Mike was born and raised on the south side of Chicago, Illinois, by his parents, Carol and Lawrence. Growing up in a blue-collar household and neighborhood, Mike recalls the sacrifices that his parents and extended family made to send him to a Catholic school. He and his sister were the first members of his family to attend college and attain degrees.

Mike's family was hard-working, religious and connected to each other. Both sets of grandparents lived next door, and Mike set a good example for his younger cousins and family members, whether volunteering at church as a kid, going to college, working hard at his job, and staying committed to family. As his cousin Donald Busse writes:

> Coming from humble beginnings on the South Side of Chicago, Mikey was raised understanding the importance of family and faith, and what it means to put in a hard day's work. Having supportive parents, and family in general, was the foundation that allowed him to be the first member of our family to complete a four year degree, and do something other than blue collar work. He set the example of what we could do, instead on traditionally picking up whatever trade our parents worked in.

(Ex. D, Letter from D. Busse).

College was not an option for Mike's parents, but they recognized the importance of education and encouraged Mike to pursue opportunities that were not available to them. As Mike's father writes:

> We worked hard to send him to the best schools and I worked two jobs while he was young so he could attend Catholic schools as we believed they provided the best education in the city. . . . Attending college was not an option for us. Aside from the focus on their studies we also preached hard work, commitment and responsibility to

our children.  Mike's first two jobs in high school were his grass cutting business in the neighborhood and as a roofer in the summers despite his fear of heights.

(Ex. B, Letter from L. Babich).

Mike also set the tone for his family and, even at a young age, helped to calm tensions and heal family disputes.  As his aunt writes:

> As with any family, some of the sibling childhood rivalries, or tension can carry over into adulthood.  Mike had seen some strain in the relationships between his parents and their siblings. Yes, all were smiles and hugs for the holidays—but it would seem some of the relationships stopped in between family gatherings.  Mike was probably a sophomore/junior in high school when I first got a glimpse of his desire for a peaceful family.  He wrote an anonymous letter to all the aunts and uncles before Christmas.  It eloquently laid out the importance of family, the need to be united, love each other and support each other and all he wished for Christmas was a family who was truly a family.  Mike was always such a smart and witty young man, but his initiative that Christmas was instrumental in relationships and healing.

(Ex. E, Letter from J. Ivancich).

As long term friends Jim and Kim Nudera write, "Mike is the type of person that makes friends for life and will always be there when you need him."  (Ex. F, Letter from J. and K. Nudera).  As an example, Mike's aunt writes that:

> In the summer of 2000, our son, who was 6 at the time and Mike's cousin, was in a tragic accident while we were on vacation and after a week of ICU care, they took our son into surgery to conduct a liver resection and repair the [in]ternal bleeding.  We were told at that time, that [it] was a very risky surgery and [we were] not confident our son would make it through the surgery.  At this time we were far from home, as we called to let our family in Chicago know that our son might [not] make it and petitioned for prayers and support.  We saw once again Mike's commitment and dedication to family.  He was a college student at the time and immediately upon hearing the news he got in his car and began driving.  After our son had gone through a full day of surgery [that] seemed to be successful, we walked into an ICU waiting room to see the first from my husband's side of the family there to support us.  Mike had driven and gotten to us late in the night supporting us with hugs and gifts for our son.  He slept those two nights on the couches in the ICU waiting room unable to do anything but be present and supportive of us.  I was so touched by his heart and commitment to his family.

(Ex. E, Letter from J. Ivancich).

In short, as the Nuderas write, Mike "is the person people look up to and is a role model to many . . . Mike has also always been an incredibly loyal person, employee, and, of course, a friend.  As his friends that have watched him for 25 years, we believe deeply in his ability to strive to be a good person and we beg you to try to see him as we do."  (Ex. F, Letter from J. and K. Nudera).

### b.  Education & Early Employment with Dr. John Kapoor

After graduating from Mount Carmel boys' school in 1994, Mike went to college at the University of Illinois at Urbana-Champaign.  As noted, Mike was a committed student, as his friends Jim and Kim Nudera write:

> He is a hard worker, always striving to make his family proud.  Mike was never spoiled or given things easily.  He always had to work hard to succeed.  This was a constant theme.  Throughout Catholic school on the south side of Chicago, where he studied to get the grades needed to attend the University of Illinois, and through his perseverance in college, and his career, Mike has worked tirelessly.

(Ex. F, Letter from J. and K. Nudera).

