UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

MICHAEL BABICH

Defendant

Criminal Action No.
16-cr-10343-ADB

## DEFENDANT MICHAEL BABICH'S
## MOTION FOR PROPOSED ALTERNATIVE LOSS METHODOLOGY

Defendant Michael Babich submits this memorandum considering alternative methodologies for calculating the appropriate loss in the above-captioned matter in response to the Court's request. *See* ECF No. 1088.

While it has been established that the Defendants, including Mr. Babich, engaged in fraud in connection with certain prescriptions of Subsys, it is undisputed that Subsys was an effective, FDA-approved medicine that provided real value to insurers and thousands of patients alike. Subsys also was a fractional piece of the broader opioid market, accounting for substantially under one-half of one percent of opioid prescriptions. It was only one in a "crowded"[1] field with a "large number"[2] of fentanyl products that have been prescribed for decades by licensed physicians in the United States

---

[1] *See* Indictment at ¶ 10, ECF No. 1 (Dec. 6, 2016) (describing pain market "crowded with competitor drugs")

[2] *See* Second Superseding Indictment at ¶ 8, ECF No. 419 (Sept. 11, 2018) ("Practitioners willing to write prescriptions for Subsys had a large number of competing medications from which to choose.")

to treat non-cancer and cancer pain in a variety of outpatient and inpatient settings.  We emphasize this pertinent background not in any way to diminish the seriousness of the opioid crisis or the government's prosecution of this action, but rather to clearly distinguish incendiary headlines about opioids from the actual facts in this case that Subsys has not been shown to be a diverted street drug or illicitly used because of any Defendant's conduct.  Accordingly, each payment for a Subsys prescription in this case should be treated as presumptively medically appropriate, until and unless the government meets its burden of establishing otherwise with specific and credible evidence.  It simply has not done so here on any reliable basis in estimating loss under the U.S. Sentencing Guidelines, as explained more fully in our Objections to the Probation Office's draft pre-sentence report.  *See* Ltr. from Babich Counsel to Probation Officer Jennifer Broquist (Nov. 5, 2019).

The draft pre-sentence report correctly recognizes that loss should be based on the number of medically unnecessary prescriptions written and properly acknowledges that "[w]ithout analyzing each patient's medical history, it is difficult to address the issue of medical necessity," Pre-Sentence Report for Michael Babich, dated October 10, 2019, *United States v. Michael Babich et al.*, No. 16-CR-10343 ("Babich PSR") at ¶ 27.  The government follows suit by adopting a methodology that purports to exclude medically necessary prescriptions from loss.  *See* United States' Consolidated Sentencing Memorandum, ECF No. 1064 at 22-23 (describing government's loss methodology as focused on Medicare payments for beneficiaries with cancer-related diagnoses and claims associated with 13 co-conspirator practitioners); Ltr. from Government to Probation Office Re: Babich PSR Objections/Corrections (Nov. 5, 2019) at 2, 3-4 (agreeing with Probation Officer's loss calculation methodology relying upon 13 prescribers, IRC opt-in rates and off-label estimates; "no objection" to loss calculation guideline calculation of approximately $17.8 million at para. 134, but noting conservative loss in government's view to justify loss category range "with margin for error" between $9.5 and $25 million).

The government's calculation of medically unnecessary prescriptions, however, reflects a flawed methodology, and the resulting loss figures significantly overstate the amount of loss that the government has the burden of proving by a preponderance of the evidence.   Although the government's approach correctly focuses on actual loss to Medicare as the relevant federal insurer,[3] its methodology is riddled with unreliable assumptions and unsupported conjecture that broadly generalizes without connecting insurance claims for specific patients to false IRC statements and the associated bribes causing practitioners to write prescriptions.[4] U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.(3) (A)(i)–(ii) (U.S. Sentencing Comm'n 2018) ("Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense").   The government bears the burden of proof on the calculation of the loss amount.   *United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015).

