UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL BABICH<br><br>Defendant | Criminal Action No.<br>16-cr-10343-ADB<br><br>**Leave to File Sur-Reply**<br>**Granted Jan. 21, 2020** |

# MICHAEL BABICH'S SUR-REPLY TO GOVERNMENT'S MOTION FOR ORDERS OF FORFEITURE

KING & SPALDING LLP
Joseph Sedwick Sollers III
Mark A. Jensen
Daniel C. Sale
Lucas M. Fields
1700 Pennsylvania Ave., NW
Washington, D.C. 20006
+1 202 737 0500

HOGAN LOVELLS
William H. Kettlewell
125 High Street
Suite 2010
Boston, MA 02110
+1 617 371 1005

*Attorneys for Defendant Michael Babich*

**INTRODUCTION**

The government filed its motion for forfeiture against Mr. Babich on December 17, 2019 (ECF No. 1052) (Gov't Forfeiture Motion). On January 6, 2020, Mr. Babich filed his opposition (ECF No. 1125), and the government replied on January 15, 2020 (ECF No. 1148) (Gov't Forfeiture Reply). Mr. Babich files this sur-reply to address certain issues in the government's reply brief.

The government's reply brief leaves the misimpression that the forfeiture sought against Mr. Babich in this case is commonplace and run-of-the-mill. It is not. In fact, the government's position here is entirely novel. Not one of the cases it cites deals with forfeiture of stock option proceeds under 18 U.S.C. § 981 and how to trace share value to illegal transactions, let alone proceeds from stock options received long before any illegal conduct occurred. In seeking to take every dollar, cent, and share of stock that Mr. Babich ever received at Insys (including the imputed "value" of shares he never sold for money he never obtained), the government is seeking to carve out a position on forfeiture under ordinary mail fraud and conspiracy law that is even *broader* than the RICO forfeiture it is pursuing against the other defendants. *See, e.g.*, *United States v. Defries*, 129 F.3d 1293, 1314 (D.C. Cir. 1997) (stating that RICO statute is intended "to provide an extreme remedy for an extreme situation"). That extraordinary position is without legal support and is directly undermined by the plain language of the narrower § 981 forfeiture statute and the facts of this case.

The government's forfeiture position is a bridge too far. This Court should limit forfeiture to the $3.5 million the government previously determined at sentencing was justified after years of investigation.

**I.    THE GOVERNMENT'S REPLY INCORRECTLY SHIFTS THE BURDEN OF PROOF**

The government's reply is more remarkable for what it doesn't say than what it does. The government sets up a strawman argument to knock down easily, claiming that Mr. Babich has argued that trial evidence is off-limits to prove forfeiture. Not so. Mr. Babich has invited the government to

meet its burden to cite trial evidence for purposes of showing this Court (i) which illegal bribes and practitioners caused which sales, or otherwise were related to which false IRC statements, which insurers, and which paid claims, (ii) how many sales were impacted, (iii) how any of those illegal transactions impacted the market price for Mr. Babich's stock sales over time, and (iv) how other factors, such as legal sales and unrelated market conditions, impact the forfeiture claim. *See* ECF No. 1125 at 3 (noting government "does not cite any trial evidence whatsoever in its forfeiture motion").

Instead of engaging with the evidence in that way, the government simply invents a "permeated with fraud" forfeiture standard that has never been recognized in the First Circuit, stating conclusively that this "Court has ample evidence in the record to support a finding that Insys was permeated with fraud." ECF 1148 at 2. But how so? Mr. Babich did not plead guilty to racketeering conspiracy where the entire enterprise may be at issue through indirect forfeiture. What evidence would allow this Court to order forfeiture of the entire value of every share Mr. Babich acquired at any time (even if not sold and no money realized), as if Insys were an entirely fictional sham company for an entirely fictional sham product? The government does not say.

The reality is that the evidence introduced at trial cannot support such a sweeping argument. The government narrowly focused its case at trial on 10 co-conspirator practitioners (out of thousands) and a small number of patients (out of tens of thousands). The government's own expert "analysis" of the 10 co-conspirator practitioners demonstrated that they accounted for only 11% of at-issue Medicare reimbursements, and then applied a further set of assumptions about off-label use as a proxy for fraud. *See* Declaration of Michael J. Petron, ECF No. 1035-2; *see also* Babich Motion for Proposed Alternative Loss Methodology, ECF No. 1126 at n.11 and accompanying text. Whatever little the government has done to connect the forfeiture dots, it does not come close to carrying its burden of proving which proceeds Mr. Babich obtained as the result of illegal transactions.

