UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 16-10343-ADB |
| | ) | |
| JOHN N. KAPOOR, et al. | ) | |
| Defendants. | ) | |

**UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR RESTITUTION PURSUANT TO THE MANDATORY VICTIM RESTITUTION ACT**

The Court has informed the parties that it intends to enter an Order of Restitution that is meaningful, yet somewhat feasible for each Defendant. The government has shared the Court's statements at the January 13, 2020 hearing regarding forfeiture and restitution with those victims whose restitution claims are contested by the Defendants. Resolution of restitution, of course, is mandatory and must be primarily concerned with compensating losses incurred by victims of the Defendants' serious and damaging crimes.

The law requires (1) that the Court find the amount of restitution owed, and (2) only after completing step 1, that the Court consider 18 U.S.C. § 3664(h) and/or set a payment schedule for each defendant based upon that defendant's resources. *See* 18 U.S.C. § 3664(f)(2); *see also Paroline v. U.S.*, 134 S. Ct. 1710, 1728 (2014) (the Court can set payment schedule and manner based upon defendant's ability to pay). "In each order of restitution, the court shall order restitution to each victim in ***the full amount of each victim's losses*** as determined by the court and ***without consideration of the economic circumstances of the defendant***." 18 U.S.C. § 3664(f)(1)(A) (emphasis added). The government has filed a separate motion requesting the Court (a) bifurcate steps one and two and (b) limit the February 4, 2020 hearing to resolution of step one.

The First Circuit has instructed that "[w]hen determining restitution, a sentencing court is not expected to undertake a full-blown trial"—to the contrary, ***"a restitution award requires only a modicum of reliable evidence."*** *United States v. Naphaeng*, 906 F.3d 173, 179 (1st Cir. 2018) (internal quotations omitted). Defendants ask the Court to impose a far more exacting standard on the government for proving restitution than is required by law. The government, however, is not required to re-litigate the months-long trial to adequately support its restitution request. Such a heightened requirement is inconsistent with the goal of the Mandatory Victim Restitution Act (MVRA), which strengthens protections for fraud victims. Indeed, by relying on a combination of letters, affidavits, and other documentary evidence, the government has far exceeded the "modicum of reliable evidence" needed to support the restitution figure it seeks.

The restitution sought by in the government's restitution motion (Doc. 1035) is not only defensible, but warranted by the MVRA based on the extensive losses sustained by the victims. Nonetheless, the government is mindful of the Court's stated intent to "come up with a restitution amount that is feasible . . . that incentivizes people to try and pay" in order to "maximize the chances of these awards being satisfied." 1/13/20 Tr. at 7. In keeping with the Court's objectives, and in an effort to streamline the restitution analysis, the government submits herewith supplemental materials from the commercial payers, certain of which include restitution figures that have been revised downward in order to incentivize full and expedient payment.

Further, the government addresses below Defendants' faulty critiques of the government's restitution analysis.

### I.     Additional Patient Restitution Requests

As contemplated by the MVRA, victims have made additional restitution requests and/or renewed requests for restitution based upon documents previously provided to the Court and

counsel. For example, Victim 6002800 previously provided information but the government did not request restitution on her behalf for her dental harm. Since the original filing, Victim 6002800 obtained a letter from her dentist linking her dental harm to her use of Subsys.[1] The Court has received the following additional requests:

| | |
|---|---|
| **Victim ID Number 6002800:** | Requests $48,816 (documents provided along with letters from dentist). Attached as Exhibit 1 (UNDER SEAL). |
| **Victim ID Number 5431212:** | Requests $42,839.70 (documents and letter provided). Attached as Exhibit 2 (UNDER SEAL). This includes (and supersedes) the $1,815 sought in the original *Motion* and supported by Exhibits 1 and 10 to that *Motion*. |
| **Victim ID Number 6192691:** | Through counsel, requests restitution and provides a number of documents and expert reports in support of this request. Counsel has informed the government that he intends to supplement this request with a letter to the Court. Attached as Exhibit 3 (UNDER SEAL). |
| **Victim ID Number 5431204:** | Through counsel, requests future care needs and lost income. Provides two future care plans and supporting documents. The present value of the cost of Plan A is $622,156 to $622,381. The present value of Plan B is $1,340,706 to $1,357,748. Attached as Exhibit 4 (UNDER SEAL). |

---

[1] The government received and encloses two such letters. The first letter indicated that this victim's dental problems began in the early 2000's. After the government noted the date, the victim obtained a second doctor letter more closely connected in time to the prescription of Subsys.