After graduating from college, Mike began as an entry-level portfolio manager at Northern Trust bank, where Mike hoped to make a decades-long career and retire as a bank "lifer."  Mike was humble, committed and gained the respect of bank executives, who eventually suggested him to Dr. Kapoor, to manage some of Dr. Kapoor's personal investments at his own financial firm, EJ Financial. Demonstrating his trust in Mike, Dr. Kapoor eventually turned over primary management of one portfolio to Mike to manage.  Dr. Kapoor also paid for Mike to attend graduate school at night, where he received his Masters in Business Administration from the Kellog School of Management at Northwestern University in 2007, a benefit Dr. Kapoor provided to match what that other financial firms were offering their employees.

As Mike's relationship with Dr. Kapoor grew, Dr. Kapoor also began investing in a sublingual spray technology that would eventually become the delivery mechanism for Subsys, and potentially other products.  After Mike received his MBA, Dr. Kapoor encouraged Mike to join his new company

in Arizona, Insys Therapeutics, as its Chief Operating Officer. What began as a small, private operation with only a few employees and no approved product grew significantly in 2010-2011 when Dr. Kapoor decided he wanted to take the fledgling company public following Subsys approval. After two failed initial public offerings, Dr. Kapoor, Mike, and the Company succeeded in going public in 2012. At that point, recognizing his own limitations regarding interpersonal skills, Dr. Kapoor installed Mike as the CEO of the company to play the role of public "face" of the company. Mike was personable, financially literate, and able to present to the media and investors in a way that Dr. Kapoor could not. Despite the lofty title of CEO, Mike was very much under Dr. Kapoor's thumb; and even more so after taking the company public, as Dr. Kapoor was the Executive Chairman and retained both strategic and day-to-day control of his company and made virtually all significant decisions. Notably, Dr. Kapoor did not commit the critical compliance and in-house legal resources necessary to run a compliant pharmaceutical operation, despite Mike's requests for that support.

   c.  **Working at Insys—from Accomplished Finance Professional to Unsophisticated Pharma Executive**



As the CEO of Insys—and particularly following the IPO in 2013—Mike found himself in the position of drinking from the proverbial fire hose. Despite the favorable IPO, Dr. Kapoor was upset with the pace of sales and put extreme pressure on Mike and other Insys employees to improve

and produce.  Without a grounding in the pharmaceutical industry—and compliance in pharmaceutical sales practices in particular—Mike, subject to Dr. Kapoor's approval and direction, hired people he thought were experienced professionals to help manage the company.  Mike now recognizes that he failed in a fundamental responsibility to insist upon compliant behavior and stand up to Dr. Kapoor's ever-increasing pressure to increase sales.  He failed for two primary reasons: (1) a sincere belief that things would "get better" as the company and its compliance function hopefully grew, and (2) a fear of failing his employees, failing his family by quitting a long-time job, and even failing Dr. Kapoor himself, who despite a demanding and difficult style, had believed in him, supported his growth and business school aspirations, and supervised him for nearly his entire professional career.

Put simply, Mike was in over his head.  Almost overnight he found himself with extraordinary responsibilities, few resources to address the issues he did recognize, and ever-increasing expectations put on him and the company he nominally ran.  His experience in financial portfolio management did not prepare him for the complexities and challenges he encountered at Insys, and he did not want to let down the people who believed in him.

### d.  Devotion to Family



A consistent theme throughout the letters submitted is Mike's devotion to his family.  As the Court is aware, Mike first met his wife, Natalie, when she worked for Insys as a sales representative in the Boston area.  They dated for only ten months before she left the Company.  Natalie was prosecuted, pleaded guilty, and was sentenced by the District Court for the District of Connecticut to five years' probation for her role in the Insys bribery scheme.  She cooperated fully with the government's investigation and testified at the federal trial of an HCP in Connecticut.  The stress this case has put on the Babich family has been acute.  As the Court knows, Mike was terminated and told by Dr. Kapoor that he was the "fall guy" at Insys in November 2015.  From that moment and over the past four years, Mike's clear and primary commitment has been caring for and supporting his wife and children.  Mike's aunt writes:

> It comes to no surprise that his heart for family and children grew exponentially when he was blessed with his own children.  Mike's character as a husband and father is to be admired.  His commitment to be a selfless father and husband is demonstrated daily.  I have had the joy of watching him be a dedicated stay at home father.  It isn't a one-time occurrence, it is weekly, daily and hourly.  His boys adore him, and he goes consistently above and beyond to ensure values, character and love are showered on those boys.  He is engaged in every aspect of their life and schedules daily outing[s], family engagements, teaching them all that he can.

(Ex. E, Letter from J. Ivancich).  Mike's involvement in his children's lives is particularly significant. As his long-term friends Jim and Kim Nudera write that:

> Mike is extremely devoted to his family.  Mike is a wonderful father who loves his two small boys, ▮▮▮▮ and ▮▮▮▮ more than anything.  He is totally involved in every aspect of raising them and he knows that it means to teach them right from wrong . . . His sense of the importance of family is unparalleled in anyone we've ever met.  If Mike is not involved in his children's development, it will not only be a detriment to them both, but it will be incredibly painful for Mike.  Having Mike be in their young lives to experience their father's awesome love and devotion will help them grow[] into caring, great people.  Mike is also a loving husband that adores his wife, Natalie. . . . Separating Mike and Natalie would be so difficult to see.  They lean on each other for everything and need each other.