In summary, any correct measure of loss must account for and exclude both on-label and off-label prescriptions that were, in fact, medically necessary.   Assessing medical necessity accurately requires analysis of individual prescriptions.   To count toward loss, individual prescriptions must be found, by a preponderance of the evidence, to have been medically unnecessary.   Performing that analysis would significantly reduce the loss attributable to Mr. Babich's conduct to under $3.5

---

[3] The government does not contend that claims paid by commercial insurers should be included in these loss calculations, for good reason. *See* Babich PSR at 28, n.9; *see also* United States' Consolidated Sentencing Memorandum, ECF No. 1064 at 23.  Any such "loss" claims under the U.S. Sentencing Guidelines would suffer from many more methodological infirmities, as detailed in Defendants' Response to Government's Motion for Restitution, ECF No. 1121, and are incorporated herein.

[4] It is the government's theory that Defendants "bribed doctors" to prescribe Subsys and "defrauded and misled insurance companies" to secure payment for these Subsys prescriptions. *See* United States' Motion for Restitution Pursuant to the Mandatory Victim Restitution Act, ECF No. 1035 at 1.  In particular, in rejecting the trial Defendants' arguments about spillover prejudice from the CSA and HSF, this Court held in no uncertain terms that "the conspiracy charged in the indictment was *a single conspiracy that consisted of bribing healthcare practitioners to prescribe Subsys and then defrauding insurers to pay for those prescriptions.*" *See* Mem. & Order, ECF. No. 1028 at 38 (emphasis added). *See also* Defendants' Response to Government's Motion for Restitution, ECF No. 1121 at 8-10.

million, resulting in an Offense Characteristic loss enhancement under the Guidelines of no more than +16 levels, not the +20 levels currently suggested in the PSR.

## I.    Methodological Flaws in the Government's "Top-Down" Approach to Loss that Improperly Assumes Every Subsys Prescription Was Fraudulent.

Instead of calculating loss by analyzing Subsys prescriptions in a bottom-up manner to add losses starting from zero, the government assumes away its burden of proof by taking a top-down approach that dubiously sweeps into loss all reimbursements for Subsys prescriptions—even though many of those prescriptions relate to insurers, practitioners, and patients never shown to be impacted by fraud.  The government attempts to paper over this obvious flaw in its methodology by focusing on the 13 co-conspirator practitioners identified in pretrial disclosures (and even then only 10 of the 13 co-conspirators were connected to the charged conspiracy at trial).[5]  But narrowing the focus does not fix the flaws in the foundation on which the top-down methodology rests.

The government's top-down approach begins with all Medicare reimbursements for Subsys prescriptions written by the 13 co-conspirator practitioners, without regard for critically important factors like when they started prescribing Subsys, whether they began prescribing Subsys before conducting any speaker programs (and without identifying how many such programs were shams), which patients they treated, and how those patients' clinical symptoms presented.[6]  This "analysis" is

---

[5] Defendants' Response to Government's Motion for Restitution (ECF No. 1121) details a variety of methodological flaws with the government's broader restitution demand, which apply equally to this narrower loss calculation as to Mr. Babich personally.  We incorporate by reference those arguments here for efficiency but elaborate on only certain factors in this submission as additional context for the Court's consideration of an alternative loss methodology.

[6] The Court itself at trial observed that a practitioner's receipt of a kickback does not render all his/her subsequent prescriptions bogus and medically unnecessary.  *See* 2/4 Trial Tr. 17-19 (Judge Burroughs) ("I just don't agree with the theory that every prescription that follows a kickback is bogus . . . I don't think the question is would you have wanted to know that your doctor was taking kickbacks.  I think it was more like, would you have wanted to know if the prescription wasn't medically necessary. . . . And in terms of the IRC, not every prescription that necessarily went through there is evidence of a crime.").