**II. THE GOVERNMENT CONTRADICTS ITSELF & APPLIES THE WRONG STANDARD: A "MONEY JUDGMENT" OF FORFEITURE UNDER 18 U.S.C. § 981(A)(2)(B) IS LIMITED TO THE NET PROCEEDS ACTUALLY TRACEABLE TO THE OFFENSE**

The government has sought forfeiture against Mr. Babich under 18 U.S.C. § 981(a)(1)(C) which subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [specified statutes], or a conspiracy to commit such offense." (emphasis added). In its initial motion for forfeiture, the government acknowledged that only funds "traceable" to a crime are forfeitable. *See* Gov't Forfeiture Motion, ECF No. 1052 at p. 2 ("Defendant must forfeit any property, real or personal, which constitutes or is derived from proceeds *traceable* to a violation of, or conspiracy to commit, specified unlawful activity.") (emphasis added). Remarkably, in its reply brief, the government abandons that clear statutory requirement and now argues that, because it is seeking a money judgment, "tracing is not necessary." Gov't Reply in Support of Motion for Orders of Forfeiture, ECF No. 1148 at 3.

The critical flaw in the government's argument is the assumption that pursuing a money judgment forfeiture suspends its burden to prove which illegal transactions (*e.g.*, which bribes, related false IRC statements, and which sales) resulted in Mr. Babich obtaining which shares and which proceeds when sold. As discussed in Mr. Babich's opposition brief (ECF No. 1125), the proper starting place is an accurate calculation of the "proceeds" of the crime. Depending on the nature of the crime, federal law provides two different definitions of the "proceeds" that are subject to forfeiture. 18 U.S.C. § 981(a)(2)(A)–(B). "In cases involving illegal goods, illegal services [and] unlawful activities," the term "proceeds" means "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to the forfeiture, and any property traceable thereto." *Id.* § 981(a)(2)(A). "In cases involving lawful goods or lawful services that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired *through the illegal transactions* resulting in the forfeiture, less the direct costs incurred in providing the goods or

services." *Id.* § 981(a)(2)(B). Put differently, § 981(a)(2)(B) "does *not* explicitly render property forfeitable if that property is an *indirect* fruit of the crime"; it requires a defendant to forfeit only the crime's "net proceeds." *United States v. George*, 886 F.3d 31, 40 (1st Cir. 2018) (emphasis added). Therefore, under § 981(a)(2)(B)—which Mr. Babich contends is the clearly correct statutory definition of proceeds, as discussed below—the government must first prove by a preponderance of the evidence the amount of money Mr. Babich acquired directly "through the illegal transactions."

The government seeks to sidestep this evidentiary burden by arguing that the Court should begin its analysis by calculating the gross amount of money Mr. Babich indirectly received through his employment at Insys. *See* Gov't Forfeiture Motion at 4. Citing to a single district court case in the Southern District of New York, the government contends that "[t]he calculation of proceeds begins the same whether the Court applies the gross proceeds rule of 18 U.S.C. § 981(a)(2)(A) or the net proceeds rule of 18 U.S.C. § 981(a)(2)(B)." That is not the law in the First Circuit.

The First Circuit has repeatedly confirmed that identifying which of the two relevant statutory definitions of "proceeds" applies is the correct first step in the analysis. *See, e.g.*, *George*, 886 F.3d at 40 (recognizing that "the classification of an offense of conviction can have profound effect on the amount that may be subject to forfeiture in a particular case," and starting the analysis with the identification of § 981(a)(2)(A) as the proper statutory reference in light of the facts of that case); *United States v. Carpenter*, 941 F.3d 1, 7-8 (1st Cir. 2019) (starting the analysis by affirming the district court's use of § 981(a)(2)(B)); *United States v. Gorski*, 880 F.3d 27, 41 (1st Cir. 2018) (starting analysis by recognizing the parties' agreement that § 981(a)(2)(B) was proper definition of proceeds).