The Court will recall that each of these victims (or their estate) provided compelling statements at Dr. Kapoor's sentencing. At least one of these victims intends to be present on February 4, 2020 and has requested permission to address the Court.

### II. The Requested Restitution Does Not Represent an Improper "Pivot" in the Government's Approach to Restitution.

The government acknowledges that the amount of restitution sought represents a higher figure than the "loss amount" the government used for purposes of the sentencing guidelines. The government disagrees, however, with Defendants' contention that the differing dollar amounts are somehow improper. The government has been clear throughout the sentencing process that the USSG "loss amount" used for purposes of the guidelines calculations was a ***conservative estimate***. The United States explicitly reserved the right to argue an amount of restitution larger than the loss amount. *United States Consolidated Sentencing Memorandum*, ECF 1064, at n. 77 ("The United States reserves the right to seek restitution in excess of the calculated loss amount. *See United States v. Keller*, 236 F. App'x 274, 276 (9th Cir. 2007) (holding that because courts are granted wide latitude in granting restitution, a district court did not err when the loss calculation was lower than the restitution amount); *see also United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010)(tracking similar Circuit Court precedent))." The government relied upon the conservative figure with respect to the guidelines range given that the potential sentences associated with even the conservative figures were substantial.

The government is in a different position, however, with respect to the amount of restitution sought, for two critical reasons. ***First,*** loss calculations are about punishment; restitution findings are about the actual harm caused to victims. As set forth in the government's restitution motion, restitution is mandatory for crimes involving fraud and deceit—including the crimes of which

Defendants were convicted. *See* Doc. 1035 at 1-3. Full and complete restitution to the victims is thus mandatory, which cannot be limited by a prior conservative estimate.

*Second,* where—as here—the underlying criminal conduct involves a conspiracy, the MVRA dictates that victims of the entire conspiracy are entitled to restitution. Thus, contrary to Defendants' assertions, restitution is not limited to victims of the specifically-identified prescribers, but is instead much more expansive. Because restitution and loss calculation are distinct concepts, the fact that the government arrived at different figures does not represent a "fundamental[] inconsisten[cy]," as Defendants allege. (Resp. at 1.)

### A. Past Corporate Resolutions Are Irrelevant to the Restitution Issues Presently Before the Court.

The Defendants contend that the government's settlement agreements with past corporations somehow mean that the government is now attempting to punish them because they are individuals. Not so. Each case presents its own unique facts circumstances, which are considered when reaching resolution of those cases (for example, by plea agreement). Defendants have made no showing whatsoever that the instant case is in any way analogous to cases they cite in which the government has not sought restitution, other than a broad statement that the cases are all "large healthcare fraud cases." Doc. 1121 at 2. Having provided no analysis as to why the Defendants before you are situated similarly to the cases cited in their brief—and indeed, they are not—Defendants' complaints about alleged disparate treatment should be rejected.

### B. The Government's Trial Strategy Is Irrelevant.

The Defendants improperly attempt to limit the government's restitution request to only that restitution consistent with its narrow approach to proving the case at trial. This argument makes no sense. Obviously, the government will elect to present its case to the jury in a particular fashion and, particularly in a conspiracy case, the government may elect not to present the full

5

scope of the crime during the trial for a variety of reasons, including judicial economy.  In preparing to prove the case to the jury, the government focused its evidence on certain practitioners and certain proofs of the crimes—even the streamlined trial lasted from January through May.  Now, having convicted the Defendants following nearly four months of trial, the government properly seeks restitution for all the victims of the Defendants' sweeping crimes.  The Court, particularly because it presided over the entire case, is no doubt capable of making such a determination.  The law, correctly, does not force the government to choose between presenting the full scope of its restitution evidence to the trial jury—substantially lengthening an already long trial—or foregoing full, mandatory restitution.