(Ex. F, Letter from J. and K. Nudera).  As important as his general involvement is in his children's development and enrichment, his specific, physical presence and provision of day-to-day care is

critical.  As discussed in the PSR, ¶ 160 ████████████████████████████████

████████████████████████████████████████████████████████████████████████ .

*See, e.g.*, Sealed Ex. I.  She has, for years, relied on Mike for tasks as mundane as lifting or carrying their

small children.  As Natalie's mother, Maria Neris, writes:

> The care he provides for ███████ and ███████ is the same he provides to my daughter.
> Unfortunately ██████████████████████████████████████████████████████
> ████████ . Natalie ████████████████████████████████████████████████████
> ████████████████████████████ When ██████████ was about one years old Natalie
> ████████████████████████████████████████████████████████████████████████
> ████████████ and extended periods where she could not care for or even hold her own kids.
> Her misdiagnosis caused great pain for years and continues to this day.

(Ex. C, Letter from M. Neris).  In addition, both █████ and ████████████████████████

█████████████████████████████████████████  Natalie's mother writes about Mike's experience after

his eldest son ████████████████████████ :

> Mike never left his bedside as doctors sought to discover what could have caused this
> ████████████████████████ . He slept at the hospital in bed with his son and he and Natalie
> now ██████████████████████████████████ Mike and Natalie always ensure that the
> school, myself and every environment they bring both kids to ████████████████████████
> ████████ Their second son, ██████████ ████████████████████████████████████
> ███████████████████████████████████ Mike makes me so proud
> how attentive he is to ensure the safety of his children.

(Ex. C, Letter from M. Neris).

Mike's Mother writes that:

> He is the backbone to so many family aspects and his ability to focus his life on the
> positives during a dark period is something I admire him for.  I have given my life to
> my faith in Christ and pray every day that his sons get to have Mike wake up and cook
> vegan pancakes for them.  They love his terrible singing as he sings to them at night
> and I ask selfishly that I get to FaceTime and see my son every day.  My faith teaches
> me that we all do wrong but it is how we come out the other side that is the true test
> of a person.

(Ex. A, Letter from C. Babich).

Mike is the glue that holds his family together—his young boys and his wife need him at home. Removing him from the lives of his wife and children will cause trauma that will not easily be healed. As his aunt writes: "I request that you consider the impact that imprisonment would have on his wife and children.  The boys are both so close to their father and, at their age, the impact this could have would be difficult."  (Ex. E, Letter from M. Ivancich).

### e.   Mike Provided Extraordinary Cooperation in This Case and Others

As the government has reported, Mike was critical to its efforts to prosecute and convict the defendants who went to trial.   Indeed, this Court's opinion upholding the convictions of Trial Defendants (ECF 1028) relied on Mike's testimony extensively, citing at least 35 specific instances of his testimony, including essential and unique insights that only he provided at trial given Trial Defendants' decision to exercise their rights not to testify.  Without Mike's testimony, it is entirely uncertain whether the Trial Defendants would have been convicted.

For example, Mike's testimony was instrumental in placing defendants Dr. Kapoor and Gurry at daily 8:30 a.m. management calls on which a number of the elements of the conspiracy were discussed.  *See, e.g.*, ECF 1028 at n. 46.  Mike's testimony linked defendant Gurry to the implementation of the Insys Reimbursement Center ("IRC").  *Id.* at n. 57.  His testimony linked defendant Kapoor to the IRC, and he testified regarding Dr. Kapoor's knowledge of "several strategies to deceive insurers into approving prior authorizations for Subsys."  *Id.* at nn. 67-70.   Regarding Defendant Simon's challenge to the mail and wire fraud predicates, this Court cited Mike's testimony in observing that "[t]he jury could have found beyond a reasonable doubt that Defendant Simon knew about the bribes and agreed to the mail and wire fraud schemes based on the evidence presented at trial."  *Id.* at p. 31. This Court also cited Mike's testimony to conclude that "[t]he weight of the evidence supported a conclusion that Defendant Kapoor agreed to conduct Insys' affairs through bribes and fraud."  *Id.* at p. 62 and nn. 100-101.

In addition to providing a full and truthful proffer in connection with his guilty plea, Mike met with the government for hours-long sessions on multiple occasions leading up to the trial, and provided information critical to the government in preparing its case.