no analysis at all, and it does not even evaluate the testimony of the co-conspirator practitioners[7] or the patients called as witnesses at trial.[8]  The government then identifies a set of Subsys prescriptions it deems off-label and assumes that reimbursements for  80.9% of those prescriptions count as "loss" because 80.9% of all Subsys prescribers had opted in to "use[] the IRC to obtain prior authorization for their patients" as of January 2013.[9]  This simple and rough approach, without citation to evidence that would connect even a single Medicare reimbursement to a single IRC statement to a single speaker payment (or other) bribe, is then applied to the Sentencing Guidelines calculation for Mr. Babich and to restitution.  This is not the type of credible, reliable evidence necessary to prove loss in either context.

1.      The government's top-down approach includes prescriptions from too many HCPs in tabulating the relevant off-label prescriptions.  Its methodology includes prescriptions written by 13 co-conspirators.  But not all those HCPs are relevant to loss calculation.  The government adduced evidence linking only 10 of the 13 to the charged conspiracy at trial.  The other three practitioners, Drs. Frey, Khanna, and Roque, were almost never mentioned at trial,[10] and the government presented no evidence that they received bribes during the trial or in the relevant-conduct materials submitted to the Probation Office.  Consequently, a top-down loss calculation should start with prescriptions written by those 10 prescribers.  Excluding the 3 practitioners

---

[7] *See, e.g.,* 1/31/19 Trial Tr. 30:4-8 (Dr. Gavin Awerbuch) ("As a pain practitioner, I treated many, many patients with chronic pain. And if they were having breakthrough pain episodes, I would also use TIRF medicines, not only Subsys but some of the other TIRF medicines to help with breakthrough pain in those patients who didn't have cancer.")

[8] See Defendants' Response to Government's Motion for Restitution, ECF No. 1121 at 6, n.3, 18 (citing trial evidence demonstrating multiple testifying patients needed clinical analgesia treatment).

[9] *See* Babich PSR at 29, ¶ 120

[10] *See* 3/12/19 Trial Tr. 191:1–3 (reference to Dr. Frey at sidebar as someone that Tracy Krane called on); 3/1/19 Trial Tr. 155:14–20 (Burlakoff testifying only that Dr. Khanna was a high-decile prescriber of opioids); 3/26/19 Trial Tr. 12:1–11 (referencing Dr. Roque only at sidebar prior to Sue Beisler's testimony).

reduces the Medicare reimbursement amount by 8.1%, from $32,444,964 to $29,815,585. *See* Declaration of Michael J. Petron in support of United States' Motion for Restitution Pursuant to the Mandatory Victim Restitution Act ("Petron Report"), ECF No. 1035-2 at 4 & n.4.

2.       The government's top-down methodology overestimates the extent of off-label reimbursements.  The government assumes that any prescription for Subsys that was not preceded by a "principal diagnosis of cancer" in the 365 days leading up to the prescription is off-label, leading it to calculate total off-label reimbursements from the 10 relevant co-conspirators of $22,518,591.  That methodology embeds at least two arbitrary conditions that artificially inflate the number of prescriptions counted as off-label: (a) requiring the cancer diagnosis code to be a "principal" code and (b) requiring the cancer diagnosis code to appear in the 365 days prior to the prescription.

Neither the government nor its expert has explained or defended these arbitrary conditions, which assume an unrealistic degree of precision in coding of patients' medical records—a task that may not be performed by patients' treating physicians.  Applying those conditions to actual patients would lead to absurd real-world results.  It would deem on-label prescriptions written to treat a long-term cancer patient to be off-label for loss purposes solely because a cancer diagnosis code was not placed in the patient's medical records in the year before a Subsys prescription.  In similar fashion, this approach would deem on-label prescriptions for a patient with a cancer diagnosis code that was not a "principal" code to be off-label for loss purposes.  Based on data provided by the government's expert, removing those arbitrary conditions has the effect of reducing the amount of

Subsys reimbursements deemed off-label by roughly 30%, from \$22,518,591 to approximately \$15,562,517.[11]  *See* Petron Report, Exhibit 7, n.5; Exhibit 6, n.4.