In this case, § 981(a)(2)(B), or the net proceeds provision, is the correct definition of proceeds. Section 981(a)(2)(B) applies when "the crime [ ] involve[s] a good or service that could, hypothetically, be provided in a lawful manner." *George*, 886 F.3d at 40. This definition applies to the conduct here by its plain language. Subsys was undoubtedly a lawful product that was sold, at times, in an unlawful

manner.  It requires no hypothetical scenario to contemplate lawful sales of Subsys.  They happened, as the evidence at trial proved and by the government's own acknowledgements, and those lawful sales continue to this day.[1]  The government argues in its reply for a different conclusion by conveniently redefining the *manner* in which Subsys was sold.  The government asserts that the "crux" of the crime was "insurance fraud," but the fact that some sales of Subsys—a "lawful good"—involved insurance fraud does not remove this case from § 981(a)(2)(B).  The facts as applied to clear statutory language makes it plain that this case "involv[es] lawful goods . . . that [were] sold or provided in an illegal manner," as § 981(a)(2)(B) contemplates.

The government attempts to buttress its shaky position in reply by stating that "[t]he First Circuit recently opined, without deciding, that mail and wire fraud might fall into the gross proceeds rule."  Gov't Forfeiture Reply at 5 (citing *Carpenter*, 941 F.3d at 8 n.4.).  In fact, the cited First Circuit decision actually approved of the district court's choice of § 981(a)(2)(B) in a mail and wire fraud case.  The full relevant passage reads:

> The district court's forfeiture order determined, contrary to the position of the prosecution, that the statutory provision governing Carpenter's case was 18 U.S.C. § 981(a)(2)(B).  The district court reasoned that as a textual matter, although "[m]ail and wire fraud might arguably be called 'unlawful activities'" under § 981(a)(2)(A), that section explicitly mentions "telemarketing and health care fraud schemes."  *Specifically listing these two fraud schemes "would be unnecessary . . . if the generic term 'unlawful activities' had been intended to be broad enough to encompass fraud schemes."*  Further, the district court concluded that "lawful services" being "provided in an illegal manner" was a more "apt" description for running a [property exchange] intermediary through mail and wire fraud.
>
> There was no error in the district court's choice to use § 981(a)(2)(B).  In *George II*, we explained that to fall under § 981(a)(2)(B), "the crime must involve a good or service that could, hypothetically, be provided in a lawful manner," while activities

---

[1] The government's reply asserts that Mr. Babich argues that the government must "prove lack of medical necessity" to count amounts Mr. Babich received as "proceeds."  ECF 1148 at 4.  Mr. Babich argues no such thing.  Mr. Babich's opposition rebutted the government's assumption that the Insys business was inherently unlawful by observing that the company sold—and sells—a lawful product, and many sales were—and are—entirely legitimate, medically necessary, and benefit patients in need of treatment.

> falling under § 981(a)(2)(A) are "inherently unlawful." *George II*, 886 F.3d at 40. There, we determined that the defendant's crime, embezzling funds from a federally funded organization, "[could not] be done lawfully" and so fell under § 981(a)(2)(A).
>
> By contrast, Carpenter's conviction arose out of how he solicited customers for and made misrepresentations about his [property exchange] intermediary company. Advertising and running such a business are not "inherently unlawful" activities; rather, Benistar provided what could have been a "legal service," but which Carpenter operated in an illegal manner by misrepresenting to exchangors how their funds would be invested and investing contrary to those representations.

*United States v. Carpenter*, 941 F.3d 1, 7-8 (1st Cir. 2019) (quotations and alterations in original, emphasis added).

The government's heads-I-win-tails-you-lose argument posits, incorrectly, that this Court must "find that insurance fraud can somehow be done lawfully" to rule in Mr. Babich's favor. *See* Gov't Forfeiture Reply at 5. The First Circuit has recognized that it is appropriate to apply § 981(a)(2)(B) to some cases involving fraud. In *United States v. Gorski*, 880 F.3d 27, 41 (1st Cir. 2018), the Court concluded that § 981(a)(2)(B)—the "net profits" provision—was appropriate in a wire fraud and conspiracy case involving the "knowing[] procur[ement of] government contracts for [defendant's] construction company on the false premise that the company was owned and controlled by military veterans who became disabled in connection with their military service." By the government's logic, the "crux" of the crime in that case was "government contracting fraud," so the court should have applied § 981(a)(2)(A) since "government contracting fraud" cannot "be done lawfully." Yet, the First Circuit effectively disavowed that view, and agreed in *Gorski* that § 981(a)(2)(B) was the correct statute in a money judgment forfeiture case.