### III.     Restitution will Be Offset By Any Civil Recoveries.

Should any of the victims, sophisticated or otherwise, recover for the same loss through other avenues, the Clerk shall reduce restitution owed to them accordingly.  18 U.S.C. § 3664(j)(2) (restitution shall be reduced by "any amount later recovered.").  That some of the victims are sophisticated is neither novel nor problematic.  "In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."  18 U.S.C. § 3664(f)(1)(B).[2]  In other words, the restitution amount must reflect the loss, and any later recoveries by victims from other sources would reduce what is paid to them, but then the third-party payors may step into the shoes of the victim(s) and be entitled to those funds.  *See* 18 U.S.C. § 3664(j)(1).

---

[2] It is truly ironic that having reportedly spent in excess of $40 million on their own defense, the Defendants now argue that their victims have too many resources and the Court should not bother making those victims whole.

### IV.   The Execution of the IRC Fraud Involved Far More Prescribers Than the Named Co-Conspirator Practitioners.

Utilization of the IRC was absolutely critical to the success of Insys' criminal enterprise. Under Dr. Kapoor, the salesforce pushed hard to have every prescriber "opt-in" to the services of the IRC. *See e.g.* Trial Tr. 3/06 at 16. In fact, Insys offered free product to many patients if they opted into the IRC and the IRC failed to get their prescription authorized for payment. *See e.g.* Trial Tr. 3/06 at 56. The IRC operators called insurance companies all day every day and lied whenever necessary to get approval for payments. *See e.g.* Trial Tr. 2/14 at 91; *see also* Trial Tr. 2/25 at 100; Trial Tr. 2/22 at 193. Building from its pilot in 2012, and following its formal launch in 2013, the IRC was in fact a smashing success for Insys. The IRC was busy and continued to expand. *See e.g.* Trial Tr. 2/26 at 73. Every prescription written for Subsys anywhere in the United States was, according to Dr. Kapoor's intent and plan, supposed to be sent to the IRC so that the IRC could work its illegal approval-process magic. *See e.g.* Trial Tr. 2/14 at 75-76 and 78-79. No doubt, the conspiracy failed to route the approval of every single prescription to the IRC, but its capture was remarkable. The IRC gave no regard to the name of the prescriber, except as a necessary component of the lying process. Any prescription written by any prescriber anywhere in America was potentially subject to the IRC's involvement. *See e.g.* Trial Exhibits 1973, 1974, 1977, 1978 (IRC call evidence relating to Dr. Goldstein); *see also* Trial Exhibits 1983 and 1981 (IRC call evidence relating to Drs. Gatz and Badday). The IRC evidence was not limited to any particular set of prescribers.

The Defendants, however, ask this Court to draw an arbitrary line between the identified co-conspirator practitioners and reality. This Court should do no such thing. Recognizing the significance of the fraud, the Court should hold the Defendants financially accountable for the true breadth of the conspiracy and the full scope of harm the Defendants caused. The Defendants

7

seemingly concede that the government is entitled to restitution for 10 of the 13 named practitioners but argue that the government has not sufficiently linked Drs. Frey, Khanna and Roque to its restitution request. To the contrary, the linkage is evident: Dr. Frey pleaded guilty in the Middle District of Florida to a number of crimes, including accepting kickbacks in exchange for prescribing Subsys. *See* Plea Agreement of Dr. Michael Frey, *United States v. Michael Frey*, 2:18-cr-71, (M.D.F.L.), Doc. 3 at 29 (agreeing Insys induced him to write Subsys prescriptions using kickbacks from at least September 2013 through September 2015). Drs. Khanna and Roque were opted-in to the IRC by at least January 2013. *See* Exhibit 5, INS4737304 (Insys business record demonstrating Khanna and Roque opted-into IRC by January 14, 2013). This evidence alone is sufficient to prove the IRC fraud touched these prescribers.