## II.     PROBATION'S GUIDELINE RANGE SIGNIFICANTLY OVERSTATES THE LOSS ATTRIBUTABLE TO MIKE

Subsys is an effective medicine that provided real value to insurers and patients alike.  FDA-approved fentanyl has been an important medicine in the United States for decades prior to the Subsys launch, Subsys itself was an infinitesimal percentage of the market (well less than 1%), and no evidence suggested, much less established, that Subsys was any kind of diverted "street" fentanyl that characterizes many inflammatory public headlines about the opioid crisis.  Accordingly, any approach to calculating loss must exclude the value provided from medically necessary Subsys prescriptions. Although the Initial PSR correctly recognizes that loss should be based on the number of medically unnecessary prescriptions written, *see, e.g.*, PSR ¶ 26, its attempts to calculate the number of medically unnecessary prescriptions result in a significant overstatement of loss.

"[L]oss is the greater of actual loss or intended loss."  U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.(3) (U.S. Sentencing Comm'n 2018).  "Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" is "the pecuniary harm that the defendant purposely sought to inflict."  *Id.* at cmt. n.(3)(A)(i)–(ii).  The government bears the burden of proving the loss amount by a preponderance of the evidence.  *See United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015).  In this case, the only relevant measurement is actual loss.  Mike did not agree in his plea papers that he intended to cause medically unnecessary prescriptions, and as this Court recognized, at trial "the Government did not prove . . . an intent that healthcare practitioners prescribe the drug to people that did not need it or in unnecessarily high doses."  ECF No. 1028 at pp. 81-82. Therefore, the government must establish by a preponderance of the evidence the amount of pecuniary harm that actually resulted from Mike's conduct.

The government (Medicare) and insurers bargained for and received effective pain medication.[2] And there is no question that certain conduct at Insys was perfectly legal. *See, e.g.*, Parties Agreed Statement of Facts, ECF No. 668 at 2 (recognizing that "speakers programs were not illegal or improper in general" but that "Defendant and his coconspirators used them *at times* as an illegal vehicle to bribe pain practitioners to prescribe Subsys rather than as a tool to educate medical professionals") (emphasis added). Regardless of whether a certain practitioner was motivated to write prescriptions by illegal bribes, it cannot be said that every prescription written by that practitioner was medically unnecessary. In fact, at trial this Court expressed a consistent view on this issue: "I just don't agree with the theory that every prescription that follows a kickback is bogus . . . I don't think the question is would you have wanted to know that your doctor was taking kickbacks. I think it was more like, would you have wanted to know if the prescription wasn't medically necessary. . . . And in terms of the IRC, not every prescription that necessarily went through there is evidence of a crime." 2/4 Trial Tr. 17-19.[3]

The government bears the burden of proving loss, *see United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015), and we respectfully submit that an accurate estimate of medically unnecessary

---

[2]  On Friday, December 13, 2019, the government provided some information about a separate, potential claim for restitution (ECF No. 1035), and yesterday, December 17, 2017, 2019, the government filed a motion for Forfeiture of Property (ECF No. 1052). We do not address this new information here but will instead file separate opposition papers in accordance with this Court's standard motion practice.

[3]  In the civil fraud context under the False Claims Act, including those where kickbacks have been established, courts have regularly rejected the notion that even a proven fraud in the submission of claims to the government necessarily taints all such claims and devalues their value to zero. *See, e.g.*, *United States v. Anchor Mortgage Corp.*, 711 F.3d 745, 749-51 (7th Cir. 2013) (in a case alleging kickbacks related to a government subsidy program, explaining the measure of damages (loss) as "the difference between the contract price and the price of what arrives" was "the norm"); *United States ex rel. Wall v. Circle C Constr.*, 813 F.3d 616, 617-18 (6th Cir. 2016) (holding that "[a]ctual damages are the difference in value between what the government bargained for and what the government received" and explaining that "the relevant question is not whether in some hypothetical scenario the government would have withheld payment, but rather, more prosaically, whether the government in fact got less value than it bargained for").

prescriptions—as recognized in the Initial PSR as the appropriate measure of loss—requires a case-by-case review of individual prescriptions filed.  Any other approach overstates the true number of medically unnecessary prescriptions.  As the Initial PSR notes, the government did present some evidence regarding medical necessity:

> At trial, the government called approximately ten patients whose testimony was relevant to the issue of medical necessity as well as insurance fraud.  The government's theory was that any doctor who took a bribe and then prescribed Subsys violated his/her duty of honest services to the patient.  *The Court rejected this theory and held that the government had to show that the prescriptions were medically unnecessary.*  The government put on a summary witness who analyzed about forty different cases where there were false diagnoses used to justify the prescriptions.  The government also called two coconspirator practitioners who testified that they prescribed the drug when it was not medically necessary and put about a dozen of their patient files into evidence to illustrate the point.