3.      The government's top-down approach assumes that 80.9% of "all Subsys prescriptions passed through the IRC," citing paragraph 120 of the PSR for support.  In its motion seeking mandatory restitution, the government triumphantly declares that no Defendant has contested the 80.9% rate.  *See* United States' Motion for Restitution Pursuant to the Mandatory Victim Restitution Act, ECF No. 1035 at 9, n.6.  But the PSR does not state that 80.9% of Subsys *prescriptions* passed through the IRC.  It states that 80.9% of prescribers had opted into the IRC as of January 2013.  *See* Babich PSR at 29.  The government has not cited evidence that would demonstrate a connection between the number of prescribers who opted into in the IRC as of January 2013 and the number of prescriptions involved in fraud that passed through the IRC throughout the relevant period.

In the absence of evidence establishing a connection between prescribers enrolled in the IRC at a specific point in time and actual prescriptions involved in fraud, the 80.9% figure that the government's loss model depends on is nothing more than an arbitrary proxy for the percentage of prescriptions that passed through the IRC that allegedly involved illegality.[12]  But the evidence at trial

---

[11]  The government's expert, imposing the two conditions questioned above, calculates off-label reimbursements for the 10 relevant co-conspirators of \$22,518,591 (effective off-label rate of 75.5%).  Petron Report, Exhibit 7, n.5.  According to the expert, removing both conditions for all 13 co-conspirators drops the off-label reimbursement amount to \$16,934,945.  Petron Report, Exhibit 6, n.4.  The expert does not provide a similar figure for the 10 relevant co-conspirators.  Total Medicare reimbursements for the 10 relevant co-conspirators are 8.1% less than total Medicare reimbursements for all 13 co-conspirators.  *See* Petron Report at 4 & n.4; *see also* Petron Report, Exhibit 3.  Reducing the \$16,934,945 off-label reimbursement amount provided by the expert for all 13 co-conspirators by 8.1% yields an off-label reimbursement figure for the 10 relevant co-conspirators of \$15,562,517 (effective off-label rate of 52.2%).  The \$15,562,517 amount is 30.9% less than the off-label reimbursement total calculated imposing the government's two conditions (\$22,518,591).

[12]  As this Court correctly observed, "not every prescription that necessarily went through [the IRC] is evidence of a crime."  *See* 2/4 Trial Tr. 17-19.

is replete with alternative proxies that would approximate illegality in a less shoddy manner. For example, according to trial testimony, the IRC achieved an approval rate of 65-70%, whereas the third-party company that preceded creation of the IRC, Apricot, and did not engage in any alleged fraud, achieved an approval rate of 30-35%. *See* 2/14/19 Trial Tr. 74:13-19 (Michael Babich) (describing Apricot success rate of 30-35%); 88:6-15 (Michael Babich) (describing IRC pilot program data showing 65-70% success rate). Comparing those approval rates (roughly 70% success by IRC compared to 35% success baseline by Apricot) indicates a proxy of approximately 50% for the subset of IRC-related claims submissions worthy of further analysis for a potential connection to illegality—a percentage much lower than the government's 80.9%. While even that 50% alternative would be subject to multiple other arguments and loss reductions within this subset of claims, it does not appear that the government considered this alternative proxy or others, perhaps because they do not lead to a dollar figure as high as the 80.9% number the government prefers. Applying this hypothetical replacement proxy of 50% instead of 80.9% would reduce the government's top-down loss calculation, after correcting the other errors described above, to roughly $7,781,259 in supposed loss.