The flaw in the government's "money judgment" position is further exposed by its own methodology, which double-counts through the money judgment $10,238,989.84 in stock option exercise value that Mr. Babich never obtained. Rather, he held those shares after exercising his options—and never sold then and realized any value, to this very day. They are worth only about $26,000 today if sold, not the $10,238,989.84 that comprises part of the government's $37,768,992.04

forfeiture demand.[2] But true to form, the government asks the Court to forfeit those held stocks, too, regardless of the extraordinary and unjustified imputed value that has never been shown to be an obtained "proceed" of any illegal transaction. The government's money judgment methodology is anomalous, internally inconsistent, and not supported by the law or facts.

For those reasons, § 981(a)(2)(B) contains the correct definition of proceeds for the conduct at issue here. Pursuant to that provision, the only amounts subject to forfeiture are the amounts the government can prove Mr. Babich acquired "through the illegal transactions." As discussed below, that amount is far less than the government's requested amount.

### III. THE GOVERNMENT'S REPLY FAILS TO ADDRESS ITS SHIFTING POSITIONS ON THE AMOUNT OF MR. BABICH'S "PROCEEDS"

As Mr. Babich's opposition brief explains, when the government sought a temporary restraining order against $3.5 million of his assets in 2017, and affirmed that amount at Mr. Babich's January 2019 guilty plea consistent with Department of Justice policy, it took the position that the $3.5 million sought *were* the proceeds that Mr. Babich received during the conspiracy. *See* ECF No. 1125 at 10-11 (quoting government statements that the $3.5 million constituted the criminal proceeds and that other funds "seemingly unrelated to criminal proceeds" were commingled in Mr. Babich's bank account; and that the $3.5 million constituted "the proceeds this defendant personally obtained"). The government's reply made no effort to reconcile these drastically different understandings of the relevant proceeds, and it presumably has no answer. As we explained in our

---

[2] Mr. Babich retains 436,068 Insys shares that he exercised during the conspiracy period. *See also* Gov't Forfeiture Reply, ECF No. 1148 at 2 n.1 (explaining government's revised calculations include "the total taxable compensation or amount subject to alternative minimum tax ("AMT") based on addition by Federal Bureau of Investigations Forensic Accountant Horan, of taxable compensation or, if the stock was not immediately sold, amount subject to AMT, as reported by Solium Capital business records."). *See also* Exhibit B to Mr. Babich's PSR Objection letter, transmitted to the government, to Probation, and to the Court contemporaneously with this filing. The forfeiture of a imputed, historic share value on stock never sold with no proceeds actually realized only magnifies the constitutional issue describe below in Section V.

opposition brief, an amount up to $3.5 million is an appropriate amount of forfeiture here. To go beyond that amount requires proof that the government has failed to provide.

**IV.  MR. BABICH'S NET PROCEEDS ARE FAR LESS THAN THE FORFEITURE AMOUNT SOUGHT BY THE GOVERNMENT**

As noted at the outset, the government's forfeiture request for over $37 million here is broad and novel. There is no authority in the context of 18 U.S.C. § 981 to claim that the full value of stock option exercises and sales that relate to a variety of untainted business activities are forfeitable, and the government cites none. Instead, it appears as though the government is attempting to shoehorn Mr. Babich into a RICO-like forfeiture posture, perhaps in an attempt to achieve "consistency" with the other defendants who were convicted of different crimes. *Compare* 18 U.S.C. § 1963(a)(2) (permitting forfeiture of "any . . . security of . . . any enterprise" in violation of RICO), *with* 18 U.S.C. § 981(a) (permitting forfeiture of "proceeds" of offenses). Regardless of the reason, the government's formulation is wrong.

Under the government's view, "[b]ut-for the crime, Babich would not have obtained his salary, bonus, car allowance, or proceeds from the receipt of stock options and liquidation of Insys stock." Gov't Forfeiture Reply at 4. Yet this simply is not so. For example,

- Mr. Babich worked for Insys for years before the government alleges any impropriety at the company began;

- Mr. Babich earned many of his stock options and other accrued assets well before 2012. In fact, he was granted nearly *half* of all his stock options in February 2010 and March 2011, long before Subsys was even approved for sale by the FDA in January 2012; and

- Mr. Babich drew a manager-level salary before Subsys was approved for sale by the FDA, and he would have continued to be compensated at that level regardless of the allegations in this case.