Finally, the Defendants argue that by using the word "those" in its Rule 29/33 Order, this Court made an affirmative finding that the IRC fraud <u>only</u> touched those prescribers whom the Defendants bribed. *See Defendants' Response in Opposition*, Doc. 1121 at 9. The Court made no such finding. In fact, such a finding would be inconsistent with the facts and evidence.

**V.     The IRC Lied Almost All Day, Every Day.**

This Court heard countless hours of testimony and evidence regarding the IRC, including recorded phone calls and testimony from Elizabeth Gurrieri and Lindsey Meyer. There can be no doubt that the IRC was permeated with fraud and operated under a common plan to do whatever necessary on each phone call in order to get payment authorized. For example, Elizabeth Gurrieri gave the following testimony:

> Q.     In terms of the government pay programs like Medicare and the private insurer, the commercial plans, some of the things you talked about, the tried and failed medications that you provided that weren't true, the history of cancer that was provided as active cancer, those lies, right?
>
> A.     *Yes.*

8

> Q.  Were those provided to commercial and government paid programs?
>
> A.  *Yes.*
>
> Q.  How often?
>
> A.  *Almost every call.*
>
> Q.  How do you know?
>
> A.  *Because I could hear everyone, and I made them as well.*
>
> Q.  Almost every call from the Insys reimbursement center included lies or misrepresentations?
>
> A.  *Most of them, yes.*

Trial Testimony of Elizabeth Gurrieri, Trial Tr. 02/22 at 223.  IRC Call center operator Lindsey Meyer also testified about the frequency with which she lied to obtain prior authorizations for Subsys:

> Q.  How often -- just characterize for the jury about how often you would use the spiel in a given week at Insys.
>
> A.  *I used it every day.*
>
> Q.  Just to make sure we understand, when I say "use the spiel," how often would you say things on the phone to insurance companies that weren't true to get them to approve Subsys prescriptions?
>
> A.  *I ended up using the spiel on almost every call.*
>
> Q.  Was the spiel accurate when you would use it?
>
> A.  *No.*
>
> Q.  Was what you were saying true or was it misleading?
>
> A.  *It was misleading.*

Trial Testimony of Lindsey Meyer, Trial Tr. 3/22 at 86.

**VI.     It Is Simply Not True that the IRC Stopped Lying In 2014.**

The Defendants, in contradiction to the evidence, argue that by the middle of 2014, the IRC no longer lied about cancer diagnosis. *See* Doc. 1121 at 14. The Defendants cite the testimony of Elizabeth Gurrieri regarding written policies about the "spiel." Yet, the Defendants conveniently ignore that witnesses, including Elizabeth Gurrieri, testified emphatically that the written policy did not comport with the actual practices were separate matters. *See e.g.* Trial Testimony of Elizabeth Gurrieri, Trial Tr. 2/26 at 74 (lying continued despite written policy); *see also* Trial Testimony of Lindsey Meyer, 03/26 at 57 (same; training and practice were to lie regularly to get approvals).

**VII.    Trial Evidence Established That the Majority of Subsys Prescriptions Were Off-Label.**

The Defendants argue that the government has failed to prove to a preponderance that the IRC lied about patients' cancer diagnosis. Ignoring trial evidence and facts they know to be true, the Defendants claim that Medicare *might* have knowingly permitted off-label payment for Subsys if a compendium permitted it. *See* Doc. 1121, n.14. Yet the Defendants know that at no time during the conspiracy (or after) did any compendium permit off-label use of Subsys and so the inference they provide in their footnote is plainly false. *See e.g.* Testimony of Amy Moyer-Carey, Trial Tr. 03/20 at 227-28 ("no off-label uses in a compendia for Subsys."). Trial evidence established this fact and, had the Defendants known otherwise, they certainly would have sought to present such evidence to the jury, and they did no such thing. Trial evidence also supports Petron's observation that a large number of paid prescriptions lacked cancer diagnoses. For example, Elizabeth Gurrieri testified as follows:

> Q. And again, about how often would you see opt-in forms that actually had cancer diagnoses on them?
>
> A. *Very rarely.*

Trial Testimony of Elizabeth Gurrieri, Trial Tr. 02/22 at 211. It was a centerpiece of the racketeering scheme that despite the high number of off-label prescriptions, the IRC lied to give those prescriptions the appearance of being on-label. That Petron corroborated the lack of cancer diagnosis in the past year is entirely consistent with this evidence. It has never been the Defendants' position, nor could it be, that the prescriptions were largely on-label. To the contrary, the Defendants argued in opening statements and throughout the trial that TIRF medications were largely prescribed off-label. *See e.g.* Opening Statement of John Kapoor, Trial Tr. 04/02 at 106-07 (FDA knew TIRFS were largely being used off-label when they approved Subsys).

### VIII. The Trial Evidence Plainly Established That It Mattered Where a Prior Authorization Call Originated.

Ignoring significant and repeated trial evidence, the Defendants argue that it is not clear that Medicare would not have approved requests for prior authorization had Medicare known the request originated at Insys. This argument lacks merit. **First,** the Defendants claim that somehow the non-government witnesses that testified at trial, including Moyer-Carey and Schenk, were not competent to testify on this topic. Yet the Defendants raised no such argument in their plethora of motions *in limine* or at trial. **Second,** the Defendants argue now what they did not at trial—that IRC caller language like "on behalf of" somehow cures the lies the IRC told the insurers. Not so. The testimony at trial was consistent, clear and credible—Medicare requires a prescriber supporting statement and has very stringent rules regarding patient designated authorized representatives. *See e.g.* Trial Tr. 03/21 at 62. Finally on this point, the Defendants argue that the government is condemning the use of third-party call centers. That is not the issue or the point.

The issue here, and the evidence here, is that the call center at Insys was setup and operated in a fraudulent manner designed to lie to insurers on a daily basis. This Court need not decide whether there might be other lawful, or even unlawful, call center operations happening in the United States.

### IX. 80.9% of All Subsys Prescriptions is a Conservative Estimate of the Amount of Subsys Prior-Authorizations Handled by the IRC.

Defendants challenge the Government's position that 80.9% of all Subsys claims were processed by the IRC, arguing that the Government's figure overstates the number of prescriptions that passed through Insys' fraudulent call center. (Resp. at 15-17.) Defendants' position is belied by the facts, which demonstrate that the 80.9% figure is likely a conservative estimate of the number of Subsys prescriptions that passed through the IRC.

Analysis by FBI Forensic Accountant Bridget Horan demonstrates that in January 2013, approximately 80.9% of Subsys prescribers opted-in to the IRC's fraud center. In arriving at this figure, Ms. Horan reviewed the Relay Reports for January 2013 and determined there were 272 unique Subsys prescribers. Ms. Horan further reviewed an Insys Powerpoint presentation slide titled "Impact of the IRC" (Trial Exhibit 492), which showed that 220 of those 272 prescribers— or 80.9%— were enrolled in the IRC as of January 2, 2013. *See* excerpt of Trial Exhibit 492 at 96, attached as Exhibit 6 (excerpted). Thus, in January 2013, 80.9% of Subsys prescribers had opted-in to the IRC.

Defendants note that the 80.9% rate represents "the percentage of *prescribers* who opted into the IRC, not the percentage of *prescriptions* processed by the IRC." (Resp. at 16) (emphasis in original). On this point, the government and Defendants agree. But this fact does not help Defendants' argument—given that Defendants' conspiracy specifically targeted the top Subsys prescribers and successfully urged those prescribers to use IRC, the percentage of total

prescriptions that passed through the IRC was almost certainly much higher than the percentage of individual prescribers who used the center.

Given the nature of the conspiracy, and the evidence adduced at trial regarding aggressive recruitment of high decile prescribers to the IRC, it is reasonable for this Court to find that the top Subsys prescribers in the United States utilized Defendants' fraud center, and that the 80.9% utilization rate on which the government relies is reasonable.