Initial PSR ¶ 26 (emphasis added).  The Initial PSR further, and correctly, observes that "[w]ithout analyzing each patient's medical history, it is difficult to address the issue of medical necessity," Initial PSR ¶ 27.  But remarkably, no substantive medical review of individual patient files and individual prescriptions has been introduced into evidence, or, to our knowledge, even performed.[4]

Instead of conducting that difficult analysis, the Initial PSR attempts to identify proxies for medically unnecessary prescriptions.  The Initial PSR considers statistics from academic papers analyzing so-called "off-label" prescriptions for Subsys as one such proxy, *see* Initial PSR ¶ 121, but those statistics are irrelevant to medical necessity because not all off-label prescriptions are medically unnecessary.  As recognized by the Supreme Court, by other courts, and by statute, off-label prescriptions are a common and necessary aspect of modern medical treatment.  *See, e.g., Buckman Co.*

---

[4]  The evidence suggesting a lack of medical necessity comprise only a tiny fraction of total Subsys prescriptions.  For example, using the government's own data, between July 2010 and December 2015, there were 5,101 unique *Medicare* beneficiaries that received at least one Subsys prescription.  *See* Exhibit 2 to government's Motion for Restitution (ECF No. 1035-2 at p. 3).  The numbers of commercial non-Medicare beneficiaries is likely even higher—meaning that at most the government has presented evidence of medical necessity relating to less than half of one percent of the total Subsys patient population.

*v. Plaintiff's Legal Committee*, 531 U.S. 341, 350 (2001 ("[O]ff-label usage . . . is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine"); *United States v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012) ("courts and the FDA have recognized the propriety and potential public value of unapproved or off-label drug use"); *Wash. Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 73 (D.D.C. 1998) (stating that off-label treatments may "constitute the most effective treatment available"). The FDA itself has acknowledged that "off-label uses or treatment regimens . . . may even constitute a medically recognized standard of care." Food & Drug Admin., Guidance for Industry — Good Reprint Practices (Jan. 2009). And Congress has mandated that Medicaid and Medicare reimburse physicians who treat covered patients with any "medically accepted" treatment—even if off-label. 42 U.S.C. §§ 1396b(i)(10), 1396r-8(k)(2)-(3) (Medicaid); 1395y(a)(1)(A) (Medicare). In this very case, it is clear from trial that one Insys strategy was to *switch patients from one medically necessary fentanyl product to another (Subsys)*, in what was a crowded market for FDA-approved fentanyl products that all were subjected to a strict, highly regulated and controlled REMs.

The Initial PSR examines the prescriptions that went through the IRC as another potential proxy for medically unnecessary prescriptions. But this Court has already considered the relationship between the IRC and medical necessity, observing that "not every prescription that necessarily went through [the IRC] is evidence of a crime." Many prescriptions that passed through the IRC were medically necessary, and calculating loss based on an 80.9% estimate of the volume of IRC prescriptions does not establish in any way how many of those prescriptions were, in fact, medically unnecessary.

These two proxies simply fail to carry the government's burden to quantify the number of medically unnecessary prescriptions, and therefore necessarily overstate the loss amount driving the

Initial PSR sentencing range.  We submit that the actual number of such prescriptions results in a significantly lower loss amount for sentencing purposes.

Finally, regardless of the methodology used to calculate loss, the Initial PSR also uses too broad a brush in characterizing the time period of the RICO conspiracy (2012-2015) without accounting for evidentiary weaknesses for purposes of calculating loss tied to prescriptions, much less as to Mike individually.  The Initial PSR's time period appears to be based on the fact that Subsys was launched in March 2012 and that Mike became the "fall guy" in connection with his termination in November 2015.  PSR ¶¶ 105 and 178.  But the Insys speaker program did not ramp up until 2013, continuing through 2014, and Mike had been frozen out of meaningful corporate decision making at Insys by Summer 2015, *id.* ¶ 168.  Mike's plea materials focus on evidentiary support during a narrower period.  Those plea materials cite acts of fraud during a fourteen-month period from April 2013 and June 2014.  *See* U.S.S.G. Commentary to § 6B1.4 (explaining that "[t]his provision requires that when a plea agreement includes a stipulation of fact, the stipulation *must fully and accurately disclose all factors relevant to the determination of sentence*").  The period used by the Initial PSR is more than three times as long, using a monolithic approach without any evidentiary specificity that ties key evidence to actual patients and their prescriptions over time.  Basing the loss calculation for Mike on the longer period used in the Initial PSR, without more evidentiary rigor connected to medical necessity, unjustly inflates the losses attributable to his activities and the ordinary conspiracy and mail fraud counts to which he pled guilty.