4.      The government's loss calculation never credits the obvious reality that Medicare patients were entitled to reimbursement of prescription pain medication to treat their legitimate medical needs, and that Medicare as an insurance program was obligated to provide that benefit. *See* Ltr. from Babich Counsel to Probation Officer Jennifer Broquist (Nov. 5, 2019) at 4-7; *cf.* Defendants' Response to Government's Motion for Restitution, ECF No. 1121 at 6. If the alternative treatment prescribed to those patients would have been either Subsys itself or a more expensive therapy, then pecuniary losses for those prescriptions obviously would be zero. Trial testimony established that Subsys was priced below a popular branded competitor, Fentora. Competing medications targeted by Insys, like Actiq or Abstral, were priced approximately 3-18%

below Subsys during the conspiracy period.[13]   *See* Exhibit A – INS-BOS-002906662 (exemplar summary spreadsheet reflecting Subsys and certain competitor pricing data provided to Defendants in discovery).   Rounding up in the government's favor to 20% (*i.e.*, assuming competitive branded alternatives were priced at 80% of the Subsys price) and using that percentage as a rough, hypothetical proxy for the cost of prescriptions that Medicare would have reimbursed as alternatives to Subsys to treat patients' legitimate pain would further reduce the amount of loss by at least 80% to $1,556,252.  *Id.*

Correcting just partially the errors and flawed assumptions described above, within the framework of the government's own top-down methodology, would lead to a loss number of $1.556 million, substantially less than the government's proposed amount.   The applicable Offense Characteristic loss enhancement under the Guidelines (category ranging between $1.5 million and $3.5 million) would result in no more than +16 levels, not the +20 levels currently suggested in the PSR.

## II.   An Alternative "Bottom Up" Methodology, Using the Government's Own Bill of Particulars Allegations About IRC Fraud for Medicare Claims, Also Would Substantially Decrease Loss to Less Than $3.5 Million.

One of the government's persistent challenges in this case has been restraining its broad, conclusory, and thematic arguments about Subsys as a dangerous opioid, doctors as corrupt recipients of kickbacks, and Medicare as a swindled insurance carrier, and instead connecting actual evidence of illegal behavior to real patients and specific transactions.[14]   In the context of attempting

---

[13] An expert could consider a variety of ways to evaluate the market alternatives to Subsys, relative price points, and market share over time.  We provide this example simply to emphasize that the government did not conduct any such analysis, whether through the expert it retained or otherwise; that this type of rigor is required for a more reliable loss methodology.

[14] The government identified a limited number of patients of co-conspirator practitioners as possible trial witnesses (18 patients of tens of thousands who took Subsys) in its disclosure letter a month before trial, and those patients were treated by a limited number of practitioners (8 practitioners out of thousands who

to prove loss, it is far easier to assume that broad categories of prescriptions count toward loss than to tie specific prescriptions to evidence of illegality, and the government's top-down approach suffers that infirmity, falling short of the mark for the reasons described above.

But with respect to a potential "bottom up" approach, the government did provide some specific evidence of approximately 150 phone calls with details of calls, practitioners, insurers, claims, dates, and patients in advance of trial.  Part of the government's effort to protect the sprawling claims included in the First Superseding Indictment ("FSI") against dismissal included complying with specific commitments to the Court "to provide additional information in a bill of particular with regard to the mail fraud and wire fraud allegations" in the FSI.  *See* Exhibit B - (Gov't Ltr. to Counsel for Defendants (Aug. 21, 2018)) at 1–2; Hearing Tr. at 48: 22-25; 56:11-14 (Judge Burroughs: "[C]ouldn't we fix Counts 2 and 3 with a bill of particulars?  These are the mailings; these are the wires."; Government: "The government is happy to concede at some level to provide additional information in the bill of particulars with regard to the mail fraud allegations or details of the wire fraud issues.").  As the Court may recall well, that motion to dismiss hearing was hotly contested, and the government was highly motivated to specify its best evidence to substantiate its insurance fraud and bribery claims.  Those same mail and wire fraud allegations survived in the