It simply is not true that "but for" the crime, Mr. Babich would have received none of that compensation from Insys. Mr. Babich fully acknowledges that the fraud may have been one of many factors that affected the *value* of some of his shares and stock options that were issued before the fraud. But it is not the case that Mr. Babich received those stock benefits only because of the fraud, or that the shares/options would have lacked any value in the absence of any fraud. The issue, therefore, is how to account for the value that the fraud caused Mr. Babich to realize. Using the terminology of § 981(a)(2)(B), the net proceeds that Mr. Babich received "through the illegal transactions" are the amounts over and above what he would have received as Chief Executive Officer of Insys absent the fraud.

While it is the government's burden to prove Mr. Babich's proceeds, Mr. Babich offers the following (1) to aid the Court to illustrate one example of what an appropriate analysis of "proceeds" might entail, (2) to provide an obvious rejoinder to the unproven suggestion that all sales and all share prices are the results of kickbacks and related insurance fraud:

- During the conspiracy period (2012-2015), Insys reported an average of $185.66 million per year in revenue from the sale of Subsys. In 2018, two years *after* the racketeering conspiracy ended, and well after Defendant Dr. John Kapoor was indicted and had resigned from Insys's Board of Directors (and the medical community was aware of the allegations at issue), Insys reported $78.76 million in net Subsys revenue. Using full-year 2018 sales as a baseline to account for some external market factors that would approximate Subsys sales unaffected by the conspiracy, that approach provides that at least 42.42% of annual net revenue could be argued as presumably unaffected by the conspiracy, prior to other adjustments within the conspiracy period.

- In government's discovery provided to Mr. Babich, and following the government's clarification of its forfeiture numbers, *see* ECF 1148 at n.1, it is now apparent that Mr.

Babich obtained $14.78 million in net compensation from sales of Insys stock between January 1, 2012 and December 31, 2015.[3] Based on the percentage calculated above, one approach could be to assume that at least 42.42% of the $14.78 million, or $6.27 million, was not derived from the criminal conspiracy due to external market factors, before evaluating other factors within the conspiracy period that may have accounted for appropriate sales of the remaining $8.51 million of Mr. Babich's net stock sales before determining illegal proceeds.

- Any number of additional proxies might assist a fact-finder in further separating legal sales from "proceeds" obtained as a result of illegal transactions within the conspiracy period. For example, the government employed an analogous approach to loss that focused "on claims paid by Medicare," – presumably because it thought the evidence was better and more specific to Medicare fraud than the byzantine and inconsistent payer rules of commercial carriers. See ECF No. 1126 at 12 (noting government trial evidence of IRC calls focused on Medicare beneficiaries). The government claimed that approximately 40.7% of Subsys sales in the relevant period were reimbursed by Medicare.[4] *See* Final Pre-Sentence Report at 28. Applying that percentage to the $8.51 million calculated above, results in $3.46 million of Medicare-related proceeds from Mr. Babich's Insys stock sales

---

[3] The $14.78 million obtained by Mr. Babich is net of state and federal taxes withheld and paid following the sales of Insys stock, and also includes withholdings and payments made for FICA and Medicare on behalf of Mr. Babich. Accordingly, he never "obtained" these funds as proceeds. Withholdings and tax payments were all tracked and accounted for by Insys' stock plan administrator, Solium Capital, and preceded disbursement of funds following and of Mr. Babich's sales of Insys stock during the time period. After conferring about the basis of the forfeiture estimates and underlying Solium Capital records, and despite disagreement on the proper measure of forfeiture (gross vs net) both the government and Mr. Babich have now corrected inaccurate estimates in their opening briefs. *See* Gov't Motion, ECF No. 1052 at 2 and Babich Opposition, ECF No. 1125 at 10, n.9.

[4] "All of claims to insurers for Subsys prescriptions from 2012-2015 amounted to $652 million…. From 2012-2015, Medicare paid approximately $265,809,293 for all of the practitioners who wrote prescriptions for Subsys." Final Pre-Sentence Report at 28.

in the relevant time period—an amount *less* than the $3.5 million Mr. Babich has already agreed to forfeit.