### X.     The Medicare Restitution Need Not Be Offset.

Next, Defendants argue that the government must prove the amount of each paid Subsys claim that would have otherwise been incurred by that payor. This imposes too high a bar and is inconsistent with the law. The government has put forth credible evidence to prove to a preponderance, at least, that but for their significant crimes, Medicare would not have paid the claims it paid. The Defendants ask this Court to speculate that the losses would have happened anyway. The Court need not entertain this argument. At trial, the Defendants attempted to limit their racketeering activity to a so-called "switch program" involving the transition of each patient from a competitor TIRF to Subsys. *See e.g.* Opening Statement of John Kapoor, Trial Tr. 04/02 at 99. This argument was disproven by the government and rejected by the jury. The Defendants deprived the payers the ability to consider what medication to cover, if any, and but for the Defendants' crimes, Medicare would not be out this money. First, the evidence at trial proved to a preponderance, at least, that patients received TIRF medication at times when it was medically unnecessary, at dosages they did not need, and in a number of dosages they did not need. Second, the other TIRF medications were subject to the same type of on-label prior authorization policies as Subsys. *See e.g.*, Testimony of Amy Moyer-Carey, Trial Tr. 03/21 at 237 (same rules for entire TIRF class). Third, any TIRF prescription would require a prescriber supporting statement, and

so the IRC fraud would impact those claims just the same. Finally, even if the Defendants were entitled to a reduction of the but-for harm, which they are not, no reduction would be available for non-TIRF medications.

XI. **Commercial Insurers**

In response to the Defendants' oppositions, many commercial insurers have supplemented their restitution requests. The supplemental pleadings are attached as Exhibits 7-12 (8-10 are filed Under Seal). The government's arguments above also apply to the claims of the third-party payers and those are incorporated here.

XII. **Summary**

In sum, the Court should enter the following restitution amounts:

| Patient Victim (VNS Identifier) | Amount Requested |
|---|---|
| 5431212 | $42,839.70 |
| 6002800 | $48,816 |
| 6192691 | Victim to submit additional letter to the Court |
| 5431204 | $622,156-$622,381 or $1,340,706-$1,357,748 |
| 5632738 | $1,140.00 |
| 6002801 | $1,231.41 |
| 6002802 | $965.00 |
| 5431216 | $2,005.56 |
| 5431207 | $3,041.23 |

| Government Payor | Amount Requested | Payor Methodology | Payor Supporting Evidence |
|---|---|---|---|
| Medicare | $136,768,059 | Amount paid for Subsys prescribed to non-cancer patients and payment made by Medicare following request from the IRC | Sworn Declaration of Michael J. Petron with detailed analysis and supporting data |

| Commercial Payor | Amount Requested | Additional Payor Supporting Evidence | Reply Ex. No. |
|---|---|---|---|
| **Aetna** | $12,760,063.00 [revised] | Declaration and supporting exhibits | 12 |
| **Anthem Blue Cross Blue Shield** | $20,714,504.00 [revised] | Memorandum of law | 7 |
| **Cigna** | $13,467,942.56 | No revision | n/a |
| **Caremark** | $76,024,612.98 | Declaration and supporting spreadsheets | 10 |
| **Silverscript** | $7,983,771.48 | Declaration and supporting spreadsheets | 9 |
| **Horizon Blue Cross Blue Shield [NJ]** | $2,088,066.00 | Response in support of restitution request and supporting declaration | 11 |
| **United HealthCare Services** | $28,318,856.50 [revised] | January 28, 2020 letter sent by counsel | 8 |

XIII. **Conclusion**

WHEREFORE, the Court should enter restitution orders equal to the total amount of actual harm caused by the conspiracy and should, at a later date, reach any issues of apportionment and/or manner and method of payment.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Date: January 28, 2020          By:   /s/ David G. Lazarus
DAVID G. LAZARUS
ALEXANDRA W. AMRHEIN
K. NATHANIEL YEAGER
FRED M. WYSHAK
Assistant United States Attorneys
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel. No. (617) 748-3373
Fax No. (617) 748-3972
David.Lazarus2@usdoj.gov