Accordingly, the loss calculation for sentencing purposes must accurately reflect the number of patients who received Subsys for reasons that were medically unnecessary based on actual evidence during a specific time period, not sweeping generalizations and estimates.  Such a calculation would be a difficult exercise and would result in a substantial decrease in the fraudulent claims the

government would be able to prove, which would, in turn, significantly reduce Mike's guidelines calculation.

### III.     THE PSR IMPROPERLY ADDS FOUR POINTS FOR MIKE'S ROLE IN THE OFFENSE

As noted in our objections to the initial PSR, we object to the four-level enhancement resulting from the PSR's characterization of Mike as an "organizer or leader" of the criminal activity under USSG § 3B1.1(a). While we recognize that Mike played a meaningful role in the criminal activity, for which he fully accepts responsibility, the evidence supports, at maximum, a three-level enhancement under USSG §3B1.1(b). Mike was, at most, a "manager or supervisor" of the misconduct. Mike held the title of CEO at Insys, but he was a CEO in name only, and the true leader of the organization was Dr. John Kapoor. This critical fact is reflected in the PSR itself. *See, e.g.*, PSR ¶77 ("Evidence at trial demonstrated that Kapoor did, in fact, effectively control the management and affairs of Insys . . . While Kapoor's conduct pervaded every aspect of the conspiracy, his participation in the criminal scheme is best demonstrated by his control over executive hiring, strategy, and funding"); ¶78 ("The success of the conspiracy largely resulted from Kapoor's complete control over the hiring of executive managers at Insys"); ¶82 ("While Kapoor hired or promoted each of his co-defendants to senior positions within Insys, Kapoor did not leave the details of the conspiracy to his subordinates. Rather, he exercised daily control over the scheme's strategy"); ¶90 ("In sum, evidence at trial proved that Kapoor exercised significant control over the criminal conspiracy alleged in the Second Superseding Indictment, and found by the jury"). *See, e.g.*, *United States v. Patrick*, 248 F.3d 11, 27 (1st Cir. 2001) (upholding a four-level role enhancement for the co-defendant "regarded as the kingpin by other conspirators" and affirming a three-level role enhancement for a subordinate co-defendant); *United States v. Gonzalez-Vazquez*, 219 F.3d 37, 44 (1st Cir. 2000) (upholding a three-level role enhancement because the defendant "was *the second in command* at the drug [distribution] point," but was not the ultimate leader).

Here, the facts support the conclusion that Mike was subordinate in every significant way to Dr. Kapoor, and that Dr. Kapoor was regarded as the ultimate decision-maker by the other co-conspirators in the criminal scheme.  And the fact that he held the title of Chief Executive Officer of Insys should not dictate the role in the offense enhancement.  *See United States v. Dominguez*, 616 F. App'x 905, 909 (11th Cir. 2015) ("The determination as to whether the leadership role enhancement applies should be based on [defendant's] actual conduct rather than [his] job title as administrator."); *United States v. Starnes*, 583 F.3d 196, 217 (3d Cir. 2009) ("The District Court's statements . . . indicate that it properly gave no weight to [defendant's] formal job title in assessing whether he should be characterized as an organizer."). *Cf. United States v. Meza-Avila*, 44 F. App'x 131, 138 (9th Cir. 2002) ("Of course, a defendant's 'job title' within an organization does not prove authority or control over others.").

Indeed, Mike was a first-time CEO at the age of 35, held that title in name only, had worked for Dr. Kapoor for virtually all of his professional life, and took his daily direction from Dr. Kapoor. Mike has fully accepted responsibility for his actions in this case, but we respectfully submit that a 4-level enhancement disproportionately and inaccurately characterizes his actual role in this offense.

## IV.   A SENTENCE OF HOME CONFINEMENT COUPLED WITH PROBATION AND A CONDITION OF SIGNIFICANT COMMUNITY SERVICE WOULD BEST SATISFY THE GOALS OF § 3553(a)

Regardless of how this Court addresses the calculation of loss, the Fraud Guideline is only one of many considerations this court must consider in fashioning a sentence that is sufficient, but not greater than necessary, to satisfy the purpose of sentencing.  As one sentencing court wrote in determining an appropriate sentence under the Fraud Guideline:

> [The defendant's sentencing] shows how the fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.  This reality does not render the Guidelines irrelevant in fraud cases; they are in fact quite useful in all sentencings.  But sentencing judges know that a full consideration of "the nature and circumstances of the offense and the history and

characteristics of the defendant," 18 U.S.C. § 3553(a)(1), implicates offense and offender characteristics that are too numerous and varied, and occur in too many different combinations, to be captured, much less quantified, in the Commission's Guidelines Manual. A consideration of those and the other factors set forth in § 3553(a) produces sentences that are moored to fairness, and to the goals of sentencing set forth in § 3553(a)(2), but sometimes not so much to the advisory Guidelines range. Indeed, in some cases the fair sentence can drift quite far away from the advisory range, which is, after all, but one of eight factors the sentencing judge must consider.