---

prescribed Subsys).  *See* Government's December 12, 2018 Discovery Letter, ECF No. 662-2 at 2.  At trial, the government elicited testimony from only 11 patients (3/28/19 Trial Tr. 139:24-140:12 (Michelle Kamzyuk); 3/28/19 Trial Tr. 185:20-25, 186:14-21, 194:1-14 (Alicia Hinesley); 3/27/19 Trial Tr. 252:25-253:5, 265:18-23, 267:18 – 268:6 (Kendra Skalnican); 3/26/19 Trial Tr. 71:17-22, 81:4-10 (Scott Byrd); 3/22/19 Trial Tr. 52:9-16 (Woodrow Chestang); 3/21/19 Trial Tr. 82:6-83:9 (Sara Dawes); 3/21/19 Trial Tr. 185:15-186:2 (Betty Carrera); 3/20/19 Trial Tr. 129:3-20, 144:24-145:1 (Kathy Avers); 3/20/19 Trial Tr. 183:21-184:1, 184:15-185:4, 185:25-187:11 (Paul Lara); 4/2/19 Trial Tr. 30:25-34:1 (Jennifer Adams); 4/1/19 Trial Tr. 124:16-127:12 (Gregory Kundla)) and 2 practitioners (1/31/19 Trial Tr. (Dr. Gavin Awerbuch); 2/11/19 Trial Tr. (APRN Heather Alfonso)).  The government eventually determining that 6 patients overall, which did not include any of the 11 trial witnesses, may be entitled to restitution, *see* United States' Motion for Restitution Pursuant to the Mandatory Victim Restitution Act, ECF No. 1035 at 2, again underscoring the focused nature of the evidence about limited transactions and claims.

government's narrowed Second Superseding Indictment as predicate offenses of a single RICO conspiracy count.

The government's Bill of Particulars letter explained that the mail and wire fraud schemes to obtain money and property from insurers involved bribes to practitioners (specifying 10 practitioners) and misrepresentations of patient information through the IRC to obtain insurance payments for those prescriptions (specifying 8 of the same 10 practitioners). *See* Exhibit B - Gov't Ltr. to Counsel for Defendants (Aug. 21, 2018) at 2-3. The letter explained "that the Defendants directed call center employees located in Arizona to obtain payment authorization by disguising the identity and location of their employer and by misrepresenting patient diagnosis, the type of pain being treated, and the course of treatment with other medications." *Id.* at 3.

To supplement the evidence of the IRC calls, the government supplied a spreadsheet listing approximately 150 calls from certain pharmacy benefit manager/insurers, along with audio recordings purportedly related to this scheme. The additional information linked the approximately 150 calls to 31 practitioners, insurers processing claims including Medicare claims, patients, and dates. On the eve of trial, in response to the Court's insistence that government specify particular evidence it may use to prove its case, the government reiterated its commitment to this phone-call evidence by specifying that it "remains the case" that it anticipated relying on the approximately 150 calls to establish the alleged insurance fraud scheme. *See* United States' Response to Court Order dated Dec. 18, 2018, ECF No. 616 at 15. The government further represented that it would not add to this list of calls unless a call related to a narrow list of 19 patients identified as potential trial witnesses. *Id.*

The government's approximately 150 handpicked phone calls offer some specifics of conversations, practitioners, insurers, claims, dates, and patients. This evidence was a good start for

the government's trial preparation and reflected the government's view of the level of detail necessary (though far from sufficient) to prove its case.  However, the government did not justify its selection of these approximately 150 calls with any statistical rationale or other validation.  And even the information provided about the approximately 150 calls does not precisely identify in every case which statements were false or misleading, how the insurers perceived the statements, whether those statements were material, which medicines the insurers would have approved if not Subsys, among other topics relevant to loss.