Still other proxies could be applied in the same manner to identify "proceeds," regardless of the type of payer, such as the roughly 50% difference in insurance approval rates between the third party vendor (Apricot) and the in-house IRC rate during the conspiracy (again resulting in a number *less* than $3.5 million). The government also could have used a "bottom up" approach to establish, based on trial evidence, which co-conspirator practitioners received bribes, which allegedly false and material IRC calls related to their patients, whether the insurance company approved the claim, and what those potential traceable proceeds would be. *See* ECF 1126 at 9–13 (providing bottom up example of analysis resulting in less than $3.7 million in sales). But the government performed none of those kind of analyses here, leaving the Court and Mr. Babich instead with an expansive "permeated with fraud" standard that is not the law and comes nowhere close to proving which stock sale amounts were proceeds.

Finally, under the § 981(a)(2)(B) analysis, the government asserts in its reply that "tax payments are not a direct cost" that is subject to a net proceeds calculation. *See* ECF No. 1148 at 4–5. Again, the government goes too far. Only one First Circuit decision addresses (without deciding) the issue, and to our knowledge, no other circuit courts have determined whether personal income tax payments constitute a direct cost available to offset the amount of proceeds acquired.[5]

Fortunately, such case law is not needed to interpret the plain language of the statute, which answers the question unambiguously. Section 981(a)(2)(B) provides that direct costs do not include

---

[5] The defendant in *United States v. Gorski*, 880 F.3d 27, 42 (1st Cir. 2018) argued that personal income taxes he paid should be credited as "direct costs" under Section 981(a)(2)(B)'s definition of proceeds. The First Circuit did not have an opportunity to fully evaluate the argument because the defendant did not present the argument to the district court, nor did he develop it at the appellate level.

the "overhead expenses of the *entity* providing the goods or services, or any part of the income taxes paid by the *entity*." (Emphasis added). The statute does not address the defendant's taxes, for good reason. Under ordinary rules of statutory construction, the statute should be read according to its plain terms—that is, that the *defendant's individual* direct costs shall be excluded from the forfeiture order, while the defendant's direct costs obviously do not include the *entity's* overhead or tax costs. *See, e.g.*, *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning.").

That common-sense interpretation is the natural reading of the statute. *See United States v. Santos*, 553 U.S. 507, 512 (2008) (Scalia, J., plurality opinion) (noting that § 981(a)(2)(A) uses the term "proceeds" in the sense of "receipts" while § 981(a)(2)(B) uses the term in the sense of "profits"). If individual tax payments by defendants were not excluded from forfeiture judgments under § 981(a)(2)(B), law-abiding and tax-paying defendants would be worse off by having paid taxes: Defendants who paid taxes would not personally benefit from amounts paid as taxes and would have to pay those amounts to the government again through forfeiture, while defendants who never paid taxes and ran entirely fraudulent schemes would have to forfeit those amounts only once. Such an interpretation does not make sense.

Finally, Judge Stearns' opinion in the *Chin* case is apt. In that case Judge Stearns found that tax payments should be excluded from the broader and more punitive RICO forfeiture calculations—a statute that provides less support than § 981(a)(2)(B) for deducting tax payments—because, he reasoned, those tax payments were not "property the defendant actually acquired as a result of the crime." *United States v. Chin*, Mem. And Order on Forfeiture of Property, Case No. 1:14-cr-10363-

RGS, ECF No. 1148 (filed Feb. 23, 2018). The same analysis should apply here to the narrower § 981(a)(2)(B), with even more force.