*United States v. Ovid*, No. 09-CR-216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y Oct. 1, 2010).

Upon consideration of all the pertinent factors under § 3553(a), a sentence significantly below the calculated Guidelines range is just and appropriate for Mike. We respectfully submit that a custodial sentence is greater than necessary to achieve the sentencing purposes of Section 3553(a), including the need to recognize the seriousness of the offense and to achieve deterrence, *see* § 3553(a)(2)(A)-(B). A sentence of home confinement coupled with probation and conditions of significant community service would be a sufficient sentence of Mike that fully satisfies the factors listed in § 3553(a).

That statute instructs the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to protect the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2); *See also Booker*, 543 U.S. 220, 258-60 (2005). In "determining the particular sentence to be imposed," the statute requires the court to consider these purposes, *id.* § 3553(a)(2), along with the nature and circumstances of the offense and the history and characteristics of the

defendant, *id.* § 3553(a)(1), and the kinds of sentences available, *id.* § 3553(a)(3).  *See* 18 U.S.C. § 3553(a)(1)–(7).

Here, consideration of these factors requires a substantial variance from the calculated Guidelines range to arrive at a sentence that is "sufficient, but not greater than necessary" for Mike. *See id.* § 3553(a).

### a.   Mike's History and Characteristics: Impact on the Babich Family—§ 3553(a)(1)

Section 3553(a)(1) requires the Court to consider the characteristics of the defendant in determining an appropriate sentence.  In this case, the court must consider the important role Mike plays in his family and the profound and unnecessary effect of a sentence of confinement.

It is appropriate for the court to consider such family circumstances in determining an appropriate sentence.  *See, e.g., United States v. Sclamo*, 997 F.2d 970 (1st Cir. 1993) (affirmed downward departure from 24-30 month range to six months home detention for defendant who had been living with a divorced mother and her two children and had developed a special relationship with the mother's son that helped ameliorate the son's serious psychological and behavioral problems, and suggestion that the son would regress if the defendant were incarcerated); *United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (affirming a downward departure where the "removal of the father from this unit at this particular point in time would have a disastrous effect on the [8 and 9 year-old] children in terms of possibilities of their education and upbringing") (internal quotation marks omitted).  The Fourth Circuit has likewise recognized that being a "good father" is a "valid consideration under § 3553(a)." *United States v. Pauley*, 511 F.3d 468, 475 (4th Cir. 2007)

As described above, Mike is genuinely and unconditionally devoted to his family as a stable husband to his wife Natalie and a committed father to their two young boys.  As described above, Natalie █████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████. Any prison time will have a significant, immediate negative effect on his family, and a long sentence would be truly devastating to his wife and children. The lives of Mike's young kids would be substantially changed by a sentence of incarceration, and that impact would be most severe should Mike be taken from them for a significant period of time.

### b. The Need for Just Punishment—§ 3553(a)(2)(A)

For the following reasons, the Guidelines calculation suggesting multiple years of imprisonment does not adequately reflect Mike's true degree of culpability when mitigating factors are fully considered.

### i. Mike's Conduct Was Uncharacteristic

As described above, the offense conduct was completely uncharacteristic of the rest of Mike's law-abiding, upstanding life. He did not engage in criminal conduct until he found himself over his head in a business venture in which he did not have the experience to extricate himself, or the sound judgment to simply quit. In hindsight, the path he should have taken is clear, and with the maturity and life lessons that accompany a six-year federal criminal investigation, dozens of civil lawsuits to come, and being a father, Mike is acutely aware that he should have acted in line with his character and chosen differently over seven years ago when Insys launched Subsys in 2012.

This Court should grant a variance based on the uncharacteristic nature of his conduct. *See, e.g., United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (sentencing a defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Rajat Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012) ("In arguing for a non-guideline sentence in the Pre-Sentence Report, the experienced Senior U.S. Probation Officer Emily Frankelis had this to say: 'We believe the defendant's commission of the instant offense was aberrant behavior—not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined by Merriam – Webster: .

. . atypical.'  The Court agrees, and finds that the aberrant nature of Mr. Gupta's conduct by itself would warrant a non-guideline sentence, even aside from the other factors favoring leniency."); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his fifteen year marriage to educate his six children and whose offense was prompted by economic pressures).