Nonetheless, if we set aside those problems and assume that the approximately 150 calls involving 8 of the 10 co-conspirator practitioners[15] were linked to the charged conspiracy, we can calculate an amount for potentially fraudulently paid claims tied to those specific payers and patients. Working with that hypothetical scenario, 26 of 58 calls involving these 8 co-conspirators appear to have resulted in some insurance approval for 24 patients, the majority of whom appear to be Medicare beneficiaries based on documents provided by the government in discovery.[16]  Based on Subsys pricing data the government produced to Defendants in discovery an estimate of Subsys reimbursements for those 24 patients during the prior authorization period approved as a result of the call (ranging from 12 months to multiple years) amounts to approximately $3.643 million.[17]

As with the government's top-down loss methodology, some additional reduction would be required to account for prescriptions for alternative therapies Medicare would have been required to

---

[15] Drs. Paul Madison and Jerrold Rosenberg were not reflected in this collection of calls.

[16] The practitioner, phone call date, insurer, claims period and patient identifying information were all supplied in the government's discovery letter and accompanying production.  Given the significant volume of patient-specific data reflected in the spreadsheet and underlying materials (USAO-MA-1278740 *et seq.*), we have not attempted to attach these materials as an exhibit to this motion.

[17] To assign a monetary value to each prescription, we simply applied the relevant price of Subsys at the time of the phone call to the units, using the attached documents also supplied through the government's discovery.  *See* Exhibit A.

reimburse to treat these patients' legitimate pain (if not Subsys itself or a more expensive competitor). Even a small adjustment of 10% (*i.e.*, the substitute pain medicine was priced at 10% of the Subsys price)—substantially less than the more accurate 80% relative price reduction described earlier—would reduce the $3.643 million loss estimate well below the $3.5 million loss threshold. The resulting offense enhancement would be not more than +16 levels, instead of the +20 levels currently suggested in the PSR.[18]

*      *      *

Any number of loss methodologies could be supported through expert analysis and mini-trials to resolve factual issues. The government has not elected to proceed in that manner. It has chosen instead to abstract away from details and rely on broad, thematic arguments not tied to specific claims or reimbursements. We fully acknowledge that the top-down and bottom-up estimates described above are basic. They are designed only to demonstrate the simple point that the evidence does not inexorably point to a loss figure as significant as the amounts calculated in the PSR and the government's restitution filings. We also understand that Mr. Babich's cooperation and the government's 5K1.1 substantial assistance motion may moot the suggested Guidelines range altogether.

But if the Court were inclined to extend these proceedings into full-blown evidentiary hearings and consider the type of evidence and expert analysis that would be required for the government to prove loss, we would prepare accordingly. To this point, despite six years of investigation and a three-month trial, the government's loss estimates have been hurried, not well-

---

[18] Both the "top down" and "bottom up" approaches we describe amount to less than the $3.5 million threshold specified in that Sentencing Guideline offense enhancement category. That amount also coincides with the amount that Mr. Babich did not contest as part of his plea agreement, and that he subsequently agreed was subject to forfeiture.

supported by substantive expert analysis, and detached from specific evidence connecting paid claims to actual patients, practitioners, false statement, and related bribes.  We do not offer these observations as criticism of the government, and we appreciate the difficulty and complexity of this exercise.  But that is precisely why the government has the burden of proving loss by a preponderance of the evidence, and it must be held to that burden with so much at stake.

*       *       *

Respectfully submitted,

KING & SPALDING LLP
Joseph Sedwick Sollers III
Mark A. Jensen
Daniel C. Sale
Lucas M. Fields
1700 Pennsylvania Ave., NW
Washington, D.C. 20006
+1 202 737 0500

HOGAN LOVELLS
William H. Kettlewell
125 High Street
Suite 2010
Boston, MA 02110
+1 617 371 1005

Dated:  January 6, 2020

*Attorneys for Defendant Michael Babich*

## CERTIFICATE OF SERVICE

I hereby certify that I served this document today by filing it using the Court's CM / ECF system, which automatically notifies the parties and counsel or record.

/s/ *William H. Kettlewell*

_____

William H. Kettlewell
(BBO No. 270320)