## V. THE GOVERNMENT'S FORFEITURE REQUEST VIOLATES THE EXCESSIVE FINES CLAUSE OF THE EIGHTH AMENDMENT

In Mr. Babich's opposition brief, we explained that the government's requested forfeiture in this case violates the Excessive Fines Clause of the Eighth Amendment because it is 172 times the maximum fine recommended by the Sentencing Guidelines. The government responds in reply that "[t]he maximum penalty, and not the guideline range, is the appropriate benchmark because the 'statutory scheme is a better guide to whether the forfeiture order is excessive.'" Gov't Forfeiture Reply at 9. By "maximum penalty," the government originally meant "not more than the greater of twice the gross gain or twice the gross loss." *Id.* (quoting 18 U.S.C. § 3571(d)). In this case, however, the "maximum penalty" is $250,000, a conclusion confirmed by Probation after considering and rejecting the government's PSR objections here. *See* PSR Addendum at 49 ("the Probation Office maintains that the statutory maximum fine cannot be based on twice the gross gain or loss"). The government now appears to agree.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that the Sixth Amendment's jury trial guarantee requires that any fact (other than the fact of a prior conviction) that increases the maximum punishment authorized for a particular crime be proved to a jury beyond a reasonable doubt. In *Southern Union Company v. United States*, 567 U.S. 343, 346 (2012), the Court held that the *Apprendi* rule applies to the imposition of criminal fines. The *Southern Union* Court discussed specifically the twice-the-gain-or-loss statute:

> The federal twice-the-gain-or-loss statute, in particular, has been used to obtain substantial judgments against organizational defendants. [ ] And where the defendant is an individual, a large fine may "engender 'a significant infringement of personal freedom.'" . . . This is exactly what *Apprendi* guards against: judicial fact finding that enlarges the maximum punishment a defendant faces beyond what the jury's verdict or the defendant's admissions allow.

567 U.S. at 351-52.

Because neither a "gain" or "loss" amount was found by the jury beyond a reasonable doubt or admitted by Mr. Babich, the maximum fine in this case must be limited to $250,000. The government recently recognized this fact at Mr. Gurry's sentencing on January 13, 2020. *See* Transcript of Sentencing Hearing of Michael Gurry at 6 and 8 ("Mr. Yeager: . . . The government is agreeing that for purposes—strike that—the government is agreeing the maximum fine here is $250,000 . . . . Probation: It could be your honor. However, in this particular case it was a prior objection of the government, and due to *Apprendi* there was no amount that was alleged or found by the jury. So, therefore, it can't be twice the gross gain or loss. It's capped at the stat max at 250, and I think the parties have ultimately agreed to that.").[6]

Accordingly, and taking into account the government's revised calculation of Mr. Babich's stock option exercises,[7] the forfeiture judgment now requested by the government in this case would be **_162 times_** the maximum statutory fine. As explained in Mr. Babich's opposition brief, such a forfeiture amount is grossly excessive in violation of the Excessive Fines Clause of the Eighth Amendment to the United States Constitution, and neither the Supreme Court nor the First Circuit has ever upheld a forfeiture so far in excess of the maximum.[8]

---

[6] The PSR calculates a fine range under the Sentencing Guidelines of between $30,000 and $300,000. *See* PSR at 43. However, the PSR also correctly notes the statutory maximum fine of $250,000, which controls here. *See id.* at 43 and 49. Even the highest end of Guideline fine range, an additional $50,000, would make no difference under the case law and would be equally unconstitutional.

[7] *See* Gov't Forfeiture Reply, ECF No. 1148 at n.1 (noting that it incorrectly represented Mr. Babich's stock option exercises in its motion for forfeiture and asserting that the revised amount is $37,768,992.04). That amount, plus Mr. Babich's non-stock compensation from 2013 – 2015 of $2,794,819, equals a total requested forfeiture of $40,563,811.04.

[8] *See also supra* at n.2 and accompanying text (explaining that the government's methodology double-counts over $10.2 million in purported "value" of stock options that Mr. Babich never sold and from which he never obtained any profit). This improper double-counting provides another basis for finding the government's requested forfeiture amount in violation of the Excessive Fines Clause.

## **CONCLUSION**

For the foregoing reasons, Mr. Babich respectfully requests that this Court deny the government's motion and instead enter an order of forfeiture of between $2.5 million and $3.63 million.

| | |
|---|---|
| KING & SPALDING LLP | HOGAN LOVELLS |
| Joseph Sedwick Sollers III | William H. Kettlewell |
| Mark A. Jensen | 125 High Street |
| Daniel C. Sale | Suite 2010 |
| Lucas M. Fields | Boston, MA 02110 |
| 1700 Pennsylvania Ave., NW | +1 617 371 1005 |
| Washington, D.C. 20006 | |
| +1 202 737 0500 | |

*Attorneys for Defendant Michael Babich*

## CERTIFICATE OF SERVICE

I hereby certify that I served this document today by filing it using the Court's CM / ECF system, which automatically notifies the parties and counsel or record.

*/s/ William H. Kettlewell*
_____
William H. Kettlewell
(BBO No. 270320)