### ii.  Mike Has Already Been Punished

Mike lost his job, his professional reputation, and all prospects for future work in the pharmaceutical industry and likely the financial industry, and he has been publicly ostracized and shamed nationally and in his local community.  Mike is also a defendant in well-over twenty civil lawsuits where he faces potentially enormous financial exposure, and years of onerous discovery, depositions, and litigation.  This Court should consider the punishment to which Mike has already been subjected, including his loss of profession and decimated reputation.  *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) (approving considerations such as loss of reputation and other penalties of a criminal conviction and noting that "[s]ometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed"); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, and negative media coverage); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business).

### c.  The Need for Deterrence—§ 3553(a)(2)(B)

There is no question that Mike, and any pharmaceutical executive following the Insys investigation and prosecution, are fully deterred from engaging in the charged conduct regardless of a

sentence of imprisonment.  Research also has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishment do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28, 2006).  Research regarding white collar offenders in particular found no difference in the deterrent effects of probation and that of imprisonment.  David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).

In imposing the least restrictive sentence sufficient to account for the need to protect the public from further crimes by Mike, this Court should consider the statistically low risk of recidivism presented by his history and characteristics.  *See, e.g.*, *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (in conspiracy to import heroin by swallowing pellets, below guideline sentence of 6 months home detention warranted because first offense and "there is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I"); *United States v. Darway*, 255 F. App'x 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 F. App'x 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, 2009 WL 565485, at *3 (E.D. Wis. Mar. 5 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties).

Mike is 43 years old, a true first-time offender, a college graduate with an additional advanced degree, was employed throughout his adult life, has been married for over four years, has no history of drug or alcohol abuse, and has fully complied with the terms of his release for the last three years. From a statistical perspective, it is highly unlikely that Mike would be a recidivist.  For all male

offenders in Criminal History Category I ("CHC I"), the recidivism rate is 15.2%. For those age 41–50, at the time of sentencing, the rate is 6.9%. For those who are college graduates, the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For offenders like Mike, the recidivism rate is much lower. *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at Ex. 9, Ex. 10 (May 2004).

### d.  Other Kinds of Sentences Aside from Confinement Are Sufficient—§ 3553(a)(3)

The Supreme Court has made it clear that "§ 3553(a)(3) directs the judge to consider sentences other than imprisonment." *United States v. Gall*, 552 U.S. 38, 59 (2007).

In *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), for example, the First Circuit considered an 87-month variance from the bottom of the Guidelines range and affirmed sentences by Judge Stearns of six months of home monitoring, three years of probation, and 1,000 hours of community service in a mail fraud, highway fraud, and conspiracy to defraud the government case related to Boston's "Big Dig." The First Circuit concluded the sentences imposed were reasonable because the alleged loss amount was "imprecise" and "did not fairly reflect the defendants' culpability" and because of the "individual circumstances of the defendants." *Id.* at 34; *see also United States v. Coughlin*, 2008 WL 313099, at *5 (W.D. Ark. Feb. 1 2008) (recognizing that "[h]ome detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive" and commenting on the value of community service).

Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a

crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

Mike Babich is not a "violent and serious offender" who "pose[s] the most dangerous threat to society." He is needed at home to support his family and raise his children. Under these circumstances, a sentence of home confinement, coupled with probation with a condition of rigorous community service, is a serious, just punishment and "sufficient, but not greater than necessary to comply with" the purposes of § 3553(a)(2).

At the Court's direction, Mike would, of course, be prepared to undertake any amount or type of community service that the Court deems appropriate. We respectfully suggest that any sentence provides for his working with organizations that help those affected by opioid misuse and abuse. Mike is deeply sorry for his conduct, and committed to creating something positive from this awful situation. He has hit rock bottom, but remains an engaging person with a powerful and cautionary story to tell. In short, we ask that in conjunction with a period of home confinement, Mike be allowed to pay his debt to society by giving his time, compassion, and experience to those most in need—justice will be better served for all involved.

## CONCLUSION

Mike Babich—a family man, hard worker, and generous friend—stands before this Court contrite and having accepted full responsibility for his conduct. For the reasons stated, we respectfully submit that a sentence of home confinement coupled with probation and the condition that he

perform a rigorous program of community service is sufficient, but not greater than necessary, to satisfy the purpose of sentencing.

KING & SPALDING LLP
Joseph Sedwick Sollers III
Mark A. Jensen
Daniel C. Sale
1700 Pennsylvania Ave., NW
Washington, D.C. 20006
+1 202 737 0500

HOGAN LOVELLS
William H. Kettlewell
125 High Street
Suite 2010
Boston, MA 02110
+1 617 371 1005

*Attorneys for Defendant Michael Babich*

## **CERTIFICATE OF SERVICE**

I hereby certify that I served this document today by filing it using the Court's CM / ECF system, which automatically notifies the parties and counsel or record.

*/s/ William H. Kettlewell*

_____

William H. Kettlewell
(BBO No. 270320)